FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUN 3 0 2004

LUTHER D. THOMAS, Clerk

By: _____ Deputy Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

Jimmy R. Woods, Individually and on
behalf of a class of all others similarly
situated,

                          Plaintiff,

        vs.

Southern Company, Southern Company
Services, Inc., Employee Savings Plan
Committee, Ellen N. Lindermann, W.
Dean Hudson, Christopher C. Womack,
Ronnie R. Labrato, Pension Fund
Investment Review Committee, Merrill
Lynch Trust Company, FSB and
Unknown Defendants 1-100,

                        Defendants.

Civil Action No.

**1 04 CV 1912**

**CAP**

## COMPLAINT FOR VIOLATIONS OF ERISA

Plaintiff Jimmy R. Woods ("Plaintiff"), a participant in the Southern
Company Employee Savings Plan (the "Plan"), on behalf of himself and a class of
all others similarly situated, alleges as follows:

### I. INTRODUCTION

1.    This is a class action brought pursuant to § 502 of the Employee
Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Plan
fiduciaries.

2.    The lawsuit concerns the Southern Company Employee Savings Plan

FORMS RECEIVED
Consent To US Mag.
Pretrial Instructions
Title VII Ntc

1

("Plan"), a retirement plan established and sponsored by Southern Company Services, Inc. ("Southern Services") which is a wholly-owned subsidiary of Southern Company ("Southern" or the "Company").

3.    The lawsuit is brought on behalf of the Plan and the participants and beneficiaries of the Plan for losses to the Plan during the Class Period (April 2, 2001 through the present) caused by the imprudent investment of Plan assets in Mirant stock.

4.    The Plaintiff was an employee of Southern Company  and a participant in the Plan.  During the Class Period, the Plan held shares of Mirant Corporation ("Mirant") stock, and Plan participants, including Plaintiff, were provided with an interest in such shares through a sub-account, known as the participant's "Mirant Account."

5.    Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan from the Defendants' failure to exercise the required skill, care, prudence, and diligence in administering the Plan and investing the assets of the Plan.

6.    Specifically, Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their fiduciary duties in violation of ERISA by: (1) failing to prudently and loyally manage the Plan's investment in Mirant stock; (2) failing to provide participants with complete and accurate information regarding Mirant sufficient to advise participants of the true risks of investing their retirement

savings in Mirant stock; (3) failing to properly monitor the performance of persons who were appointed by Defendants to serve as Plan fiduciaries and to provide such persons with complete and accurate information regarding Mirant; and (4) failing to undertake any action to protect the Plan from losses as a result of the Plan's investment in Mirant stock as a result of conflicts of interest possessed by Defendants regarding Mirant.

7.     As more fully explained below, during the Class Period, Defendants imprudently permitted the Plan to hold tens of millions of dollars of Mirant stock, which the Plan acquired when Mirant was spun-off from its parent company, Southern.  The Defendants did so despite the fact that they knew or should have known that Mirant was engaged in highly risky, unsustainable and illicit energy trading and accounting practices, was being seriously mismanaged, faced dire circumstances and, as a result, clearly was not an appropriate investment option for a participants' retirement assets.

8.     Prior to Mirant's downward spiral into bankruptcy, Mirant common stock holdings represented one of the largest single investments of the Plan.  As of December 31, 2001, the Plan held in excess of *$358 million* of Mirant stock.  Now, the stock is essentially *worthless*.  Thus, the Defendants' fiduciary breaches caused the Plan to suffer massive losses.

9.     This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. 1109, and 1132(a)(2).   In addition, under § 502(a)(3) of

ERISA, 29 U.S.C. § 1132(a)(3)), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

10.    Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for plan-wide relief for breaches of fiduciary duty, Plaintiff brings this as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period.

11.    Because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief. In addition, as discussed in more detail below, the Plan Documents are inconsistent in various respects regarding the identity and scope of the fiduciary duties of the Plan fiduciaries. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will to the extent necessary and appropriate amend his Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## II.  JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

13.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or

some Defendants reside and/or transact business in this district.

### III. PARTIES

14.   ***Plaintiff Jimmy R. Woods*** ("Plaintiff").   Plaintiff worked for Southern and was a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7).  Plaintiff owned an interest in the Mirant stock held by the Plan in his Mirant Account during the Class Period.

15.   ***Defendant Southern Company***   Southern is an Atlanta-based company with its principle place of business located within this judicial district at 270 Peachtree Street, N.W., Atlanta, Georgia 30303.  According to its filings with the Securities and Exchange Commission ("SEC"), the Company is a holding company managed by a core group of executive officers and its Board of Directors.

16.   As discussed in more detail below, Southern is a Plan fiduciary in that it exercised responsibility for, among other things, the management of the Plan's assets, as well as the appointment of Plan fiduciaries, including the Employee Savings Plan Committee members ("Plan Committee").  Thus, Southern exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

17.   ***Defendant Southern Services***   As previously stated, Southern Services is a wholly-owned subsidiary of Southern with its principle place of business at 270 Peachtree Street, N.W., Atlanta, Georgia 30303.  According to the Company's SEC filings, Southern Services is the system service company that provides specialized services to Southern and its subsidiaries at cost.  Amongst the

5

numerous services it provides are general and design engineering, purchasing, accounting and statistical analysis, finance and treasury, tax, information resources, marketing, auditing, insurance and pension administration and human resources management.   Southern Services has the third largest employee base in the Southern "family."

18.   According to the Company's Form 5500 filed with the Department of Labor for year ending December 31, 2001 ("2001 Form 5500"), Southern Services is the Plan's Sponsor.  Consequently, Southern Services is the Sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

19.   As discussed in more detail below, Southern Services is a Plan fiduciary in that it exercised responsibility for, among other things, the management of the Plan's assets, as well as, through its Board of Directors, the appointment of Plan fiduciaries, including the Trustee.  Thus, Southern Services exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

20.   ***Defendant Southern Services Board of Directors***   As discussed in more detail below, the Southern Services' Board members were fiduciaries of the Plan because they were responsible for appointing, removing, and, thus, monitoring the Trustee.  In addition, Southern Services acted through its Board in carrying out its plan-related fiduciary duties and responsibilities, and, thus, Southern Services' Board members were fiduciaries to the extent of their personal exercise of such responsibilities.   Thus, Southern Services' Board members

exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

21.     Plaintiff does not currently know the identity of the individuals who served on Southern Services' Board during the Class Period.  Once their identity is established through discovery, Plaintiff will seek leave to amend to name these individuals under their true names.

22.     Collectively, the members of Southern Services' Board of Directors are hereafter referred to as the "Director Defendants."

23.     ***Plan Committee Defendants***   The "Southern Company Savings Plan Committee" ("Plan Committee") is listed in the Company's 2001 Form 5500 as the "Plan administrator."   The Plan Committee is made up of the Vice President, System Compensation and Benefits, of the Southern Company; Senior Vice-President, Human Resources of the Southern Company; and Comptroller of the Southern Company.  As discussed in more detail below, the Committee members were fiduciaries during the Class Period because the Plan Committee is the Named Fiduciary of the Plan, and, in this capacity, the Plan Committee members exercised responsibility for administering, controlling, and operating the Plan, and communicating with participants regarding Plan assets.  Thus, the Plan Committee members exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

24.     Plaintiff does not currently know the identity of ***all*** persons who served on the Plan Committee during the Class Period.  However, based on

7

publicly filed documents, Plaintiff has identified the following Plan Committee members:

      a.     **Defendant Ellen N. Lindermann** ("Lindermann")  For at least a portion of the Class Period, Lindeman served as the Committee's Chairperson;

      b.     **Defendant W. Dean Hudson** ("Hudson")  For at least a portion of the Class Period, Hudson, who was the Company's Comptroller and Chief Accounting Officer, served on the Plan Committee;

      c.     **Defendant Christopher C. Womack** ("Womack")  For at least a portion of the Class Period, Womack, who was the Company's Senior Vice President, Human Resources, and Chief People Officer, served on the Plan Committee;

      d.     **Defendant Ronnie R. Labrato** ("Labrato")  For at least a portion of the Class Period, Labrato, who was the Vice President, Chief Financial Officer and Comptroller, served on the Plan Committee;

      e.     **Unknown John Doe Defendants 1-10** are members of the Plan Committee and persons designated by such members to carry out pertinent responsibilities of the Committee during the Class Period whose identities are currently unknown.  Plaintiff will seek leave to amend as discovery progresses;

    25.    **Southern Company's Pension Fund Investment Review Committee Defendants** ("Investment Committee" or "PFIRC")  As discussed in more detail below, the Investment Committee Defendants were fiduciaries during the Class Period because, among other fiduciary powers and actions, they possessed and

exercised responsibility for prudently selecting investment fund options for the Plan. Thus, in this capacity, the Investment Committee members exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Plaintiff currently does not know the identity of the Investment Committee members during the Class Period. Therefore, such persons are named herein as *unknown John Doe Defendants 11-20.* Plaintiff will seek leave to amend as discovery progresses.[1]

26. *Merrill Lynch Trust Company, FSB* ("ML")  ML served as the Trustee for the Southern Plan during the Class Period. As discussed in more detail below, the Plan Documents and Trust Agreement conflict with one another with respect to the scope of ML's authority and control over Plan assets. Consequently, the extent to which ML exercised authority or control respecting the management or disposition of Plan assets is currently an issue of fact. In any case, ML was a fiduciary for the Plan in that it exercised authority and control with respect to the management or disposition of the Plan's assets.

27. ML also acted as the Plan's investment manager during the Class Period. Consequently, ML was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A)(ii).

---

[1] Plaintiff cannot currently ascertain who appointed the members of this committee but believe that it was Southern's Board of Directors. Once the discovery process establishes who appointed these individuals, Plaintiff will seek leave to amend to name those individuals with appointment power as Defendants.

## IV. **THE PLAN**

### A.   **Plan Operation.**

28.   According to the Company's Form 11-K for year ending 2002 ("2002 11-K") filed with the SEC, the Plan is a "defined contribution plan" which is administered by the Plan Committee.

29.   The Plan, according to the Company's 2002 11-K, covers substantially all employees, certain former employees, and retirees of the Company's subsidiaries.[2]

30.   According to the Plan's master documents, "[t]he purpose of the Plan is to encourage *employee thrift*, to create added employee interest in the affairs of The Southern Company, to provide a means for becoming a shareholder in The Southern Company, to supplement *retirement and death benefits*..." *See* The Southern Company Employee Savings Plan as Amended and Restated Effective January 1, 2002 ("Southern Plan Document") at Art. I, (emphasis added);[3] *see also* Employee Savings Plan (ESP) Summary Plan Description, dated July 15, 2002 ("SPD" or "Prospectus/SPD")[4] (stating that the "Company offers the Employee

---

[2] These subsidiaries include Alabama Power Company, Georgia Power Company, Gulf Power Company, Mississippi Power Company, Savannah Electric and Power Company, Southern Communications Services, Inc., Southern Company Energy Solutions LLC, Southern Company Services, Inc., and Southern Nuclear Operating Company, Inc. As more fully explained herein, in April 2001, Southern Energy Resources, Inc. ("Southern Energy Resources") was removed as a subsidiary and, therefore, its participants were no longer eligible to participate in the Plan. Southern Energy Resources was the predecessor-in-interest to Mirant Services, the sponsor of Mirant's retirement savings plans.

[3] The Southern Plan Document is attached hereto as Ex. 1.

[4] The SPD is attached hereto as Ex. 2.

Savings Plan to *encourage you to save*, *to provide income for your retirement*, and as a way to buy Company Stock.") (emphasis added).

31.     Generally, under the Plan, there are three sources of contributions to participants' Plan accounts: (1) Elective Employer Contributions, by which participants elect to have their salary reduced by one to sixteen percent and such reduction contributed to their Plan accounts; (2) Voluntary Participant Contributions, by which participants can elect to contribute additional amounts to their Plan accounts; and (3) Employer Matching Contributions, by which the Board of Directors of Southern Services, in its "absolute discretion," determines the matching amount to be contributed by the Company, and causes such amount to be contributed to participants' Plan accounts.

32.     The Plan Documents provides that participants have the ability to direct the investment of their Elective Employer and Voluntary Participant Contributions into one or more of the Investment Funds provided under the Plan and selected by the Investment Committee, including the Southern Company Stock Fund.

33.     The Plan Documents further provide that participants have no choice regarding the investment of Employer Matching Contributions.   Instead, such contributions are invested in the Company Stock Fund.

**B.      Plan Ownership of Mirant Common Stock.**

34.     Mirant was spun-off from the Company on April 2, 2001 with each shareholder of Company stock receiving a fractional share of Mirant stock.

Consequently, the Plan received a significant amount of Mirant stock in proportion to the amount of Southern Stock held by the Plan.  This newly acquired Mirant stock was held by the Plan in a "Mirant Stock Fund."   *See* Southern Plan Document § 8.8.

35.    The Southern Company Employee Stock Ownership Plan[5] ("Southern ESOP") is a separate plan that employees of Southern and its subsidiaries are eligible to participate in.  All Mirant stock that was acquired by this Plan through the Mirant spin-off was immediately transferred over to the Plan.  Shares of the Mirant stock acquired by the Plan were held in a "Participant's 'Transferred ESOP Account.'"  *See* Southern Plan Document § 9.1.  This account was a subaccount of the Mirant Stock fund. *See id.* at §§ 9.1(d), 8.8.

36.    Consequently, participants in the Southern ESOP became participants in the Plan to the extent that they held Mirant stock in the "Transferred ESOP Account." *See* Southern Plan Document § 11.1.

37.    Participants were permitted to transfer funds out of the Mirant Stock Fund and into any other investment fund offered by the Plan. *Id.* at § 8.8. However, Plan participants were not permitted to make any further investments into the Mirant Stock Fund nor reinvest funds back into the Mirant Stock Fund once transferred out of the Fund.  *Id.*  In addition, Plan participants had five years to transfer all of their funds out of their Mirant Stock Fund account.  The Plan specifically stated "[I]n no event shall the Mirant Stock Fund remain as an

---

[5] *See* Southern Company Employee Stock Ownership Plan, effective January 1, 2002, § 6.10.

Investment Fund under the Plan later than . . . the five year anniversary of the date Mirant Stock is first held in the Mirant Stock Fund.[6] *Id.*

38.    As noted above, as of December 31, 2001, the Mirant Stock Fund contained over *$358 million* in Mirant stock, which represented over 13 percent of the total assets of the Plan.  The value of Mirant stock plunged over 99 percent during the Class Period.  Yet, despite the plunge, clear evidence of the serious mismanagement of Mirant, and the deteriorating financial condition of the Company, the fiduciaries took no action to divest the Plan of Mirant stock. Currently, the stock is virtually worthless.  However, prudent, diligent, and timely action by the responsible Plan fiduciaries could have prevented millions of dollars of Plan losses.

**C.    Recent Revisions to the Plan**

39.    According to a series of notices sent to Plan participants, the Plan was revised to allow a "new Self-Directed Option" ("SDO") (this change apparently took effect in December 2002).  The SDO gave participants "more investment choices" by providing access to individual stocks and more than 700 mutual funds. Notably one of the stocks that the SDO gave participants access to was Mirant stock.  However, Plan participants could not acquire Southern stock via the SDO.

40.    In a letter to Plan participants dated September 3, 2003 from Southern's Human Resources department, Plan participants were informed that (i)

---

[6]    The SPD stated that the Mirant Stock Fund was to remain "an investment option under the Plan" until June 30, 2006.

Mirant had filed for bankruptcy, and (ii) Mirant stock was delisted from the New York Stock Exchange.[6] Plan participants were also notified that they retained the right to hold or sell their shares of Mirant stock and that ML had waived the commissions it charged on sales of Mirant stock within the Plan. Absent from this notification was the fact that the Mirant plans[7] had liquidated their holdings of Mirant stock on July 22, 2003. Plaintiff believes and alleges that, to date, the Plan still holds Mirant stock.

## V. CLASS ACTION ALLEGATIONS

41. Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between April 2, 2001 and the Present (the "Class Period") and whose accounts held Mirant stock.

42. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

---

[6] *See* September 3, 2003 letter to Plan Participants, attached hereto as Ex. 3.

[7] These plans were the Mirant Services Employee Savings Plan (the "Mirant Savings Plan") and Mirant Services Bargaining Unit Employee Savings Plan (the "Mirant Bargaining Unit Plan") respectively. These were the plans that were created when employees of Southern Energy Resources became ineligible to participate in the Southern Company's Plan. *See* n2 *supra.*

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

b.     whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

c.     whether Defendants violated ERISA; and

d.     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

44.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the

Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

47.   Class action status is also warranted under the other subsections of Rule 23(b) because:  (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VI.  **DEFENDANTS' FIDUCIARY STATUS**

48.   *Named Fiduciaries*  ERISA requires every plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).

49.   *De Facto Fiduciaries*  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions.   ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i) (stating that a person is a fiduciary "to the extent...he exercises any discretionary authority or discretionary control respecting management of such

plan or exercises any authority or control respecting management of disposition of its assets...").

50.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its participants under ERISA in the manner and to the extent set forth in the Plan Document, through their conduct, and under ERISA.   As fiduciaries, Defendants were required by ERISA §§ 404(a)(1), 29 U.S.C. §§ 1104(a)(1) to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

51.    Plaintiff does not allege that each Defendant was a fiduciary with respect to *all* aspects of Plan management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

52.    In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty

described below.

53.    Other than with respect to the Trustee, Merrill Lynch, instead of delegating fiduciary responsibility for the Plan to external service providers, Southern chose to comply with the requirements of § 402(a)(1) by internalizing the fiduciary function as set forth below.

## A.    Southern & Southern Services.

54.    The Plan documents conflict with respect to the scope of Southern Services's fiduciary responsibilities.  Specifically, the Plan Document states that the Trustee "shall have sole responsibility for the administration of the assets of the Plan as provided in the Trust Agreement, except to the extent that an investment advisor [is] appointed..."  Southern Plan Document § 13.14 (emphasis added).[8] The Plan Document, thus, suggests that Merrill Lynch possessed sole responsibility with respect to the control and management of the assets of the Plan, including the Mirant Stock Fund.

55.    On the other hand, according to the Trust Agreement, the assets are managed by the "Named Investment Fiduciary," "named or provided for in the Plan as responsible for the investment and management of the Plan assets to the extent provided for in this Trust Agreement."  Trust Agreement between Merrill Lynch Trust Company, FSB as the Trustee and Southern Company Services, Inc.

---

[8] Upon information and belief, no such investment advisor was appointed with respect to the Mirant Stock Fund.

as the Employer ("Trust Agreement") at § 2.01.[9]  The Trust Agreement further sets forth that in the event that a Named Investment Fiduciary is "not named or provided for in the Plan or if so named or provided for, is not then serving, ***the Employer shall be the...Named Investment Fiduciary....***" Employer is defined as Southern Services. *See* Trust Agreement at 1.

56.    Moreover, the Trust Agreement does not identify the Trustee as the Named Investment Fiduciary.   Instead, the Trust Agreement states that the Employer shall identify the Named Investment Fiduciary in writing to the Trustee, Trust Agreement § 2.02, and that the Trustee "shall invest the Trust Fund ***as directed*** by [among others] the Named Investment Fiduciary...." *Id.*

57.    To the extent that the no person or committee was identified in writing to the Trustee as the Named Investment Fiduciary or to the extent that the Southern Services has retained a portion of the investment management and evaluation authority over the assets of the Plan, then, pursuant to the language of the Trust Agreement as set forth above, Southern Services functioned in this fiduciary capacity.  Therefore, Southern Services exercised responsibility for evaluating the merits of the Plan's investments, determining the suitability of the investments for participants' retirement savings, eliminating inappropriate and unduly risky investments, directing the Trustee regarding the investment of Plan assets, and, generally, ensuring that the Plan's assets were invested prudently.  Thus, Southern Services exercised authority and control with respect to the management and

---

[9] The Trust Agreement is attached hereto as Ex. 4.

disposition of the Plan's assets.

58.    In addition to its potential responsibility for managing the assets of the Plan, Southern Services possessed and exercised fiduciary discretion and authority over the Plan. Southern Services, through its Board of Directors, who acted on behalf of Southern Services, was responsible for appointing, removing, and, thus, monitoring, the Trustee.  Further, to the extent that other Defendants acted in the course and scope of their employment with Southern Services in the conduct giving rise to liability hereunder, Southern Services is liable for the actions of such other Defendants under the doctrine of *respondeat superior*.

59.    Southern was responsible for appointing, removing, and, thus, monitoring the Plan Committee members.  Further, Southern at all applicable times, exercised control over the activities of its officers and employees that performed fiduciary functions with respect to the Plan, including the Plan Committee, and could hire, terminate, and replace such employees at will.  Thus, Southern is responsible for the activities of its officers and employees through principles of agency and *respondeat superior* liability.

60.    Consequently, Southern and Southern Services were fiduciaries of the Plan in that they exercised discretionary authority or management of the administration of the Plan and/or exercised authority or control over the Plan's assets.

**B.    Director Defendants.**

61.    As stated above, Southern Services relies on its Board of Directors to

carry out its Plan-related fiduciary functions. As a result, the Director Defendants are functional fiduciaries of the Plan under ERISA. However, the Board's role is not purely derivative of Southern Services. To the contrary, the Board itself was assigned and exercised fiduciary responsibility for the Plan and Plan assets. Specifically, Southern Services' Board exercises responsibility for the appointment, removal, and, thus, monitoring of the Trustee.

62.    Consequently, the Director Defendants were fiduciaries of the Plan in that they exercised discretionary authority or management of the administration of the Plan and/or exercised authority or control over the Plan's assets.

**C.    Plan Committee Defendants.**

63.    According to the Plan documents, "the Committee shall be deemed the administrator of the Plan as the term 'administrator' is defined in ERISA, and the Committee shall be, with respect to the Plan, a ***named fiduciary*** as that term is defined in ERISA." Southern Plan Document at § 13.5 (emphasis added). The Plan Committee was tasked with the "duty to administer the Plan" and had the "discretionary authority, power, and duty to take all actions and to make all decisions necessary or proper to carry out the Plan and to control and manage the operation and administration of the Plan." *Id.* at § 13.4. As such, the Plan Committee Defendants possessed the authority to take action to protect the Plan against losses due to the Plan's imprudent investment in Mirant stock. Furthermore, the Plan Committee was responsible for communicating with participants, and providing participants with information and materials required by

the Plan and ERISA. *See* Plan Document § 13.9.

64.    Consequently, the Plan Committee Defendants were fiduciaries of the Plan in that they exercised discretionary authority or management of the administration of the Plan.

**D.    Investment Committee Defendants.**

65.    The Plan Document states that "[t]he Investment Funds shall be selected from time to time by the Pension Fund Investment Review Committee of the Southern Company System."[10]  Plan Document § 8.1.  In connection with its responsibility for selecting Plan investments, the Investment Committee Defendants possessed and exercised authority to evaluate the merits and performance of the Plan's investment options, and under appropriate circumstances, eliminate options that were unduly risky, inappropriate, and imprudent, including the Mirant Stock Fund.  Indeed, the SPD specifically states that "investment options previously listed will change upon recommendation of Southern Company's Pension Fund Investment Review Committee (PFIRC)."

66.    Upon information and belief, the "Named Investment Fiduciary" listed as a named fiduciary of the Plan in the Trust Agreement (*see* Trust Agreement § 2) is the Pension Fund Investment Committee described in the Plan. To this extent, the Investment Committee exercised responsibility for evaluating the merits of the Plan's investments, determining the suitability of the investments

---

[10]    As previously stated, Plaintiff believes that Southern also appointed the members of the Investment Committee.  Once the discovery process determines exactly who appointed the Investment Committee, Plaintiff will seek leave to amend to add such culpable parties.

for participants' retirement savings, eliminating inappropriate and unduly risky investments, directing the Trustee regarding the investment of Plan assets, and, generally, ensuring that the Plan's assets were invested prudently. Thus, Investment Committee exercised authority and control with respect to the management and disposition of the Plan's assets.

67.   Consequently, the Investment Committee Defendants were fiduciaries of the Plan in that they exercised discretionary authority or management of the administration of the Plan and/or exercised authority or control over the Plan's assets.

**E.   Trustee Defendants.**

68.   ML served as the Trustee for the Plan, and in the Trust Agreement acknowledges its status as a Fiduciary of the Plan. *See* Trust Agreement § 6.03. As discussed above, the Plan documents conflict with respect to the identity of the fiduciary with primary responsibility for controlling and managing the Plan assets, including the Mirant Stock Fund.

69.   To the extent that ML was solely responsible for the management of Plan assets, ML exercised authority and control over the Plan's assets, including the Mirant Stock Fund.

70.   Furthermore, even if Southern Services, or some other person, committee, or entity functioned as the Named Investment Fiduciary, and ***directed ML*** with respect to the investment of Plan assets, ML, nonetheless, is a fiduciary and possessed important authority and control in this case.

71.    Trustees that invest assets pursuant to the direction of other Named Fiduciaries are required to act prudently based on what they know or should know about the investments at issue, and disregard directions that are contrary to the Plan or ERISA.  *See* ERISA § 403(a)(1), 29 U.S.C. § 1103(a)(1) (providing that a trustee that acts pursuant to the direction of a named fiduciary "shall be subject to *proper* directions of such fiduciary which are made in accordance with the terms of the plan and which are *not contrary* [to ERISA]") (emphasis added); *see also* ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) (providing fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]").

72.    The Trust Agreement reflects this requirement in that it states: "*Except as required by ERISA*, the Trustee shall invest the Trust Fund as directed by the Named Investment Fiduciary, an Investment Manager or a Plan participant or beneficiary, as the case may be...." Trust Agreement § 5.01. Thus, in this case, even if subject to the direction of other Named Fiduciaries, ML's responsibility to follow the directions of others was *subject* to ERISA's requirements. Accordingly, ML had discretion under ERISA to disregard investment directions that it knew or should have known were contrary to ERISA, such as to make or maintain investment in Mirant stock when it no longer was a prudent investment option for the Plan, or under circumstances that indicated that the Plan's fiduciaries failed to properly investigate the prudence of maintaining the Plan's investment in Mirant

stock.

73.    In addition, whether as the primary investment fiduciary, or as trustee that acted pursuant to the direction of other Named Fiduciaries, the Trust Agreement provides ML with other important discretionary authority, including the express authority to "limit the categories of assets in which the Trust Fund may be invested." Trust Agreement § 5.01. Thus, ML had the authority to eliminate the Mirant Stock Fund as an investment option within the Plan. In addition, the Trust Agreement states that ML is authorized and empowered "generally to do all other acts which the Trustee deems necessary or appropriate for the protection of the Trust Fund." *Id.* § 7.02(d), which, as discussed in more detail below, necessarily included divesting the Plan of its imprudent holdings of Mirant stock.

74.    Consequently, whether discovery establishes that ML was solely responsible for the management of Plan assets, or subject to the direction of other Named Fiduciaries with respect to the assets, ML was a fiduciary of the Plan in that it exercised discretionary authority with respect to the Plan and Plan assets, and authority and control with respect to the management and disposition of the Plan's assets.

75.    Irrespective of whether ML was a directed trustee or retained discretion over the administration of the Plan, ML was a fiduciary of the Plan in that it served as the Plan's investment manager. As previously stated, this alone confers fiduciary status on ML in that it rendered investment advice for a fee. *See* ERISA § 3(21)(A)(ii).

## VII. MIRANT'S RISKY AND ILLICIT PRACTICES, AND COLLAPSE

### A. Mirant Stock was an Imprudent Investment for the Plan.

#### 1. The Mirant Spin-off.

76.     As detailed below, the Mirant Corporation was the (dead) end-result of a corporate divestment strategy undertaken by Southern, Mirant's former parent.

77.     In the early 1980's, as a vehicle for circumventing government regulation, Southern Company created Southern Electric International ("Southern Electric"), a wholly-owned, unregulated subsidiary, for the purpose of, among other things, engaging in energy trading.  In the early 1990's, Southern Electric changed its name to SEI Holding Inc.  The entity changed names once again in 1997, this time to Southern Energy Inc. ("SEI").  The Company maintained the same business operations, including energy trading, through its numerous appellations.[11]

78.     As the 1990s drew to a close, Southern saw an opportunity to sever its ties with its increasingly risk-laden, unregulated, subsidiary dealing in the highly volatile energy trading market by spinning off SEI.

79.     On September 27, 2000, Southern commenced an Initial Public Offering ("IPO") during which it sold 19.7% of its ownership interest in SEI.  The IPO closed on October 3, 2000, generating total proceeds of approximately $1.81 billion.  According to the Company's Form 10-K for fiscal year 2001, filed with

---

[11] As noted above, Southern Energy Inc. is the predecessor-in-interest to Mirant Corporation and Southern Energy Resources is the predecessor-in-interest to Mirant Services LLC, the sponsor of the various retirement plans offered to Mirant employees.

the SEC on March 25, 2002, the Company "recorded a $560 million increase in paid-in capital with no gain or loss to be recognized."

80.     Three months later, SEI announced that it would become the "Mirant Corporation." Public trading in the stock of this newly-named entity was to commence on the NYSE on January 22, 2001 under the symbol "MIR." Notably, at the time Mirant shares began trading on the NYSE, Southern still owned more than 80% of the Mirant entity.

81.     On April 2, 2001, Southern completed its planned Mirant spin-off by distributing its remaining 80.3 percent ownership in the company to Southern shareholders, with holders of Southern stock receiving 0.397614 shares of Mirant for every share of Southern they owned.

82.     Notwithstanding the spin off, Southern and Mirant remained closely related.  Among other connections, numerous key executive positions were filled with employees who formerly worked for Southern.  In addition, on its website, and in Company communications, Southern touted the performance of Mirant, the benefits of the Mirant spin off, and the ongoing relationship between Mirant and Southern in the interim period during which time Southern remained the eighty percent owner of Mirant.  Among other details, Southern explained that it would continue to provide "financial, accounting, engineering, and other services" to Mirant until the spin off was completed. Information Statement Spin Off of Mirant Corporation, March 6, 2001 ("Mirant Information Statement").[12]  Further, in the

---

[12] The Mirant Information Statement is attached hereto as Ex. 5.

updates sent to Plan participants, Southern directed Plan participants to Mirant's website to obtain additional information regarding Mirant.

### 2.   Mirant, the United Kingdom, and the CaliforniaEnergy Market.

83.   Two of the primary purported profit centers for Mirant were its budding ventures in the United Kingdom ("U.K.") and, to a much greater extent, its burgeoning energy trading business, and area of great speculation and supposed promise during the end of the last and beginning of the current decade.

### (a)   Mirant's overstated U.K. operations.

84.   Contained within the prospectus and registration statements required by the SEC to be filed as part of an IPO were a series of statements regarding SEI's joint venture with a subsidiary of PPL Corporation ("PPL"), dubbed Western Power Distribution ("WPD").[13]  WPD's primary business involved the distribution of electricity in England and Wales.

85.   The prospectus noted that in December of 1999 the government energy regulator, tasked with setting electricity prices in England and Wales, instituted a 20% reduction in distribution prices from April 2000 going forward, with a further 3% reduction, in real terms, for each year to be implemented after April 2001.   PPL recognized that this rate reduction constituted a significant adverse change in the business environment and would materially and adversely affect the value of WPD.   Immediately after the announcement of this regulatory

---

[13]   Interestingly, a current member of the Company's Management Council, W. Paul Bowers ("Bowers"), was the former President and Chief Executive Officer of WPD.

action, PPL recorded a $36 million impairment loss relating to its investment in WPD.

86.    In contravention of Generally Accepted Accounting Principles ("GAAP"), Southern failed to adequately account for the impairment of this asset, which was operated by its SEI subsidiary (Mirant's direct corporate predecessor). The Defendants either knew of the $36 million write down and ignored the fact that this action evidenced an impairment of WPD's value, or recklessly failed to ascertain this fact.

87.    The recognition of this impairment was not admitted by SEI or its direct corporate successor, Mirant, until the third quarter of 2002.  Therefore, the financial statements released to the investing public at large, including Plan participants, were inaccurate and incomplete.  *See* 17 C.F.R. §210.401 (a)(1) (Financial statements filed with the SEC that are not prepared in conformity with GAAP are *presumed to be misleading or inaccurate*).  (Emphasis added).

88.    Thus, from the outset, Southern failed to provide complete and accurate information to its employees and the market as a whole regarding SEI/Mirant.

### (b)    Mirant's risky and illicit energy trading practices.

89.    The importance of SEI's trading operations to Southern's profitability before the Mirant spin-off was noted in a February 1, 2000 press release issued by

the company. A.W. Dahlberg, then Chairman and CEO of Southern,[14] stated: "When we began to operate beyond our traditional businesses in the Southeast, we knew it would be important to link our newly acquired power plants to a vigorous trading and marketing operation."

90.    These trading activities were, as noted above, a primary pillar of Mirant's business plan, and therefore crucial to its success after being thrown from Southern's comfortable "nest."

91.    By the time Southern began its spin-off of Mirant, the state of California's recently de-regulated energy market had started to see an increase in wholesale energy prices, which coincided with a shrinking supply of energy and no slack in consumer demand. Mirant, along with a number of other energy trading and supply companies, such as Enron, Reliant, and Dynegy, reaped enormous profits from this confluence of events in one of America's largest energy marketplaces, yet, did so through illegal schemes and contrivances.

92.    Approximately 75% of California's electricity is distributed through a managed power grid system. The system required during the Class Period that energy traders submit bids on an hourly basis concerning prices and quantities of electricity to be provided to the grid, with the highest accepted bid establishing the price for electricity for that hour. However, if there is a perceived energy shortfall, then the participants are permitted to turn to the open market so as to buy and meet

---

[14] A.W. Dahlberg served as Chairman of the Board of Southern from March 1995 to April 2001 and CEO of Southern from March 1995 to March 2001 before moving on to serve as Mirant's Chairman.

the perceived energy needs of the State for that hour.

93.   According to a number of lawsuits filed against energy traders and suppliers of the California market, including one by FERC, Mirant, alone and in concert with other firms, manipulated this system by withholding electricity so as to create the appearance of an energy shortfall. Then, once the grid was dependant on the open market, Mirant would then use a number of tactics to drive up the bidding price for energy. This practice was extremely profitable for Mirant, who, during portions of the Class Period, was the sixth largest energy supplier to California.

94.   Given that Southern was still an eighty-percent owner of Mirant at the time that Mirant's energy manipulations and shams were ongoing, continued to provide accounting, financial, and other services to Mirant, and, upon information and belief, even shared certain Directors and Officers with Mirant through this period, Southern Officers and Directors, including those named herein, knew or should have known of Mirant's illegal and illicit practices, and thus, knew or should have known that Mirant stock was not then a prudent investment option for Southern Plan participants' retirement savings.

95.   Moreover, the Defendants named herein cannot reasonably dispute their knowledge of Mirant's risky and inappropriate practices, in light of media reports and Mirant's own disclosures in response to the media reports during this same time period. For instance, according to an article published on February 2, 2001 by *McGraw Hill*, Mirant had taken full advantage of "the opportunities" of

31

the California energy market. Mirant's earnings on operations for the fourth quarter of 2000 were $66 million, up 25% from 1999's figures, due in part to increased earnings from Mirant's California generation operations.

96.     To combat this negative press, and to reassure the investing public in general and the Plans' participants in particular, Mirant, while still a majority owned subsidiary of Southern, issued a press release reemphasizing the legality of Mirant's California operations. The March 2, 2001, press release stated, in pertinent part:

> Mirant...reiterated today that it seeks timely payment for all electricity it has sold and continues to sell into the California market, and that payment of amounts owed to generators is critical to ending California's energy crisis. We look to receive payment for all the electricity we've sold and continue to sell, and we want quick payment for the past due amounts.
>
> * * *
>
> **We entered the market well after the market rules were in place, and we played by the rules throughout.** We didn't ask that transactions be invalidated or modified when we were losing money, and we will do everything in our power to obtain payment on the **profitable transactions we made**. (Emphasis added.)

97.     However, government officials told a different story than the one urged by the Southern controlled Mirant. For example, in a complaint lodged with FERC by the State of California, it was noted that there were over **$2 billion worth of suspect transactions** committed by Mirant between January 18, 2001 and October 31, 2001.

98.   California's investigation against Mirant's activities during the state's energy crises of 2000-2001 was spearheaded in part by the California Attorney General Bill Lockyer ("Lockyer"), and complaints were filed against the Company in Superior Court of San Francisco County, with FERC, and in the United States District Court for the Northern District of California.

99.   On or about May 7, 2002, FERC ordered Mirant and other energy companies engaged in similar scheme to provide detailed information concerning their energy trading activities in California in 2000 and 2001 and to admit or deny whether they engaged in certain illegal trading practices conducted by Enron Corporation and others.

100.   On May 31, 2002, FERC issued an order finding that Mirant, along with other energy traders, committed "serious" violations of Section 205 (c) of the Federal Power Act through its failure to report transaction-specific information on their market-based power sales during California's energy crisis.   FERC also held that Mirant charged "unjust" and unreasonable rates during California's energy crisis.   Finally, FERC ruled that it found that Mirant had improperly reported aggregated data rather than transaction-specific information in their quarterly transaction reports submitted to the commission.   *See State of California, ex. rel. Bill Lockyer, Attorney General of the State of California v. British Columbia Power Exchange Corp., et al.*, 99 FERC ¶ 61, 247, Order pp. 28-35 (May 31, 2002).

101.   During the summer of 2002, press reports further described the extent

of Mirant's involvement in the California energy scandal.  On May 24, 2002, *The Atlanta Journal and Constitution* reported:

> Mirant Corp. has acknowledged engaging in one of the controversial energy trading practices used by Enron Corp. during California's electricity crisis, but Mirant insisted it complied with federal and state rules.
>
> * * *
>
> The December 2000 memos described 10 specific tactics -- described with such code names as "Fat Boy" and "Get Shorty" -- that Enron traders apparently used to limit supplies and drive up prices with phantom electricity demand during California's electricity crisis.  A suggestion in the Enron memos that other energy companies may have used similar tactics to inflate prices prompted the Federal Energy Regulatory Commission to order 150 companies, including Mirant, to submit sworn statements this week admitting or denying they employed the same practices.  *Mirant acknowledged engaging in one of the practices* -- producing electricity at a level higher than forecasted demand -- but said it did so with the approval of California energy officials.  (Emphasis added.)

102.  On June 10, 2002, the *Wall Street Journal* reported:

> *In a May 22 filing with FERC, Xcel, Minneapolis, described how its Public Service Co. of Colorado unit traded energy with Southern Co. Energy Marketing, now Mirant, in a way that enabled it to profit from California's energy market in 2000 and 2001.*
>
> *In another conversation, on June 20, a Mirant trader outlines a plan to tell grid operators it would move electricity from Southern California to Northern California, when in fact, the energy was flowing the other way.  "It's kind of loop-t-looping (sic), but it's making money," the trader said, according to the*

> *transcript. Xcel said it sold 450 megawatt-hours to Mirant that*
> *day for $60 a megawatt-hour. (Emphasis added.)*

103. On August 5, 2002, Mirant announced that the SEC had launched an inquiry into the Company and "requested additional information about Mirant's recently disclosed shareholder litigation, any round-trip trades entered into by or on behalf of the company, and [FERC's] investigation into energy-trading practices in the western United States."

104. On August 15, 2002, The New York Times reported:

> *Mirant, the biggest North American natural gas trader, said*
> *today that an accounting review had turned up mistakes that*
> *may have inflated figures on its balance sheet as much as $1.1*
> *billion.*
>
> * * *
>
> Straightening out the errors may reduce Mirant's $22.8 billion
> in assets and liabilities as of the end of 2001 by less than 5
> percent, the company said in a statement. Mirant said it did not
> expect the mistakes to change operating results, revenue,
> expenses, net income, liquidity or cash flow.    Mirant has
> reconciled $168 million of $253 million in misstatements it
> disclosed two weeks ago, a spokesman, James Peters, said.
> (Emphasis added.)

105. Finally on November 7, 2002, Mirant issued a partial disclosure relating to its illicit activities in which it acknowledged certain accounting errors, but attempted to minimize their importance. Mirant stated:

> The reviews found that, due to accounting errors, the company's
> net income from January 1, 1999 through June 30, 2002 was
> overstated by $41 million. By comparison, Mirant's cumulative
> net income for this period was approximately $1 billion. The

net $41 million overstatement is the result of net income being understated by $10 million in the first six months of 2002 and overstated by $51 million from 1999 through 2001.

106.    Southern Company issued a press release on November 12, 2002 disclosing that in connection with Mirant's practices, it had received a subpoena to provide information to a federal grand jury sitting in San Francisco for the Northern District of California.    According to the press release, the subpoena covered a "number of broad areas, including specific information regarding electricity production and sales activities in California."

107.    The *Fulton County Daily Report* revealed on December 4, 2002 that former Mirant employees alleged in federal suits that senior Mirant executives had their computers cleansed of certain email files that could be potentially damaging to them in court.

108.    On March 27, 2003, The *Atlanta Journal-Constitution* reported:

> After a 13-month investigation, federal regulators have concluded that 37 energy companies, including Atlanta-based Mirant Corp., manipulated prices during the California energy crisis three years ago. The companies could face sanctions and be required to give back profits as a result, the Federal Energy Regulatory Commission said.
>
> * * *
>
> FERC also said it expects the amount of refunds due California energy customers overcharged by the companies *will exceed the $1.8 billion that an administrative judge recommended last December*. The final amount of refunds won't be determined for several weeks. It will likely be less than the nearly $9 billion Gov. Gray Davis has said California's

ratepayers are due and probably closer to $3 billion, according to FERC investigators.

\* \* \*

FERC's findings confirm that – as California officials contended all along – power companies illegally bid up prices, manipulated supplies and gave false trading information to increase their profits at consumers' expense. "It took two years for FERC to confirm what we knew all along: There was widespread market manipulation and a massive rip-off of California ratepayers," Davis said in a statement Wednesday. Now *the question is whether the FERC commissioners will have the grit to order the remedies that are necessary.*" (Emphasis added.)

109.   Contrary to its prior rosy predictions, Mirant and Southern's touting of the future prospects of Mirant, and statements in which the companies sought to downplay the significance of Mirant's accounting improprieties and illicit trading activities, on May 1, 2003, Mirant released its year-end financial results for 2002, posting a 2002 loss of *$2.44 billion.*  Mirant also further lowered by $188 million its reported earnings for 2000 and 2001. *The Wall Street Journal* reported that same day that Mirant's finances had led the Company's outside auditor, KPMG LLP, "*to conclude there is 'substantial doubt' about the company's ability to continue as a going concern.*"

110.   Investors expressed concern that the Company might be forced to file for bankruptcy if it was unable to refinance $11 billion in debt.  In short, based on KPMG's conclusion, there was a growing doubt across the marketplace as to whether Mirant would be able to survive through the end of the year.

111.  KPMG's doubts were well-founded.   On July 14, 2003, Mirant announced that it had filed for bankruptcy protection.   The next day Bloomberg reported that the bankruptcy filing was "the largest bankruptcy this year" and the eleventh largest in U.S. history.   The day of the bankruptcy filing, Mirant's stock closed at $2.01 per share.   The following day, the NYSE suspended trading of the Company's stock.

112.  On July 22, 2003, with Mirant stock was trading at $0.231 per share, participants in Mirant's own defined contribution savings plan were notified that their retirement accounts holdings in Company stock were being liquidated.[15] Despite this liquidation, the Defendants did not act with regards to the Plan's holdings of Mirant stock.

## VIII.  DEFENDANTS' BREACHES OF FIDUCIARY DUTY UNDER ERISA

### A.  Defendants Breached Their Fiduciary Duties Under ERISA by Failing to Prudently and Loyally Manage the Plan and Plan Assets.

#### 1.  Defendants Knew That Mirant Stock Was Not a Prudent Plan Investment.

113.  As discussed above, beginning in February 2001 and continuing through the Class Period, media reports, government investigations and complaints, and Mirant's own disclosures put Defendants on notice of Mirant's highly risky and inappropriate trading and accounting practices, serious

---

[15] Plaintiff notes as well that according to a April 20, 2004 article in the *Wall Street Journal*, the U.S. bankruptcy trustee supervising the Mirant reorganization recently appointed a special examiner, William Snyder of Corporate Revitalization Partners LLC, to determine if Mirant has a claim against Southern based, in part, on Southern's knowledge regarding Mirant's improprieties and concomitant low probability for success.

mismanagement, financial instability, and dire circumstances during the Class Period. Thus, on information and belief, Defendants knew that Mirant stock was an unduly risky and inappropriate investment for the Plan participants' retirement savings.

114. In addition, evidence of Mirant's serious mismanagement was accompanied by the precipitous decline in the per share value of Mirant stock during the Class Period. In fact, by the time Mirant filed for bankruptcy protection, its stock had plunged to just over $2 per share from a Class Period high of over $47 per share -- a decline of over ninety-five percent.

115. Yet, despite this evaporation of participant retirement savings invested in Mirant stock, and Defendants' knowledge of the facts and circumstances that rendered Mirant an unduly risky and inappropriate Plan investment, Defendants failed to take action to protect the Plan from the enormous losses caused by the Plan's imprudent investment in Mirant stock. Instead, Defendants ignored their fiduciary duties altogether and stood idly by as the Plan's investment in Mirant stock became essentially worthless. Timely action by the Defendants would have spared the Plan tens of millions of dollars of losses.

### 2.   Defendants' Imprudently Retained the Plan's Investment in Mirant Stock

116. As discussed above, during the Class Period, ML and the Investment Committee were directly responsible for the management of Plan assets. In addition, depending on how the conflict between the Plan Document and the Trust

Agreement is resolved, Southern Services may also have exercised direct responsibility for the management of Plan assets. Although, on information and belief, these Defendants knew that Mirant stock was not a prudent investment for participants' retirement savings, they failed to exercise the discretion afforded them by the Plan and ERISA to divest the Plan of its holdings of Mirant stock, and in so doing abused their discretion as Plan fiduciaries.

117. In addition, upon information and belief, the investment fiduciary Defendants failed to conduct an appropriate investigation into whether Mirant stock was and continued to be a prudent investment for the Plan, as required by ERISA. Consequently, the fiduciaries failed to fulfill their obligation under the Plan Documents and ERISA to ensure that Plan assets were invested prudently.

118. In light of the public information discussed in media reports, Mirant's own disclosures, and the Defendants' access to Southern's and Mirant's top-level Officers and Directors, an adequate investigation certainly would have revealed that investment by the Plan in Mirant stock, under the circumstances alleged herein, was imprudent. Based on the duties these fiduciaries possessed under the Plan and ERISA, each of these fiduciaries had the authority, and the obligation, to conduct such an investigation, and generally to ensure the prudent administration of the Plan and Plan assets. By failing to do so, they breached their fiduciary responsibility to act prudently, diligently and loyally.

119. A prudent fiduciary dedicated, as ERISA requires, to fairly evaluating the Plan's investment in Mirant stock, certainly would have concluded that it was

not prudent to invest employees' retirement savings in a company whose survival depended upon its energy trading business that was engaged in highly risky and illegal energy trading activities, as well as accounting manipulations – not to mention a company that was highly speculative, financially unstable and facing collapse. Such a fiduciary would have discerned these circumstances – and the risks they posed – and taken appropriate steps to limit the Plan's investment in Mirant stock.

120. Defendants had available to them several different options for satisfying this duty, including, divesting the Plan of Mirant stock, and to the extent necessary, making appropriate public disclosures; investing the Plan in other investment media as the fiduciaries determined was in the best interests of Plan participants; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan in a timely manner; or resigning as Plan fiduciaries to the extent that as a result of their conflicts of interest they could not loyally serve Plan participants in connection with the Plan's management of its investment in Mirant stock.

121. Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of the Plan's investment in Mirant. Instead, they turned a blind eye to their duties and responsibilities under the Plan and ERISA.

### 3. Defendants Failed to Disclose Complete and Accurate Information Regarding Mirant Stock as a Retirement Investment.

122. As discussed above, the Plan Committee was responsible for communicating with participants, and providing participants with information and materials required by the Plan and ERISA. Plan Document § 13.9. Such communications were made in official Plan documents, which were provided to participants directly, including the Plan Document, Summary Plan Description, and prospectuses pertaining to the Plan's investments. Thus, the communications were undertaken in a fiduciary capacity.

123. In particular, the Prospectus/SPD specifically incorporated/ communicated the contents to the Plans' participants, the Company's 10-K annual report for year ending December 31, 2001, its Form 11-K for year ending December 31, 2001, the Company's Quarterly Reports on Form 10-Q for the quarter ending March 31, 2002 and the Company's Form 8-K filed on February 13, 2002. Further, the Prospectus noted that "[a]ll other documents subsequently filed" by Southern with the SEC "prior to the termination of the additional Company Stock offering" was also incorporated by reference into the Prospectus/SPD.

124. In addition, upon information and belief, Southern and Southern Services regularly communicated with Plan participants about Mirant's performance and future financial and business prospects in company-wide notices, email, and messages, as well as in statements and other communications

disseminated to Plan participants. These communications as well were undertaken in a fiduciary capacity as they were issued to Plan participants, discussed in particular the Plan, the Plan's holdings of Mirant stock, and the likely future benefit of such investment.

125.  As fiduciaries, the Plan Committee, Southern Services and Southern had a duty to provide participants with complete and accurate information regarding the Plan's investment options, including Mirant stock. This duty was particularly important with respect to Mirant stock, as participants were naturally inclined to accept the Plan Committee's, Southern Services' and Southern's statements regarding Mirant as true and well informed in light of the relationship between the two companies, and the fiduciaries' knowledge and expertise regarding Mirant.

126.  Despite these duties, however, the Plan Committee Defendants Southern Services and Southern, and the Defendants through whom Southern and Southren Services acted, failed to provide Plan participants with complete and accurate information regarding Mirant stock, such that the participants could appreciate the true risks presented by investments in Mirant stock and could make informed decisions regarding their interest in the Plan's investment in Mirant stock.  Specifically, the Plan Committee failed to notify Plan participants of Mirant's false and misleading SEC filings, which it either knew or should have known were false, and the Plan Committee, Southern Services and Southern failed to provide participants with an accurate picture of Mirant's viability as a going

concern, and the true risks of continued investment in Mirant. Southern, in fact, did just the opposite by touting the likely future success and performance of Mirant. Accordingly, these Defendants breached their duties as fiduciaries under ERISA.

### 4.    Defendants Suffered From Conflicts of Interest.

127. Southern's financial filings, including annual reports and proxy statements, during the Class Period make clear that a significant percentage of corporate Director and Executive Officer compensation is in the form of stock grants, stock option grants, and/or bonuses.

128. Consequently, Defendants, upon information and belief, received a significant amount of Mirant stock when the Company completed its divestiture of Mirant in April 2001.

129. Hence, Defendants had the incentive to keep the Plan's assets heavily invested in Mirant stock on a regular, ongoing basis at least until Defendants divested themselves of Mirant stock. Elimination of Mirant stock from the Plan would have reduced the overall market demand for Mirant stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Mirant stock, resulting in Defendants selling their shares of Mirant stock at a lower price.

130. Moreover, Defendants also had an incentive to downplay the significance of adverse information regarding Mirant's illicit business activities and accounting improprieties to Plan participants, so as to not adversely affect the

price for Mirant stock, or expose Southern to liability with respect to such practices that commenced during such time as Mirant's predecessor was a subsidiary of Southern, or Southern was the majority owner of Mirant.[16]

131.   *These conflicts of interest put the Defendants in the position of having* to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, in whose interests the Defendants were obligated to loyally serve with an "eye single."  Under ERISA, when faced with a conflict of interest of this sort, the Plan fiduciaries must promptly resolve the conflict by taking necessary and appropriate action such that they can loyally serve the Plan participants.  By failing to take any such action, and instead, putting their personal and/or corporate interests above the interests of the Plan and Plan participants, these Defendants breached their ERISA fiduciary duties.

**5.    Defendants Failed To Prudently Monitor The Plan Fiduciaries And Ensure That Their Appointees Faithfully Discharged Their Fiduciary Duties.**

132.   As discussed above, the Director Defendants, Southern Services and Southern exercised fiduciary responsibility for appointing and removing the Trustee, Plan Committee members, and, upon information and belief, the Investment Committee members.

133.   As appointing fiduciaries, these Defendants owed a fiduciary duty with respect to the selection and retention of those appointees.   29 C.F.R.

---

[16]   *See* n.15 *supra.*

§ 2509.75-8, at D-4.   Among other things, this fiduciary duty requires the appointing fiduciaries at reasonable intervals to review the performance of their appointees in such a manner as to reasonably ensure that the appointees perform their duties in compliance with the terms of the Plan and statutory standards and in satisfaction of the needs of the Plan. 29 C.F.R. § 2509.75-8 at FR-17.  In addition, this duty requires the appointing fiduciaries to provide their appointees with information that they know or should know would have an extreme impact on the Plan and, thus, is necessary for the appointees to effectively discharge their fiduciary obligations.

134.  Upon information and belief, the Director Defendants, Southern Services and Southern did not undertake any effort to, in any way, monitor the conduct of Trustee, Plan Committee, and/or Investment Committee members whom they appointed, ensure that their appointees were qualified, competent, and properly educated regarding their fiduciaries duties and responsibilities.   In addition, the Director Defendants, Southern Services and Southern failed to provide their appointees with complete and accurate information regarding Mirant's illicit trading and accounting practices, the impact of these practices on Mirant's viability, and the true risks presented by continued investment in Mirant stock, and, to the extent their appointees possessed this information, failed to ensure that their appointees performed as ERISA requires by managing the Plan's assets appropriately in light of the information.  Furthermore, these Defendants failed to remove and replace appointees who, in fact, failed to prudently, diligently,

and loyally discharge their fiduciary duties under the Plan and ERISA, as set forth herein.  Accordingly, the Director Defendants, Southern Services and Southern breached their monitoring duties under ERISA.

## IX. THE LAW UNDER ERISA

135.  ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

136.  ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

137.  ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants* and their beneficiaries, and *with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in

the conduct of an enterprise of a like character and with like aims.

138.   These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the ***duties of loyalty***, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things,

      a.     The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Mirant Stock Fund, which invested in Mirant Stock, to ensure that each investment is a suitable option for the Plan;

      b.     A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

      c.     A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

139.   ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> ...[i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following

circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

140.   Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## X. SECTION 404(c) DEFENSE INAPPLICABLE

141.   ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions.  In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.  In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], *and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or beneficiary*." 29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(I).

142.   Those provisions were not complied with here; instead of taking the necessary steps to ensure effective participant control by complete and accurate

material information disclosure, the Defendants did exactly the opposite. As a consequence, participants in the Plan did not have informed control over the Plan's assets that were invested in Mirant Stock, and the Defendants remained entirely responsible for losses that result from such investment.

143. Because ERISA § 404(c) does not apply here, the Defendants' liability to the Plan and the Class for relief stemming from the Plan's imprudent holding of Mirant Stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period.

144. Furthermore, under ERISA, fiduciaries – not participants – exercise control over the selection of investment options made available to participants. Thus, whether or not participants are provided with the ability to select among different investment options, and whether or not participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment is selected by the fiduciaries and presented as an option to participants, and as a result of such action the Plan suffers a loss. Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plan.

## COUNT I

**Failure to Prudently and Loyally Manage Plan Assets
(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405
by the Plan Committee, Investment Committee, ML, Southern Services and
Southern)**

145. Plaintiff incorporates the allegations contained in the previous

paragraphs of this Complaint as if fully set forth herein.

146. At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

147. As alleged above, the scope of the Plan Committee's, Investment Committee's, ML's, Southern Services' and Southern's fiduciary duties and responsibilities included managing the Plan and Plan assets for the sole and exclusive benefit of plan participants, and with the care, skill, diligence, and prudence required by ERISA. In connection therewith, the Defendants named in this Count were directly responsible for, among other things, selecting prudent investment options, evaluating the merits of the Plan's investment on an ongoing basis, eliminating imprudent options and administering the Plan with an "eye single" towards the best interests of the Plan participants.

148. Yet, contrary to their duties and obligations under the Plan Documents and ERISA, Defendants named in this Count failed to loyally and prudently manage the Plan's assets. Specifically, during the Class Period, on information and belief Defendants knew that Mirant stock was not a suitable and appropriate investment for the Plan, but was, instead, a highly speculative and risky investment in an unstable and deeply troubled company. Nonetheless, during the Class Period, Defendants continued to allow the Plan to maintain its enormous investment in Mirant stock. They did so despite the stock's precipitous decline in value during the Class Period, and evidence that that Mirant was being seriously mismanaged

and that its future prospects were jeopardized as a result.

149.  In addition, Defendants failed to conduct an appropriate investigation of the merits of continued investment in Mirant stock even in the face of obvious red flags that, at a minimum, raised questions regarding the risks of continued investment in Mirant stock, including, among other information, reports of Mirant's illicit energy trading practices, and accounting manipulations, government investigations and complaints, disappointing performance, and concerns about its ability to survive as a going concern.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to maintain the Plan's investment in Mirant stock.

150.  Defendants' decision to maintain the Plan's investment in Mirant stock under the circumstances alleged herein was an abuse of their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made a different investment decision.  Specifically, based on the above, a prudent fiduciary could not have believed reasonably that continued investment in Mirant stock was in keeping with the Plan settlor's expectations of how a prudent fiduciary would operate.  Instead, a prudent fiduciary would have liquidated the Plan's holding of Mirant stock and invested the proceeds in a prudent investment alternative, and would have communicated the basis of the action to the participants.  By failing to do so, and instead taking no action, these Defendants breached their fiduciary duties under ERISA.

151.  The fiduciary duty of loyalty also entails a duty to avoid conflicts of

interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

152. Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in Mirant; failing to notify appropriate federal agencies, including the Department of Labor ("DOL"), of the facts and transactions which made Mirant stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Mirant's inappropriate practices; and by otherwise placing the interests of Southern and Mirant and themselves above the interests of the participants with respect to the Plan's investment in Mirant stock.

153. Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, to do so.

Defendants named in this Count breached this duty by continuing to maintain the Plan's investment in Mirant stock based on language in the Plan regarding such investment. In addition, ML, to the extent it acted pursuant to the direction of other Named Fiduciaries, breached this duty by following directions to invest in or maintain the Plan's investment in Mirant stock despite the fact that ML knew or should have known based on public information and its sophistication as a professional trustee that Mirant was imprudent.

154. The duty of loyalty further requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding Plan investment options and holdings such that participants can make informed decisions with regard to the prudence of investing and/or holding in such options made available under the Plan. This duty applies to all Plan investment options and holdings, including the Plan's holdings of Mirant stock.

155. Because investment in the Plan was not adequately diversified in that it contained a large holding of Mirant stock, such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Mirant Stock.

156.   The Plan Committee, Southern Services and Southern breached their duty to inform participants by failing to provide complete and accurate information regarding Mirant Stock, Mirant's business improprieties, public misrepresentations and material accounting irregularities, and the consequent artificial inflation of the value of Mirant Stock and, generally, by conveying inaccurate information regarding the soundness of Mirant Stock and the prudence of holding retirement investments in Mirant equity.   These failures were particularly devastating to the Plan and the participants since a significant percentage of the Plan's assets were held in Mirant Stock during the Class Period and, thus, losses in this investment had a significant impact on the value of participants' retirement assets.

157.   These actions and failures to act caused participants and beneficiaries of the Plan to continue to maintain substantial investments in Mirant stock at a time when the Plan Committee, Southern and Southern Services knew or should have known that Mirant stock was not a prudent investment option for the Plan.

158.   Defendants named in this Count also breached their co-fiduciary obligations by, among other failures, knowingly participating in the failure of their fellow fiduciaries to prudently and loyally manage investment of Plan assets, having knowledge of such breaches by failing to undertake any effort to remedy them, and by enabling others to breach their fiduciary duties as a result of their own breaches described herein.

159.   Specifically, the Investment Committee members, Southern, Southern Services and ML knowingly participated in each other's imprudent management of

Plan assets, and knew about such breaches, but failed to remedy them by knowing Mirant sock was imprudent based on public and other information and not taking corrective action in the face of their co-fiduciaries' failure to prudently manage the investment in Mirant stock. Moreover, these same Defendants enabled each other's breaches by disregarding their fiduciary duty to evaluate the merits of the Plan's investment in Mirant stock, to take action in light of their knowledge of the stock's imprudence as a Plan investment option, and to properly direct their designees and appointees to take such action. In addition, the Director Defendants, Southern Services and Southern enabled the imprudent management of the Plan's investment in Mirant stock by failing to prudently monitor the investment fiduciaries named in this count and removing those whose performance was inadequate. Further, the Plan Committee, Southern and Southern Services also enabled the imprudent investment of Plan assets in Mirant stock by failing to provide complete and accurate information regarding Mirant stock as an investment option to Plan participants.

160. As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost tens of millions of dollars in retirement savings.

161.  Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

### Failure to Monitor Fiduciaries
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by Southern, Southern Services and the Director Defendants)

162.  Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

163.  At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

164.  At all relevant times, as alleged above, the scope of the fiduciary responsibility of Southern, Southern Services and the Director Defendants included the responsibility to appoint members of the Plan Committee and the Trustee, and, thus, to prudently monitor their appointees.

165.  Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

166.  The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate

whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

167. Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

168. Southern, Southern Services and the Director Defendants breached their fiduciary monitoring duties by, among other things: (a) failing altogether to monitor their appointees, to evaluate their performance, or to have any system in place for doing so; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Mirant's business problems alleged above, which made Mirant Stock an imprudent retirement investment for the Plan; (c) failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets; and (d) failing to remove appointees named herein whose performance was inadequate, and who breached their fiduciary duties under ERISA.

169. Defendants named in this Count also breached their co-fiduciary

obligations by, among other failures, knowingly participating in the failure of their fellow fiduciaries to prudently and loyally monitor their appointees, having knowledge of such breaches by failing to undertake any effort to remedy them, and by enabling others to breach their fiduciary duties as a result of their own breaches.

170. Specifically, Southern, Southern Services and the Director Defendants knowingly participated in each other's failure to monitor their appointees, and knew about such failure, but failed to remedy it, and enabled this breach by, individually, and as a group, failing to institute any system or procedure for monitoring their appointees, and for ensuring that their appointees properly exercised their fiduciary duties and responsibilities.

171. As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost tens of millions of dollars in retirement savings.

172. Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## XI. CAUSATION

173.  The Plan suffered at least tens of millions of dollars in losses because substantial assets of the Plan were imprudently held in Mirant Stock during the Class Period, in breach of Defendants' fiduciary duties.

174.  Defendants are responsible for losses caused by participant's holding of Mirant Stock because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants failed to provide complete and accurate information to participants such that they could appreciate the true merits of the Plan's investment in Mirant stock, and its soundness as an investment vehicle.  As a consequence, participants did not exercise independent control over their holdings in Mirant Stock, and Defendants remain liable under ERISA for losses caused by such investment.

175.  Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Mirant Stock and divesting the Plan from its holdings of Mirant Stock when maintaining such a holding became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in Mirant Stock.

## XII. REMEDY FOR BREACHES OF FIDUCIARY DUTY

176.  ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan

participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary...who breaches any of the...duties imposed upon fiduciaries...to make good to such plan any losses to the plan...." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate...."

177. With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the plan had been properly administered.

178. Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable

costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from the Plan's holdings in Mirant Stock, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

Date: June **30**, 2004

Respectfully submitted,

LAW OFFICE OF JOSHUA A.
MILLICAN, P.C.
Joshua A. Millican
Georgia Bar No.: 508998
The Grant Building, Suite 400
44 Broad Street, NW
Atlanta, Georgia 30303
Telephone: (404) 221-1555
Facsimile: (404) 221-0914

**SCHIFFRIN & BARROWAY, LLP**
Richard S. Schiffrin
Joseph H. Meltzer
Gerald D. Wells, III
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**KELLER ROHRBACK L.L.P.**
Lynn Lincoln Sarko
Derek W. Loeser
T. David Copley
Cari Campen Laufenberg
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

## DECLARATION OF JOSHUA A. MILLICAN

Joshua A. Millican, under penalties of perjury, hereby declares:

1.     I am a lawyer with The Law Office of Joshua A. Millican, P.C., plaintiffs' counsel in the action titled *Jimmy R. Woods, Individually and on behalf of a class of all others similarly situated, vs. Southern Company, et al*, in United States District Court, Northern District of Georgia, Atlanta Division.  I submit this Declaration in support of exhibits attached to the Complaint For Violations Of ERISA.

2.     Attached hereto as Exhibit 1 is a true and accurate copy of the Southern Company Savings Plan, As Amended and Restated Effective January 1, 2002.

3.     Attached hereto as Exhibit 2 is a true and accurate copy of the Employee Savings Plan Summary Plan Description, Dated July 15, 2002.

4.     Attached hereto as Exhibit 3 is a true and accurate copy of the Letter Dated September 3, 2003.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the Southern

Company Savings Plan Trust Agreement.

6.      Attached hereto as Exhibit 5 is a true and correct copy of the Mirant

Information Statement, Dated March 6, 2001.

Date: June **30**, 2004

Respectfully submitted,

LAW OFFICE OF JOSHUA A.
MILLICAN, P.C.
Joshua A. Millican
Georgia Bar No.: 508998
The Grant Building, Suite 400
44 Broad Street, NW
Atlanta, Georgia 30303
Telephone: (404) 221-1555
Facsimile: (404) 221-0914

**SCHIFFRIN & BARROWAY, LLP**
Richard S. Schiffrin
Joseph H. Meltzer
Gerald D. Wells, III
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**KELLER ROHRBACK L.L.P.**
Lynn Lincoln Sarko
Derek W. Loeser
T. David Copley
Cari Campen Laufenberg
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

# EXHIBIT 1

SouthernCompanySavingsPlan2002.txt

```
<DOCUMENT>
<TYPE>EX-10
<SEQUENCE>9
<FILENAME>x10a52.txt
<DESCRIPTION>EMPLOYEE SAVINGS PLAN
<TEXT>
```

Exhibit 10(a)52

THE SOUTHERN COMPANY

EMPLOYEE SAVINGS PLAN

As Amended and Restated

Effective January 1, 2002

`<PAGE>`

## TABLE OF CONTENTS

ARTICLE I     PURPOSE.............................................................1

ARTICLE II    DEFINITIONS........................................................2
    2.1       Account.............................................................2
    2.2       Actual Contribution Percentage Test.................................2
    2.3       Actual Deferral Percentage..........................................2
    2.4       Actual Deferral Percentage Test.....................................2
    2.5       Affiliated Employer.................................................2
    2.6       Aggregate Account...................................................2
    2.7       Aggregation Group...................................................3
    2.8       Annual Addition.....................................................3
    2.9       Average Actual Deferral Percentage..................................3
    2.10      Average Contribution Percentage.....................................3
    2.11      Beneficiary.........................................................4
    2.12      Board of Directors..................................................4
    2.13      Break-in-Service Date...............................................4
    2.14      Code................................................................4
    2.15      Committee...........................................................4
    2.16      Common Stock........................................................4
    2.17      Company.............................................................4
    2.18      Compensation........................................................4
    2.19      Contribution Percentage.............................................5
    2.20      Determination Date..................................................5
    2.21      Determination Year..................................................5
    2.22      Direct Rollover.....................................................5
    2.23      Distributee.........................................................5
    2.24      Elective Employer Contribution......................................5
    2.25      Eligible Employee...................................................6
    2.26      Eligible Participant................................................6
    2.27      Eligible Retirement Plan............................................6
    2.28      Eligible Rollover Distribution......................................7
    2.29      Employee............................................................7
    2.30      Employer Matching Contribution......................................7
    2.31      Employing Company...................................................7
    2.32      Enrollment Date.....................................................7
    2.33      ERISA...............................................................7
    2.34      Excess Aggregate Contributions......................................7

SouthernCompanySavingsPlan2002.txt

2.35   Excess Deferral Amount.....................................7
2.36   Excess Deferral Contributions..............................8
2.37   Highly Compensated Employee................................8
2.38   Hour of Service............................................8
2.39   Investment Fund............................................8
2.40   Key Employee...............................................8
2.41   Limitation Year............................................8
2.42   Look-Back Year.............................................8
2.43   Mirant.....................................................8
2.44    Mirant Services...........................................8
2.45    Mirant Stock..............................................8
2.46   Mirant Stock Account.......................................8
2.47   Mirant Stock Fund..........................................8
2.48   Non-Highly Compensated Employee............................8
2.49   Normal Retirement Date.....................................9
2.50   One-Year Break in Service..................................9
2.51   Participant................................................9
2.52   Permissive Aggregation Group...............................9
2.53   Plan.......................................................9
2.54   Plan Year..................................................9
2.55   Present Value of Accrued Retirement Income.................9
2.56   Required Aggregation Group.................................9
2.57   Rollover Contribution......................................9
2.58   SCEM......................................................10
2.59   SEPCO.....................................................10
2.60   SEPCO Plan................................................10
2.61   SEPCO Transferred Account.................................10
2.62   Super-Top-Heavy Group.....................................10
2.63   Surviving Spouse..........................................10
2.64   Top-Heavy Group...........................................10
2.65   Transferred ESOP Account..................................10
2.66   Trust or Trust Fund.......................................10
2.67   Trust Agreement...........................................10
2.68   Trustee...................................................10
2.69   Valuation Date............................................10
2.70   Voluntary Participant Contribution........................11
2.71   Year of Service...........................................11


ARTICLE III  PARTICIPATION.......................................12
3.1    Eligibility Requirements..................................12
3.2    Participation upon Reemployment...........................12
3.3    No Restoration of Previously Distributed Benefits.........12
3.4    Loss of Eligible Employee Status..........................12
3.5    Military Leave............................................12


ARTICLE IV  ELECTIVE EMPLOYER CONTRIBUTIONS AND VOLUNTARY PARTICIPANT
CONTRIBUTIONS....................................................13
4.1    Elective Employer Contributions...........................13
4.2    Maximum Amount of Elective Employer Contributions.........13
4.3    Distribution of Excess Deferral Amounts...................13
4.4    Additional Rules Regarding Elective Employer
       Contributions.............................................14
4.5    Section 401(k) Nondiscrimination Tests....................15
4.6    Voluntary Participant Contributions.......................18
4.7    Manner and Time of Payment of Elective Employer
       Contributions and Voluntary Participant Contributions.....18
4.8    Change in Contribution Rate...............................18
4.9    Change in Contribution Amount.............................18
4.10   Rollover Contributions and Direct Transfers from the
       SEPCO and ECMC Plans......................................18
4.11   Rollovers from Other Plans................................19

SouthernCompanySavingsPlan2002.txt

ARTICLE V  EMPLOYER MATCHING CONTRIBUTIONS....................................20
    5.1    Amount of Employer Matching Contributions....................20
    5.2    Payment of Employer Matching Contributions..................20
    5.3    Limitations on Employer Matching Contributions and
          Voluntary Participant Contributions.........................20
    5.4    Multiple Use Limitation.....................................22
    5.5    Reversion of Employing Company Contributions................23
    5.6    Correction of Prior Incorrect Allocations and
          Distributions...............................................23

ARTICLE VI  LIMITATIONS ON CONTRIBUTIONS......................................24
    6.1    Section 415 Limitations.....................................24
    6.2    Correction of Contributions in Excess of Section 415
          Limits......................................................24
    6.3    Combination of Plans........................................25

ARTICLE VII  SUSPENSION OF CONTRIBUTIONS......................................26
    7.1    Suspension of Contributions.................................26
    7.2    Resumption of Contributions.................................26

ARTICLE VIII  INVESTMENT OF CONTRIBUTIONS.....................................27
    8.1    Investment Funds............................................27
    8.2    Investment of Participant Contributions.....................27
    8.3    Investment of Employer Matching Contributions...............27
    8.4    Investment of Earnings......................................27
    8.5    Transfer of Assets between Funds............................28
    8.6    Change in Investment Direction..............................28
    8.7    Section 404(c) Plan.........................................28
    8.8    Mirant Stock Fund...........................................28

ARTICLE IX  MAINTENANCE AND VALUATION OF PARTICIPANTS' ACCOUNTS...............29
    9.1    Establishment of Accounts...................................29
    9.2    Valuation of Investment Funds...............................30
    9.3    Rights in Investment Funds..................................30

ARTICLE X  VESTING............................................................31
    10.1   Vesting.....................................................31

ARTICLE XI  WITHDRAWALS AND LOANS.............................................32
    11.1   Withdrawals by Participants.................................32
    11.2   Notice of Withdrawal........................................33
    11.3   Form of Withdrawal..........................................33
    11.4   Minimum Withdrawal..........................................33
    11.5   Source of Withdrawal........................................33
    11.6   Requirement of Hardship.....................................33
    11.7   Loans to Participants.......................................35
    11.8   Special Waiver for Participants Employed in the
          United Kingdom..............................................37

ARTICLE XII  DISTRIBUTION TO PARTICIPANTS.....................................38
    12.1   Distribution upon Retirement................................38
    12.2   Distribution upon Disability................................39
    12.3   Distribution upon Death.....................................39
    12.4   Designation of Beneficiary in the Event of Death............39

SouthernCompanySavingsPlan2002.txt

        12.5    Distribution upon Termination of Employment.................40
        12.6    Commencement of Benefits..................................40
        12.7    Transfer between Employing Companies......................41
        12.8    Distributions to Alternate Payees.........................41
        12.9    Requirement for Direct Rollovers..........................42
        12.10   Consent and Notice Requirements...........................42
        12.11   Form of Payment...........................................43
        12.12   Partial Distribution upon Termination of Employment.......43
        12.13   Distribution of Dividends Payable on Common Stock..........43


ARTICLE XIII  ADMINISTRATION OF THE PLAN...................................45
        13.1    Membership of Committee...................................45
        13.2    Acceptance and Resignation................................45
        13.3    Transaction of Business...................................45
        13.4    Responsibilities in General...............................45
        13.5    Committee as Named Fiduciary..............................45
        13.6    Rules for Plan Administration.............................46
        13.7    Employment of Agents......................................46
        13.8    Co-Fiduciaries............................................46
        13.9    General Records...........................................46
        13.10   Liability of the Committee................................46
        13.11   Reimbursement of Expenses and Compensation of
                Committee.................................................47
        13.12   Expenses of Plan and Trust Fund...........................47
        13.13   Responsibility for Funding Policy.........................47
        13.14   Management of Assets......................................47
        13.15   Notice and Claims Procedures..............................48
        13.16   Bonding...................................................48
        13.17   Multiple Fiduciary Capacities.............................48
        13.18   Change in Administrative Procedures.......................48


ARTICLE XIV  TRUSTEE OF THE PLAN..........................................49
        14.1    Trustee...................................................49
        14.2    Purchase of Common Stock..................................49
        14.3    Voting of Common Stock....................................49
        14.4    Voting of Other Investment Fund Shares....................50
        14.5    Uninvested Amounts........................................50
        14.6    Independent Accounting....................................50


ARTICLE XV  AMENDMENT AND TERMINATION OF THE PLAN.........................51
        15.1    Amendment of the Plan.....................................51
        15.2    Termination of the Plan...................................51
        15.3    Merger or Consolidation of the Plan.......................52
        15.4    Transfer of Plan Assets...................................52


ARTICLE XVI  TOP-HEAVY REQUIREMENTS.......................................53
        16.1    Top-Heavy Plan Requirements...............................53
        16.2    Determination of Top-Heavy Status.........................53
        16.3    Minimum Allocation for Top-Heavy Plan Years...............54


ARTICLE XVII  GENERAL PROVISIONS..........................................55
        17.1    Plan Not an Employment Contract...........................55
        17.2    No Right of Assignment or Alienation......................55
        17.3    Payment to Minors and Others..............................55
        17.4    Source of Benefits........................................56
        17.5    Unclaimed Benefits........................................56
        17.6    Governing Law.............................................56

SouthernCompanySavingsPlan2002.txt

ARTICLE XVIII   SPECIAL REQUIREMENTS FOR ACCOUNT BALANCES ATTRIBUTABLE
                TO ACCRUED BENEFITS TRANSFERRED FROM THE SEPCO PLAN.................57
        18.1        SEPCO Transferred Accounts................................57
        18.2        In-Service Withdrawals from SEPCO Transferred
                    Accounts..................................................57
        18.3        Loans from SEPCO Transferred Accounts.....................57
        18.4        Distribution of SEPCO Transferred Accounts................57
        18.5        Code Section 411(d)(6) Protected Benefits.................59

<PAGE>


THE SOUTHERN COMPANY

EMPLOYEE SAVINGS PLAN

As Amended and Restated

Effective January 1, 2002

ARTICLE I

PURPOSE


        The purpose of the Plan is to encourage employee thrift, to create
added employee interest in the affairs of The Southern Company, to provide a
means for becoming a shareholder in The Southern Company, to supplement
retirement and death benefits, and to create a competitive compensation program
for employees through the establishment of a formal plan under which
contributions by and on behalf of Participants are supplemented by contributions
of Employing Companies. This Plan is intended to be a stock bonus plan, and all
contributions made by an Employing Company to this Plan are expressly
conditioned upon the deductibility of such contributions under Code Section 404.
In addition, with the exception of the portion of the Plan that is invested in
the common stock of Mirant Corporation, the Plan is also intended to be an
employee stock ownership plan, as defined in Code Section 4975(e)(7) and ERISA
Section 407(d)(6), and is designed to invest primarily in qualifying employer
securities, as defined in Code Section 409(l). The Plan was originally effective
March 1, 1976, and was most recently amended and restated effective as of
January 1, 2002 to incorporate a variety of plan design and other changes.

<PAGE>


ARTICLE II

DEFINITIONS


        All references to articles, sections, subsections, and paragraphs shall
be to articles, sections, subsections, and paragraphs of this Plan unless
another reference is expressly set forth in this Plan. Any words used in the
masculine shall be read and be construed in the feminine where they would so
apply. Words in the singular shall be read and construed in the plural, and all
Page 5

SouthernCompanySavingsPlan2002.txt

words in the plural shall be read and construed in the singular in all cases where they would so apply.

For purposes of this Plan, unless otherwise required by the context, the following terms shall have the meanings set forth opposite such terms:

2.1 "Account" shall mean the total amount credited to the account of a Participant, as described in Section 9.1.

2.2 "Actual Contribution Percentage Test" shall mean the test described in Section 5.3(a).

2.3 "Actual Deferral Percentage" shall mean the ratio (expressed as a percentage) of Elective Employer Contributions on behalf of an Eligible Participant for the Plan Year to the Eligible Participant's compensation for the Plan Year. For the purpose of determining an Eligible Participant's Actual Deferral Percentage for a Plan Year, the Committee may elect to consider an Eligible Participant's compensation for (a) the entire Plan Year or (b) that portion of the Plan Year in which the Eligible Participant was eligible to have Elective Employer Contributions made on his behalf, provided that such election is applied uniformly to all Eligible Participants for the Plan Year. The Actual Deferral Percentage of an Eligible Participant who does not have Elective Employer Contributions made on his behalf shall be zero.

2.4 "Actual Deferral Percentage Test" shall mean the test described in Section 4.5(a).

2.5 "Affiliated Employer" shall mean an Employing Company and (a) any corporation which is a member of a controlled group of corporations (as defined in Section 414(b) of the Code) which includes such Employing Company, (b) any trade or business (whether or not incorporated) which is under common control (as defined in Section 414(c) of the Code) with such Employing Company, (c) any organization (whether or not incorporated) which is a member of an affiliated service group (as defined in Section 414(m) of the Code) which includes such Employing Company, and (d) any other entity required to be aggregated with such Employing Company pursuant to regulations under Section 414(o) of the Code. Notwithstanding the foregoing, for purposes of applying the limitations of Article VI, the term Affiliated Employer shall be adjusted as required by Code Section 415(h).

2.6 "Aggregate Account" shall mean with respect to a Participant as of the Determination Date, the sum of the following:

(a) the Account balance of such Participant as of the most recent valuation occurring within a twelve-month period ending on the Determination Date;

(b) an adjustment for any contributions due as of the Determination Date;

(c) any Plan distributions, including unrelated rollovers and plan-to-plan transfers (ones which are both initiated by the Employee and made from a plan maintained by one employer to a plan maintained by another employer), but not related rollovers or plan-to-plan transfers (ones either not initiated by the Employee or made to a plan maintained by the same employer), made within the one-year period ending on the Determination Date. The preceding sentence shall also apply to distributions under a terminated plan which if it had not been terminated would have been required to be included in an Aggregation Group. In the case of a distribution made for a reason other than severance from employment (or separation from service), death or disability, this provision shall be applied by substituting "five-year period" for "one-year period";

SouthernCompanySavingsPlan2002.txt

(d) any Employee contributions, whether voluntary or mandatory;

(e) unrelated rollovers and plan-to-plan transfers to this Plan accepted prior to January 1, 1984; and

(f) related rollovers and plan-to-plan transfers to this Plan.

2.7 "Aggregation Group" shall mean either a Required Aggregation Group or a Permissive Aggregation Group.

2.8 "Annual Addition" shall mean the amount allocated to a Participant's Account and accounts under all defined contribution plans maintained by the Affiliated Employers during a Limitation Year that constitutes

(a) Affiliated Employer contributions,

(b) Voluntary Participant Contributions,

(c) forfeitures, if any, allocated to a Participant's Account or accounts under all defined contribution plans maintained by the Affiliated Employers, and

(d) amounts described in Sections 415(l)(1) and 419A(d)(2) of the Code.

2.9 "Average Actual Deferral Percentage" shall mean the average (expressed as a percentage) of the Actual Deferral Percentages of the Eligible Participants in a group.

2.10 "Average Contribution Percentage" shall mean the average (expressed as a percentage) of the Contribution Percentages of the Eligible Participants in a group.

2.11 "Beneficiary" shall mean any person(s) who, or estate(s), trust(s), or organization(s) which, in accordance with the provisions of Section 12.4, become entitled to receive benefits upon the death of a Participant.

2.12 "Board of Directors" shall mean the Board of Directors of Southern Company Services, Inc.

2.13 "Break-in-Service Date" means the earlier of:

(a) the date on which an Employee terminates employment, is discharged, retires, or dies; or

(b) the last day of an approved leave of absence including any extension.

For purposes of subsection (a) above, an Employee who ceases to be eligible to participate in the Plan pursuant to paragraph (5) of Section 2.25 shall be deemed to have experienced a termination of employment as of the date as of which Section 2.25(5) first applies.

In the case of an individual who is absent from work for maternity or paternity reasons, such individual shall not incur a Break-in-Service Date earlier than the expiration of the second anniversary of the first date of such absence; provided, however, that the twelve-consecutive-month period beginning on the first anniversary of the first date of such absence shall not constitute a Year of Service. For purposes of this paragraph, an absence from work for maternity or paternity reasons means an absence (a) by reason of the pregnancy of the Employee, (b) by reason of a birth of a child of the Employee, (c) by

SouthernCompanySavingsPlan2002.txt
reason of the placement of a child with the Employee in connection with the adoption of such child by such Employee, or (d) for purposes of caring for such child for a period beginning immediately following such birth or placement.

2.14 "Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor statute, and the rulings and regulations promulgated thereunder. In the event an amendment to the Code renumbers a section of the Code referred to in this Plan, any such reference automatically shall become a reference to such section as renumbered.

2.15 "Committee" shall mean the committee appointed pursuant to Section 13.1 to serve as plan administrator.

2.16 "Common Stock" shall mean the common stock of The Southern Company.

2.17 "Company" shall mean Southern Company Services, Inc., and its successors.

2.18 "Compensation" shall mean the salary or wages of a Participant, including all amounts contributed by an Employing Company to The Southern Company Flexible Benefits Plan on behalf of a Participant pursuant to a salary reduction arrangement under such plan, plus monthly shift and monthly seven-day schedule differentials, geographic premiums, monthly customer service premiums, monthly nuclear plant premiums, sales commissions paid under a sales commission payment program sponsored by an Employing Company for sales commissioned based employees, and overtime pay resulting from fluctuations in a Participant's weekly hours worked pursuant to a pre-determined flexible work schedule established or approved by an Employing Company that is intended to produce, on average, forty (40) hour work weeks, and before deduction of taxes, social security, etc., but excluding all awards under any incentive pay plans sponsored by the Employing Company, including but not limited to, The Southern Company Performance Pay Plan, The Southern Company Productivity Improvement Plan, and The Southern Company Executive Productivity Improvement Plan, overtime pay (except as specifically included above), any hourly shift differentials, substitution pay, such amounts which are reimbursements to a Participant paid by any Employing Company, including but not limited to, reimbursement for such items as moving expenses and travel and entertainment expenses, and imputed income for automobile expenses, tax preparation expenses and health and life insurance premiums paid by the Employing Company.

The Compensation of each Participant taken into account for purposes of this Plan shall not exceed the applicable limit under Code Section 401(a)(17).

2.19 "Contribution Percentage" shall mean the ratio (expressed as a percentage), of the sum of the Voluntary Participant Contributions and Employer Matching Contributions under the Plan on behalf of the Eligible Participant for the Plan Year to the Eligible Participant's compensation for the Plan Year. For the purpose of determining an Eligible Participant's Contribution Percentage for a Plan Year, the Committee may elect to consider an Eligible Participant's compensation for (a) the entire Plan Year or (b) that portion of the Plan Year in which the individual is an Eligible Participant, provided that such election is applied uniformly to all Eligible Participants for the Plan Year. The Contribution Percentage of an Eligible Participant who does not make Voluntary Participant Contributions or have Employer Matching Contributions made on his behalf shall be zero.

2.20 "Determination Date" shall mean with respect to a Plan Year, the last day of the preceding Plan Year.

2.21 "Determination Year" shall mean the Plan Year being tested.

2.22 "Direct Rollover" shall mean a payment by the Plan to the
Page 8

SouthernCompanySavingsPlan2002.txt
Eligible Retirement Plan specified by the Distributee.

2.23 "Distributee" shall include an Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is an alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code, are Distributees with regard to the interest of the spouse or former spouse.

2.24 "Elective Employer Contribution" shall mean contributions made pursuant to Section 4.1 during the Plan Year by an Employing Company, at the election of the Participant, in lieu of cash compensation and shall include contributions made pursuant to a salary reduction agreement.

2.25 "Eligible Employee" shall mean an Employee who is employed by an Employing Company and (a) who was eligible to be included in the Plan on January 1, 1991, or (b) who is a regular full-time, regular part-time, or cooperative education employee other than:

(1)     an individual who is classified by an Employing Company as a leased employee, regardless of whether such classification is determined to be in error;

(2)     any Employee who is represented by a collective bargaining agent unless the representatives of his bargaining unit and the Employing Company mutually agree to participation in the Plan subject to its terms by members of his bargaining unit;

(3)     an individual who is a cooperative education employee and who first performs an Hour of Service on or after January 1, 1995;

(4)     an individual who is classified by the Employing Company as a temporary employee (who was not eligible to be included in the Plan on January 1, 1991) or an independent contractor, regardless of whether such classification is determined to be in error. Effective September 1, 1998, any individual classified by the Employing Company as a temporary employee shall be excluded from the Plan, regardless of any prior inclusion in the Plan and regardless of whether the "temporary employee" classification is determined to be in error; and

(5)     an individual who is employed by Mirant Services.

2.26 "Eligible Participant" shall mean an Eligible Employee who is authorized to have Elective Employer Contributions or Voluntary Participant Contributions allocated to his Account for the Plan Year.

2.27 "Eligible Retirement Plan" shall mean an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in Section 403(a) of the Code, a plan described in Section 403(b) of the Code, a plan described in Section 457(b) of the Code which is maintained by a state, an agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this Plan, or a qualified trust described in Section 401(a) of the Code that accepts the Distributee's Eligible Rollover Distribution. This definition of Eligible Retirement Plan shall also apply in the case of a distribution to a surviving spouse, or to a spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Code Section 414(p).

Page 9

SouthernCompanySavingsPlan2002.txt

2.28 "Eligible Rollover Distribution" shall mean any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution does not include: (a) any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Distributee, the joint lives (or joint life expectancies) of the Distributee and the Distributee's Beneficiary, or for a specified period of 10 years or more; (b) any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; (c) the portion of any distribution that is not includable in gross income (determined without regard to the exclusion from net unrealized appreciation with respect to employer securities); and (d) any hardship distribution described in Section 401(k)(2)(B)(i)(IV) of the Code.

2.29 "Employee" shall mean each individual who is employed by an Affiliated Employer under common law and each individual who is required to be treated as an employee pursuant to the "leased employee" rules of Code Section 414(n) other than a leased employee described in Code Section 414(n)(5).

2.30 "Employer Matching Contribution" shall mean a contribution made by an Employing Company pursuant to Section 5.1 with respect to Elective Employer Contributions and Voluntary Participant Contributions made on behalf of each Participant each payroll period.

2.31 "Employing Company" shall mean the Company and any affiliate or subsidiary of The Southern Company which the Board of Directors may from time to time determine to bring under the Plan and which shall adopt the Plan, and any successor of them. The Employing Companies are set forth on Appendix A to the Plan as updated from time to time. No such entity shall be treated as an Employing Company prior to the date it adopts the Plan.

2.32 "Enrollment Date" shall mean the first day of each payroll period.

2.33 "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, or any successor statute, and the rulings and regulations promulgated thereunder. In the event an amendment to ERISA renumbers a section of ERISA referred to in this Plan, any such reference automatically shall become a reference to such section as renumbered.

2.34 "Excess Aggregate Contributions" shall mean the amount referred to in Code Section 401(m)(6)(B) with respect to a Participant. In no event may the Excess Aggregate Contributions for any Highly Compensated Employee exceed the amount of the Employer Matching Contributions or Voluntary Participant Contributions made on behalf of the Highly Compensated Employee for the Plan Year.

2.35 "Excess Deferral Amount" shall mean the amount of Elective Employer Contributions for a calendar year that exceed the Code Section 402(g) limits as allocated to this Plan pursuant to Section 4.3(b).

2.36 "Excess Deferral Contributions" shall mean the amount of Elective Employer Contributions on behalf of a Highly Compensated Employee referred to in Code Section 401(k)(8)(B).

2.37 "Highly Compensated Employee" shall mean (in accordance with and subject to Code Section 414(q) and any regulations, rulings, notices or procedures thereunder), with respect to any Plan Year: (1) any Employee who was a five percent (5%) owner of The Southern Company or an Affiliated Employer (as determined pursuant to Code Section 416) during the Plan Year or the immediately preceding Plan Year, or (2) any Employee who earned more than $80,000 in the preceding Plan Year. The $80,000 amount shall be adjusted for inflation and for short Plan Years, pursuant to Code Section 414(q). The Employer may, at its

Page 10

SouthernCompanySavingsPlan2002.txt
election, limit Employees earning more than $80,000 to only those Employees who fall within the "top-paid group," as defined in Code Section 414(q) excluding those employees described in Code Section 414(q)(8) for such purpose. In determining whether an Employee is a Highly Compensated Employee, the Committee may make any elections authorized under applicable regulations, rulings, notices, or revenue procedures.

2.38 "Hour of Service" shall mean each hour for which an Employee is paid, or entitled to payment, for the performance of duties for an Affiliated Employer.

2.39 "Investment Fund" shall mean any one of the funds described in Article VIII which constitutes part of the Trust Fund.

2.40 "Key Employee" shall mean any Employee or former Employee (and his Beneficiary) who is a key employee within the meaning of Code Section 416(i)(1).

2.41    "Limitation Year" shall mean the Plan Year.

2.42 "Look-Back Year" shall mean the Plan Year preceding the Determination Year.

2.43 "Mirant" shall mean Mirant Corporation, any subsidiary of Mirant Corporation, or any successor thereto.

2.44    "Mirant Services" shall mean Mirant Services, LLC.

2.45    "Mirant Stock" shall mean the common stock of Mirant.

2.46 "Mirant Stock Account" shall mean the total amount credited to the Account of a Participant as described in Section 9.1(c).

2.47 "Mirant Stock Fund" shall mean, effective April 2, 2001, the fund established to hold Mirant Stock as described in Section 8.8.

2.48 "Non-Highly Compensated Employee" shall mean an Employee who is not a Highly Compensated Employee.

2.49 "Normal Retirement Date" shall mean the first day of the month following a Participant's sixty-fifth (65th) birthday.

2.50 "One-Year Break in Service" shall mean each twelve-consecutive-month period within the period commencing with an Employee's Break-in-Service Date and ending on the date the Employee is again credited with an Hour of Service.

2.51 "Participant" shall mean (a) an Eligible Employee who has elected to participate in the Plan as provided in Article III and whose participation in the Plan at the time of reference has not been terminated as provided in the Plan, (b) an Employee or former Employee who has ceased to be a Participant under (a) above, but for whom an Account is maintained under the Plan, (c) an Eligible Employee who has made a Rollover Contribution to this Plan to the extent that the Provisions of the Plan apply to such Rollover Contribution of the Eligible Employee, and (d) an Employee or former Employee for whom a Transferred ESOP Account is maintained under the Plan.

2.52 "Permissive Aggregation Group" shall mean a group of plans consisting of the Required Aggregation Group and, at the election of the Affiliated Employers, such other plan or plans not required to be included in the Required Aggregation Group, provided the resulting group, taken as a whole, would continue to satisfy the provisions of Code Section 401(a)(4) or 410.

2.53 "Plan" shall mean The Southern Company Employee Savings Plan
Page 11

SouthernCompanySavingsPlan2002.txt
(known as the Employee Savings Plan for The Southern Company System prior to January 1, 1991), as described herein or as from time to time amended.

2.54 "Plan Year" shall mean the twelve-month period commencing January 1st and ending on the last day of December next following.

2.55 "Present Value of Accrued Retirement Income" shall mean an amount determined solely for the purpose of determining if the Plan, or any other plan included in a Required Aggregation Group of which the Plan is a part, is top heavy in accordance with Code Section 416.

2.56 "Required Aggregation Group" shall mean those plans that are required to be aggregated as determined under this Section 2.56. In determining a Required Aggregation Group hereunder, each plan of the Affiliated Employers in which a Key Employee is a participant and each other plan of the Affiliated Employers which enables any plan in which a Key Employee participates to meet the requirements of Code Section 410 or 401(a)(4) will be required to be aggregated.

2.57 "Rollover Contribution" shall mean that portion of an eligible rollover distribution that an Eligible Employee elects to contribute to this Plan in accordance with the requirements of Section 4.11. The Plan will accept a direct rollover of an eligible rollover distribution from (a) a qualified plan described in Code Section 401(a) or 403(a), (b) an annuity contract described in Code Section 403(b), or (c) an eligible plan under Code Section 457(b) In addition, the Plan will accept a Rollover Contribution from a conduit individual retirement account or annuity ("IRA"). However, in no event shall the Plan accept after-tax employee contributions as a Rollover Contribution.

2.58        "SCEM" shall mean Southern Company Energy Marketing, L.P.

2.59        "SEPCO" shall mean Savannah Electric and Power Company.

2.60 "SEPCO Plan" shall mean the Employee Savings Plan of Savannah Electric and Power Company as in effect December 31, 1992.

2.61 "SEPCO Transferred Account" shall mean the total amount credited to the account of a Participant as described in Section 9.1(b).

2.62 "Super-Top-Heavy Group" shall mean an Aggregation Group that would be a Top-Heavy Group if 90% were substituted for 60% in Section 2.64.

2.63 "Surviving Spouse" shall mean the person to whom the Participant is married on the date of his death, if such spouse is then living, provided that the Participant and such spouse shall have been married throughout the one (1) year period ending on the date of the Participant's death.

2.64 "Top-Heavy Group" shall mean an Aggregation Group in which, as of the Determination Date, the sum of:

(a) the Present Value of Accrued Retirement Income of Key Employees under all defined benefit plans included in that group, and

(b) the Aggregate Accounts of Key Employees under all defined contribution plans included in the group, exceeds 60% of a similar sum determined for all employees.

2.65 "Transferred ESOP Account" shall mean the total amount credited to the Account of a Participant as described in Section 9.1(d).

2.66 "Trust" or "Trust Fund" shall mean the trust established pursuant to the Trust Agreement.

Page 12

SouthernCompanySavingsPlan2002.txt

2.67 "Trust Agreement" shall mean the trust agreement between the Company and the Trustee, as described in Article XIV.

2.68 "Trustee" shall mean the person or corporation designated as trustee under the Trust Agreement, including any successor or successors.

2.69 "Valuation Date" shall mean each business day of the New York Stock Exchange.

2.70 "Voluntary Participant Contribution" shall mean a contribution made pursuant to Section 4.6 during the Plan Year.

2.71 "Year of Service" shall mean a twelve-month period of employment as an Employee, including any fractions thereof. Calculation of the twelve-month periods shall commence with the Employee's first day of employment, which is the date on which an Employee first performs an Hour of Service, and shall terminate on his Break-in-Service Date. Thereafter, if he has more than one period of employment as an Employee, his Years of Service for any subsequent period shall commence with the Employee's reemployment date, which is the first date following a Break-in-Service Date on which the Employee performs an Hour of Service, and shall terminate on his next Break-in-Service Date. An Employee who has a Break-in-Service Date and resumes employment with the Affiliated Employers within twelve months of his Break-in-Service Date shall receive a fractional Year of Service for the period of such cessation of employment.

Notwithstanding anything in this Section 2.71 to the contrary, an Employee shall not receive credit for more than one Year of Service with respect to any twelve-consecutive-month period.

<PAGE>

## ARTICLE III

### PARTICIPATION

3.1 Eligibility Requirements. Each Eligible Employee who was an active Participant on December 31, 2001 shall continue to be an active Participant in the Plan on January 1, 2002, provided he remains an Eligible Employee. Each other Eligible Employee may elect to participate in the Plan as of any Enrollment Date after the Employee's first day of employment as an Eligible Employee or as soon as administratively practicable thereafter. An Eligible Employee shall make an election to participate by authorizing deductions from or reduction of his Compensation as contributions to the Plan in accordance with Article IV, and directing the investment of such contributions in accordance with Article VIII. Such Compensation deduction and/or reduction authorization and investment direction shall be made in accordance with the procedures established by the Committee.

3.2 Participation upon Reemployment. If an Employee terminates his employment with an Affiliated Employer and is subsequently reemployed as an Eligible Employee, he may elect to become an active Participant in the Plan as of the date of his reemployment or as soon as administratively practicable thereafter.

3.3 No Restoration of Previously Distributed Benefits. A Participant who has terminated his employment with the Affiliated Employers and who has received a distribution of the amount credited to his Account pursuant to Section 12.5 shall not be entitled to restore the amount of such distribution to his Account if he is reemployed and again becomes a Participant in the Plan.

SouthernCompanySavingsPlan2002.txt

A Participant whose benefit under the Plan was transferred to a qualified plan maintained by Mirant Services as a result of the spin-off of Mirant from the Southern Company controlled group on April 2, 2001 shall not be entitled to restoration of the amount of such transfer upon his subsequent reemployment by an Affiliated Employer.

3.4 Loss of Eligible Employee Status. If a Participant loses his status as an Eligible Employee, but remains an Employee, such Participant shall be ineligible to participate and shall be deemed to have elected to suspend making Voluntary Participant Contributions or to have Elective Employer Contributions made on his behalf.

3.5 Military Leave. Notwithstanding any provision of the Plan to the contrary, contributions, benefits, and service credit with respect to qualified military service will be provided in accordance with Section 414(u) of the Code. Loan repayments will be suspended under the Plan as permitted under Section 414(u)(4) of the Code.

<PAGE>

## ARTICLE IV

### ELECTIVE EMPLOYER CONTRIBUTIONS AND

### VOLUNTARY PARTICIPANT CONTRIBUTIONS

4.1 Elective Employer Contributions. An Eligible Employee who meets the participation requirements of Article III may elect on a form provided by the Employing Company to have his Compensation reduced by a whole percentage of his Compensation, which percentage shall not be less than one percent (1%) nor more than sixteen percent (16%) (eight percent (8%) for a Highly Compensated Employee) of his Compensation, such Elective Employer Contribution to be contributed to his Account under the Plan.

4.2 Maximum Amount of Elective Employer Contributions. The maximum amount of Elective Employer Contributions that may be made on behalf of a Participant during any Plan Year to this Plan or any other qualified plan maintained by an Employing Company shall not exceed the dollar limitation set forth in Section 402(g) of the Code in effect at the beginning of such Plan Year.

4.3      Distribution of Excess Deferral Amounts

(a) In General. Notwithstanding any other provision of the Plan, Excess Deferral Amounts and income allocable thereto shall be distributed (and any corresponding Employer Matching Contributions shall be forfeited) no later than April 15, 2002, and each April 15 thereafter, to Participants who allocate (or are deemed to allocate) such amounts to this Plan pursuant to (b) below for the preceding calendar year. Excess Deferral Amounts that are distributed shall not be treated as an Annual Addition. Any Employer Matching Contributions forfeited pursuant to this subsection (a) shall be applied, subject to Section 6.1, toward funding Employing Company contributions (for the Plan Year immediately following the Plan Year to which such forfeited Employer Matching Contributions relate) or distributed, as directed by the Committee, to the extent permitted by applicable law.

(b) Assignment. The Participant's allocation of amounts in
Page 14

SouthernCompanySavingsPlan2002.txt

excess of the Code Section 402(g) limits to this Plan shall be in writing; shall be submitted to the Committee no later than March 1; shall specify the Participant's Excess Deferral Amount for the preceding calendar year; and shall be accompanied by the Participant's written statement that if such amounts are not distributed, such Excess Deferral Amount, when added to amounts deferred under other plans or arrangements described in Section 401(k), 408(k), 408(p), 402(h)(1)(B), 457, 501(c)(18), or 403(b) of the Code, exceeds the limit imposed on the Participant by Section 402(g) of the Code for the year in which the deferral occurred. A Participant is deemed to notify the Committee of any Excess Deferral Amounts that arise by taking into account only those deferrals under this Plan and any other plans of an Affiliated Employer.

(c) Determination of Income or Loss. The Excess Deferral Amount distributed to a Participant with respect to a calendar year shall be adjusted for income or loss through the last day of the Plan Year or the date of distribution, as determined by the Committee. The income or loss allocable to Excess Deferral Amounts is the sum of:

(1) income or loss allocated to the Participant's Account for the taxable year multiplied by a fraction, the numerator of which is such Participant's Excess Deferral Amount for the year and the denominator is the Participant's Account balance attributable to Elective Employer Contributions, minus any income or plus any loss occurring during the Plan Year; and

(2) if the Committee shall determine in its sole discretion, ten percent (10%) of the amount determined under (1) above multiplied by the number of whole calendar months between the end of the Plan Year and the date of the distribution, counting the month of distribution if distribution occurs after the 15th of the month.

Notwithstanding the above, the Committee may designate any reasonable method for computing the income or loss allocable to Excess Deferral Amounts, provided that the method does not violate Section 401(a)(4) of the Code, is used consistently for all Participants and for all corrective distributions under the Plan for the Plan Year, and is used by the Plan for allocating income or loss to Participants' Accounts.

(d) Maximum Distribution Amount. The Excess Deferral Amount, which would otherwise be distributed to the Participant, shall, if there is a loss allocable to such Excess Deferral Amount, in no event be less than the lesser of the Participant's Account under the Plan attributable to Elective Employer Contributions or the Participant's Elective Employer Contributions for the Plan Year.

4.4       Additional Rules Regarding Elective Employer Contributions.
          ----------------------------------------------------------

Salary reduction agreements shall be governed by the following:

(a) A salary reduction agreement shall apply to payroll periods during which such salary reduction agreement is in effect. The Committee, in its discretion, may establish administrative procedures whereby the actual reduction in Compensation may be made to coincide with each payroll period of the Employing Company, or at such other times as the Committee may determine.

(b) The Employing Company may amend or revoke its salary

SouthernCompanySavingsPlan2002.txt
reduction agreement with any Participant at any time, if the Employing
Company determines that such revocation or amendment is necessary to
ensure that a Participant's additions for any Plan Year will not exceed
the limitations of Sections 4.2 and 6.1 of the Plan or to ensure that
the Actual Deferral Percentage Test is satisfied.

(c) Except as required under (b) above, and under Section
4.5(b) below, no amounts attributable to Elective Employer
Contributions may be distributed to a Participant or his Beneficiary
from his Account prior to the earlier of:

(1)     the severance from employment, death or disability of
        the Participant;

(2)     the attainment of age 59 1/2 by the Participant;

(3)     the termination of the Plan without establishment of
        a successor plan;

(4)     a financial hardship of the Participant pursuant to
        Section 11.6 of the Plan;

(5)     the date of a sale by an Employing Company to an
        entity that is not an Affiliated Employer of
        substantially all of the assets (within the meaning
        of Code Section 409(d)(2)) with respect to a
        Participant who continues employment with the
        corporation acquiring such assets; or

(6)     the date of the sale by an Employing Company or an
        Affiliated Employer of its interest in a subsidiary
        (within the meaning of Code Section 409(d)(3)) to an
        entity which is not an Affiliated Employer with
        respect to the Participant who continues employment
        with such subsidiary.

4.5     Section 401(k) Nondiscrimination Tests.

(a) Actual Deferral Percentage Test. The Plan shall satisfy
the nondiscrimination test of Section 401(k)(3) of the Code, under
which no Elective Employer Contributions shall be made that would cause
the Actual Deferral Percentage for Eligible Participants who are Highly
Compensated Employees to exceed the following:

(1) The Average Actual Deferral Percentage for the
Eligible Participants who are Highly Compensated Employees in the
current Plan Year shall not exceed the Average Actual Deferral
Percentage for the prior Plan Year for Eligible Participants who were
Non-Highly Compensated Employees for the prior Plan Year multiplied by
1.25; or

(2) The Average Actual Deferral Percentage for
Eligible Participants who are Highly Compensated Employees in the
current Plan Year shall not exceed the Average Actual Deferral
Percentage for Eligible Participants who were Non-Highly Compensated
Employees in the prior Plan Year multiplied by two (2), provided that
the Average Actual Deferral Percentage for Eligible Participants who
are Highly Compensated Employees in the current Plan Year does not
exceed the Average Actual Deferral Percentage for the prior Plan Year
for Eligible Participants who were Non-Highly Compensated Employees in
the prior Plan Year by more than two (2) percentage points.

(b)     Distribution of Excess Deferral Contributions.
                        Page 16

SouthernCompanySavingsPlan2002.txt
------------------------------------------------

(1) In General. The Excess Deferral Contributions for a Highly Compensated Employee for a Plan Year which are to be distributed shall be distributed such that the Highly Compensated Employee with the highest amount of Elective Employer Contributions for the Plan Year shall be reduced to the extent required to:

(A) distribute the total amount of Excess Deferral Contributions, or

(B) cause the amount of such Highly Compensated Employee's Elective Employer Contributions to equal the amount of Elective Employer Contributions of the Highly Compensated Employee with the next highest amount of Elective Employer Contributions for the Plan Year.

This process must be repeated until all Excess Deferral Contributions are distributed.

Excess Deferral Contributions plus any income and minus any loss allocable thereto shall be distributed (and any corresponding Employer Matching Contribution shall be forfeited) to Participants on whose behalf such Excess Deferral Contributions were made within two and one-half (2-1/2) months after the last day of the Plan Year in which such excess amounts arose, and in any event not later than the last day of the Plan Year following the close of the Plan Year for which such contributions were made. Distribution of Excess Deferral Contributions shall be made to Highly Compensated Employees in accordance with this Section 4.5(b). Any Employer Matching Contributions forfeited pursuant to this Subsection (b)(1) shall be applied, subject to Section 6.1, toward funding Employing Company Contributions (for the Plan Year immediately following the Plan Year to which such forfeited Employer Matching Contributions relate) or distributed, as directed by the Committee, to the extent permitted by applicable law.

(2) Determination of Income or Loss. Excess Deferral Contributions to be distributed shall be adjusted for any income or loss through the last day of the Plan Year or the date of distribution, as determined by the Committee. The income or loss allocable to such Excess Deferral Contributions is the sum of:

(A) income or loss allocated to the Participant's Account for the taxable year multiplied by a fraction, the numerator of which is the Participant's Excess Deferral Contributions to be distributed for the year and the denominator is the Participant's Account balance attributable to Elective Employer Contributions, minus any income or plus any loss occurring during the Plan Year; and

(B) if the Committee shall determine in its sole discretion, ten percent (10%) of the amount determined under (A) above multiplied by the number of whole calendar months between the end of the Plan Year and the date of the distribution, counting the month of distribution if distribution occurs after

Page 17

SouthernCompanySavingsPlan2002.txt
the 15th of the month.

Notwithstanding the above, the Committee may designate any reasonable method for computing the income or loss allocable to Excess Deferral Contributions, provided that the method does not violate Section 401(a)(4) of the Code, is used consistently for all Participants and for all corrective distributions under the Plan for the Plan Year, and is used by the Plan for allocating income or loss to Participants' Accounts.

(3) Maximum Distribution Amount. The Excess Deferral Contributions which would otherwise be distributed to the Participant shall be adjusted for income; shall be reduced, in accordance with regulations, by the Excess Deferral Amount distributed to the Participant; and shall, if there is a loss allocable to the Excess Deferral Contributions, in no event be less than the lesser of the Participant's Account under the Plan attributable to Elective Employer Contributions or the Participant's Elective Employer Contributions for the Plan Year.

(c)     Special Rules.
--------------

(1) For purposes of this Section 4.5, the Actual Deferral Percentage for any Eligible Participant who is a Highly Compensated Employee for the Plan Year and who is eligible to have deferral contributions allocated to his account under two (2) or more plans or arrangements described in Section 401(k) of the Code that are maintained by an Affiliated Employer shall be determined as if all such deferral contributions were made under a single arrangement. If a Highly Compensated Employee participates in two (2) or more cash or deferred arrangements that have different plan years, all cash or deferred arrangements ending with or within the same calendar year shall be treated as a single arrangement. Notwithstanding the foregoing, certain plans shall be treated as separate if mandatorily disaggregated under Code Section 401(k).

(2) In the event that this Plan satisfies the requirements of Code Section 401(k), 401(a)(4), or 410(b) only if aggregated with one or more other plans, or if one or more other plans satisfy the requirements of Code Section 401(k), 401(a)(4), or 410(b) only if aggregated with this Plan, then the actual deferral percentages shall be determined as if all such plans were a single plan.

4.6 Voluntary Participant Contributions. An Eligible Employee who meets the participation requirements of Article III may elect in accordance with the procedures established by the Committee to contribute to his Account a Voluntary Participant Contribution consisting of any whole percentage of his Compensation, which percentage is not less than one percent (1%) nor more than sixteen percent (16%) of his Compensation. The maximum Voluntary Participant Contribution shall be reduced by the percent, if any, which is contributed as an Elective Employer Contribution on behalf of such Participant under Section 4.1. Notwithstanding the above, a Highly Compensated Employee may contribute not less than one percent (1%) nor more than three percent (3%) of his Compensation as a Voluntary Participant Contribution.

4.7 Manner and Time of Payment of Elective Employer Contributions and Voluntary Participant Contributions. Contributions made in accordance with

SouthernCompanySavingsPlan2002.txt
Sections 4.1 and 4.6 will be made only through payroll deductions and will be
effective as of the payroll period commencing as soon as practicable after the
date on which the Participant elects to commence participation in the Plan.
Contributions shall be remitted to the Trustee as of the earliest date on which
such contributions can reasonably be segregated from each Employing Company's
general assets, but in any event not later than the fifteenth (15th) business
day of the month following the month during which such amounts would otherwise
have been payable to the Participant in cash or such earlier time as may be
prescribed by applicable law.

4.8 Change in Contribution Rate. A Participant may prospectively change
the percentage of his Compensation that he has authorized as the Elective
Employer Contribution to be made on his behalf or his Voluntary Participant
Contribution to another permissible percentage in accordance with the procedures
established by the Committee. Such election shall be effective as soon as
practicable after it is made.

4.9 Change in Contribution Amount. In the event of a change in the
Compensation of a Participant, the percentage of the Elective Employer
Contribution made on his behalf or his Voluntary Participant Contribution
currently in effect shall be applied as soon as practicable with respect to such
changed Compensation without action by the Participant.

4.10 Rollover Contributions and Direct Transfers from the SEPCO and
ECMC Plans.

(a) A Participant shall be entitled to transfer (or cause to
be transferred directly from the trustee) to the Trust to be held as
part of his Account all or a portion of the fair market value of the
cash or other property a Participant receives in the distribution of
his accrued benefits under the Profit Sharing Plan for Electric City
Merchandise Company, Inc. ("ECMC Plan"), reduced by any voluntary
participant contributions under such plan. Such rollover contribution
may only be made within sixty (60) days following the date the
Participant receives the distribution (or within such additional period
as may be provided under Section 408 of the Code if the Participant
shall have made a timely deposit of the distribution in an individual
retirement account). No such rollover contribution or trustee to
Trustee transfer shall be made by a Participant (or on his behalf) if
not otherwise permissible under the Code or if such rollover
contribution or transfer would subject this Plan to the requirements of
Section 401(a)(11)(A) of the Code.

Notwithstanding the foregoing, the Trustee is specifically
authorized to accept any rollover accounts under the terms of the SEPCO
Plan as are necessary to reflect a Participant's interest in the Plan
resulting from the merger of the SEPCO Plan into this Plan effective as
of January 1, 1993. Any such rollover account shall be held as part of
the Participant's Account and shall be subject to the requirements of
Article XVIII.

(b) Any amounts so transferred to the Trust shall be
entitled to share in earnings or losses of the Trust in the same manner
as other Employing Company contributions to the Trust.

(c) The portion of a Participant's Account attributable to
any rollover contribution or trustee to Trustee transfer shall be
distributed with the balance of the Participant's Account pursuant to
Article XII of the Plan.

4.11 Rollovers from Other Plans. An Eligible Employee who is hired or
rehired and has received a distribution of his interest in a retirement plan of
a former employer, or a distribution of the interest of his deceased spouse in a
Page 19

SouthernCompanySavingsPlan2002.txt

retirement plan of his spouse's former employer, under circumstances meeting the requirements of Section 402(c)(4) of the Code relating to eligible rollover distributions from qualified plans, including plans established under Code Section 403(b) or 457(b), may elect to deposit all or any portion (as designated by such Eligible Employee) of the amount of such distribution as a Rollover Contribution to this Plan. A Rollover Contribution may be made only within 60 days following the date the Eligible Employee receives the distribution from the plan of his former employer (or within such additional period as may be provided under Section 408 of the Code if the Eligible Employee shall have made a timely deposit of the distribution in an individual retirement account) and within 18 months after the date of his employment or reemployment with an Employing Company. However, the 18-month requirement shall not apply with respect to Rollover Contributions attributable to the distribution of the interest of an Eligible Employee's deceased spouse in a retirement plan of the spouse's former employer.

The Committee shall establish rules and procedures to implement this Section 4.11, including without limitation, such procedures as may be appropriate to permit the Committee to verify the tax qualified status of the plan of the former employer and compliance with any applicable provisions of the Code relating to such contributions. The amount contributed to the Trustee pursuant to this Section 4.11 shall be placed in the Eligible Employee's Rollover Contribution subaccount for the benefit of the Eligible Employee pursuant to Section 9.1. The Eligible Employee shall have a fully vested interest in the balance of his Rollover Contribution subaccount at all times and such Rollover Contribution subaccount shall share in the earnings, gains, and losses of the Trust Fund as set forth in Article IX of the Plan. An Employee shall be entitled to a distribution of his Rollover Contribution subaccount pursuant to the applicable provisions of Articles XI and XII hereof.

<PAGE>

## ARTICLE V

### EMPLOYER MATCHING CONTRIBUTIONS

5.1 Amount of Employer Matching Contributions. The Board of Directors, in its sole and absolute discretion, shall determine the amount of Employer Matching Contributions that shall be made by each Employing Company on behalf of each Participant in its employ. The amount of Employer Matching Contributions shall be fixed by resolutions of the Board of Directors and communicated to each Employing Company prior to the first day of each Plan Year.

5. 2 Payment of Employer Matching Contributions. Except as provided herein, Employer Matching Contributions shall be remitted to the Trustee as soon as practicable after the payroll period to which they relate.

5. 3 Limitations on Employer Matching Contributions and Voluntary Participant Contributions.

(a) Actual Contribution Percentage Test. The Plan shall satisfy the nondiscrimination test of Section 401(m) of the Code, under which the Average Contribution Percentage for Eligible Participants shall not exceed (1) or (2) as follows:

(1) The Average Contribution Percentage for Eligible Participants who are Highly Compensated Employees in the current Plan Year shall not exceed the Average Contribution Percentage for the prior Plan Year for Eligible Participants

Page 20

SouthernCompanySavingsPlan2002.txt
who were Non-Highly Compensated Employees in the prior Plan
Year multiplied by 1.25; or

(2) The Average Contribution Percentage for Eligible
Participants who are Highly Compensated Employees in the
current Plan Year shall not exceed the Average Contribution
Percentage for Eligible Participants who were Non-Highly
Compensated Employees in the prior Plan Year multiplied by two
(2), provided that the Average Contribution Percentage for
Eligible Participants who are Highly Compensated Employees in
the current Plan Year does not exceed the Average Contribution
Percentage for the prior Plan Year for Eligible Participants
who were Non-Highly Compensated Employees in the prior Plan
Year by more than two (2) percentage points.

(b)      Distribution of Excess Aggregate Contributions.
-------------------------------------------------

(1) In General. The Excess Aggregate Contributions
for a Highly Compensated Employee for a Plan Year which are to
be distributed shall be distributed such that the Highly
Compensated Employee with the highest amount of Matching
Employer Contributions and Voluntary Participant Contributions
shall be reduced to the extent required to:

(A) distribute the total amount of Excess
Aggregate Contributions, or

(B) cause the amount of such Highly
Compensated Employee's Employer Matching
Contributions and Voluntary Participant Contributions
to equal the amount of Employer Matching
Contributions and Voluntary Participant Contributions
of the Highly Compensated Employee with the next
highest amount of Employer Matching Contributions and
Voluntary Participant Contributions for the Plan
Year.

This process must be repeated until all Excess
Aggregate Contributions are distributed.

Excess Aggregate Contributions, plus any income and
minus any loss allocable thereto, shall be distributed (or, if
forfeitable, forfeited) within 2-1/2 months after the last day
of the Plan Year in which such excess amounts arose, and in
any event not later than the last day of the following Plan
Year, to Participants to whose Accounts such Excess Aggregate
Contributions were allocated for the Plan Year. Excess
Aggregate Contributions shall be treated as Annual Additions.

(2) Determination of Income or Loss. Excess Aggregate
Contributions to be distributed shall be adjusted for any
income or loss through the last day of the Plan Year or the
date of distribution, as determined by the Committee. The
income or loss allocable to such Excess Aggregate
Contributions is the sum of:

(A) income or loss allocated to the
Participant's Account attributable to Voluntary
Participant Contributions and Employer Matching
Contributions to be distributed for the Plan Year
multiplied by a fraction, the numerator of which is
the Participant's Excess Aggregate Contributions for
Page 21

SouthernCompanySavingsPlan2002.txt
the year and the denominator is the Participant's
Account balance attributable to Voluntary Participant
Contributions and Employer Matching Contributions,
minus any income or plus any loss occurring during
the Plan Year; and

(B) if the Committee shall determine in its
sole discretion, ten percent (10%) of the amount
determined under (1) above multiplied by the number
of whole calendar months between the end of the Plan
Year and the date of the distribution, counting the
month of distribution if distribution occurs after
the 15th of the month.

Notwithstanding the above, the Committee may
designate any reasonable method for computing the income or
loss allocable to Excess Aggregate Contributions, provided
that the method does not violate Section 401(a)(4) of the
Code, is used consistently for all Participants and for all
corrective distributions under the Plan for the Plan Year, and
is used by the Plan for allocating income or loss to
Participants' Accounts.

(3) Accounting for Excess Aggregate Contributions.
Excess Aggregate Contributions shall be distributed first from
Voluntary Participant Contributions allocated to the
Participant's Account and any corresponding Employer Matching
Contribution shall also be forfeited and then, if necessary,
distributed from the remaining Employer Matching Contribution
allocated to the Participant's Account.

(c)      Special Rules.

(1) The Contribution Percentage for any Eligible
Participant who is a Highly Compensated Employee for the Plan
Year and who is eligible to make voluntary participant
contributions, to receive employer matching contributions, or
to make deferral contributions under two or more plans
described in Section 401(a) of the Code or arrangements
described in Section 401(k) of the Code that are maintained by
an Affiliated Employer shall be determined as if all such
contributions were made under a single plan.

(2) In the event that this Plan satisfies the
requirements of Code Section 401(m), 401(a)(4), or 410(b) only
if aggregated with one or more other plans, or if one or more
other plans satisfy the requirements of Code Section 401(m),
401(a)(4), or 410(b) only if aggregated with this Plan, then
the contribution percentages shall be determined as if all
such plans were a single plan.

(3) The determination and treatment of the
Contribution Percentage of any Eligible Participant shall
satisfy such other requirements as may be prescribed by the
Secretary of the Treasury.

5. 4 Multiple Use Limitation. If both the Average Actual Deferral
Percentage and the Average Contribution Percentage of the Highly Compensated
Employees exceed 1.25 of the Average Actual Deferral Percentage and the Average
Contribution Percentage of the Non-Highly Compensated Employees and if one or
more Highly Compensated Employees makes Elective Employer Contributions and
receives Employer Matching Contributions, and the sum of the Actual Deferral
Percentage and Actual Contribution Percentage of those Highly Compensated

SouthernCompanySavingsPlan2002.txt

Employees subject to either or both tests exceed the aggregate limit as defined
in Treasury Regulation Section 1.401(m)-2, then the Employer Matching
Contribution of those Highly Compensated Employees who participate in the cash
or deferred arrangement will be reduced (beginning with such Highly Compensated
Employee whose Employer Matching Contribution is the highest) so that the
aggregate limit is not exceeded. For purposes of determining if the aggregate
limit has been exceeded, the Actual Deferral Percentage and the Contribution
Percentage of the Highly Compensated Employees shall be determined after any
corrections required to meet the Actual Deferral Percentage Test and the Actual
Contribution Percentage Test.

        5. 5 Reversion of Employing Company Contributions. Employing Company
contributions computed in accordance with the provisions of this Plan shall
revert to the Employing Company under the following circumstances:

                (a) In the case of an Employing Company contribution which is
        made by reason of a mistake of fact, such contribution upon written
        direction of the Employing Company shall be returned to the Employing
        Company within one year after the payment of the contribution.

                (b) If any Employing Company contribution is determined to be
        nondeductible under Section 404 of the Code, then such Employing
        Company contribution, to the extent that it is determined to be
        nondeductible, upon written direction of the Employing Company shall be
        returned to the Employing Company within one year after the
        disallowance of the deduction.

        The amount which may be returned to the Employing Company under this
Section 5.7 is the excess of (1) the amount contributed over (2) the amount that
would have been contributed had there not occurred a mistake of fact or
disallowance of the deduction. Earnings attributable to the excess contribution
shall not be returned to the Employing Company, but losses attributable thereto
shall reduce the amount to be so returned. If the withdrawal of the amount
attributable to the mistaken contribution would cause the balance of the Account
of any Participant to be reduced to less than the balance which would have been
in the Account had the mistaken amount not been contributed, then the amount to
be returned to the Employing Company shall be limited so as to avoid such
reduction.

        5.6 Correction of Prior Incorrect Allocations and Distributions.
Notwithstanding any provisions contained herein to the contrary, in the event
that, as of any Valuation Date, adjustments are required in any Participants'
Accounts to correct any incorrect allocation of contributions or investment
earnings or losses, or such other discrepancies in Account balances that may
have occurred previously, the Employing Companies may make additional
contributions to the Plan to be applied to correct such incorrect allocations or
discrepancies. The additional contributions shall be allocated by the Committee
to adjust such Participants' Accounts to the value which would have existed on
said Valuation Date had there been no prior incorrect allocation or
discrepancies. The Committee shall also be authorized to take such other actions
as it deems necessary to correct prior incorrect allocations or discrepancies in
the Accounts of Participants under the Plan.

<PAGE>


                              ARTICLE VI

                     LIMITATIONS ON CONTRIBUTIONS


                              Page 23

SouthernCompanySavingsPlan2002.txt

6.1 Section 415 Limitations. Notwithstanding any provision of the Plan to the contrary, except to the extent permitted under Code Section 414(v), the total Annual Additions allocated to the Account (and the accounts under all defined contribution plans maintained by an Affiliated Employer) of any Participant for any Limitation Year in accordance with Code Section 415 and the regulations thereunder, which are incorporated herein by this reference, shall not exceed the lesser of the following amounts:

    (a) one hundred percent (100%) of the Participant's compensation (as defined in Code Section 415(c)(3) and any rulings and regulations thereunder) in the Limitation Year; or

    (b) $40,000 (as adjusted pursuant to Code Section 415(d)(1)(C)).

The Annual Addition for any Plan Year beginning before January 1, 1987 shall not be recomputed to treat all Voluntary Participant Contributions as an Annual Addition.

6.2 Correction of Contributions in Excess of Section 415 Limits. If the Annual Additions for a Participant exceed the limits of Section 6.1 as a result of the allocation of forfeitures, if any, a reasonable error in estimating a Participant's annual compensation for purposes of the Plan, a reasonable error in determining the amount of elective deferrals (within the meaning of Section 402(g)(3) of the Code) that may be made with respect to any individual, or under other limited facts and circumstances that the Commissioner of the Treasury finds justify the availability of the rules set forth in this Section 6.2, the excess amounts shall not be deemed Annual Additions if they are treated in accordance with any one or more or any combination of the following:

(a)    distribute to the Participant that portion, or all, of his Elective Employer Contributions (as adjusted for income and loss) as is necessary to ensure compliance with Section 6.1;

(b)    return to the Participant that portion, or all, of his Voluntary Participant Contributions (as adjusted for income and loss) as is necessary to ensure compliance with Section 6.1; and

(c)    forfeiture of that portion, or all, of the Employer Matching Contributions (as adjusted for income and loss) and any forfeitures of Employer contributions that were allocated to the Participant's Account (as adjusted for income and loss), as is necessary to ensure compliance with Section 6.1.

Any amounts distributed or returned to the Participant under (a) or (b) above shall be disregarded for purposes of the Actual Deferral Percentage Test and for purposes of the Actual Contribution Percentage Test.

Any amounts forfeited under this Section 6.2 shall be held in a suspense account and shall be applied, subject to Section 6.1, toward funding the Employer Matching Contributions for the next succeeding Plan Year. Such application shall be made prior to any Employing Company contributions and prior to any Employer Matching Contributions that would constitute Annual Additions. No income or investment gains and losses shall be allocated to the suspense account provided for under this Section 6.2. If any amount remains in a suspense account provided for under this Section 6.2 upon termination of this Plan, such amount will revert to the Employing Companies notwithstanding any other provision of this Plan.

6.3 Combination of Plans. If an Employee participates in more than one

SouthernCompanySavingsPlan2002.txt

defined contribution plan maintained by an Affiliated Employer and his Annual Additions exceed the limitations of Section 6.1, corrective adjustments shall be made first under this Plan and then, to the extent necessary, under The Southern Company Performance Sharing Plan and then, to the extent necessary, under The Southern Company Employee Stock Ownership Plan.

<PAGE>

## ARTICLE VII

### SUSPENSION OF CONTRIBUTIONS

7.1 Suspension of Contributions. A Participant may (on a prospective basis) voluntarily suspend the Elective Employer Contributions made on his behalf and his Voluntary Participant Contributions in accordance with the procedures established by the Committee. Such suspension shall be effective as soon as practicable after it is made. Whenever Elective Employer Contributions made on a Participant's behalf and Voluntary Participant Contributions are suspended, Employer Matching Contributions shall also be suspended.

7.2 Resumption of Contributions. A Participant may terminate prospectively any such suspension in accordance with the procedures established by the Committee. Such resumption of contributions shall be effective as soon as practicable after the election to terminate prospectively the suspension is made. There shall be no make up of any contributions by a Participant or by an Employing Company with respect to a period of suspension.

<PAGE>

## ARTICLE VIII

### INVESTMENT OF CONTRIBUTIONS

8.1 Investment Funds. The Investment Funds shall be selected from time to time by the Pension Fund Investment Review Committee of the Southern Company System. In addition to such other Investment Funds selected by the Pension Fund Investment Review Committee, the Investment Funds shall include the "Company Stock Fund". The Company Stock Fund shall be invested and, subject to Section 12.13 of the Plan, reinvested in Common Stock, provided that funds applicable to the purchase of Common Stock pending investment of such funds may be temporarily invested in short-term United States Government obligations, other obligations guaranteed by the United States Government, commercial paper, or certificates of deposit, and, if the Trustee so determines, may be transferred to money market funds utilized by the Trustee for qualified employee benefit trusts.

8.2 Investment of Participant Contributions. Each Participant shall direct, at the time he elects to participate in the Plan and at such other times as may be directed by the Committee or pursuant to Section 8.6, that his Elective Employer Contributions and Voluntary Participant Contributions be invested in one or more of the Investment Funds, provided such investments are made in one-percent (1%) increments.

8.3 Investment of Employer Matching Contributions. Employer Matching Contributions shall be invested entirely in the Company Stock Fund and shall remain invested in the Company Stock Fund except as follows:

Page 25

SouthernCompanySavingsPlan2002.txt

(a) Any Participant whose employment with the Affiliated Employers is terminated as a result of his retirement pursuant to the defined benefit pension plan of an Affiliated Employer may elect to invest the amount credited to his Employer Matching Contribution subaccount in any of the Investment Funds under this Plan as provided in Section 8.5; and

(b) Any Participant may elect at any time on or after the fifth anniversary of the Enrollment Date on which he first became a Participant in this Plan to invest a portion of the amount credited to his Employer Matching Contribution subaccount in any of the Investment Funds under this Plan as provided in Section 8.5, except that the amount subject to such election attributable to Common Stock may not exceed fifty percent (50%) of the amount of Common Stock credited to his Employer Matching Contribution subaccount at the time the election is made.

.   8.4 Investment of Earnings. Except as provided in Section 12.13 of the Plan, interest, dividends, if any, and other distributions received by the Trustee with respect to an Investment Fund shall be invested in such Investment Fund.

8.5 Transfer of Assets between Funds. A Participant may direct in accordance with the provisions of this Section 8.5 and such procedures established by the Committee that all of his interest in an Investment Fund or Funds attributable to amounts in his Account (including Employer Matching Contributions other than those required to be invested in the Company Stock Fund pursuant to Section 8.3) or any portion of such amount (expressed in number of shares, whole dollar amounts, or one-percent (1%) increments) to the credit of his Account be transferred and invested by the Trustee as of such date in any other Investment Fund as designated by the Participant. Such direction shall be effective as soon as practicable after it is made.

8.6 Change in Investment Direction. Any investment direction given by a Participant shall continue in effect until changed by the Participant. A Participant may change his investment direction as to the future contributions and allocations to his Account (other than Employer Matching Contributions) in accordance with the procedures established by the Committee, and such direction shall be effective as soon as practicable after it is made.

8.7 Section 404(c) Plan. This Plan is intended to be a plan described in ERISA Section 404(c) and shall be interpreted in accordance with Department of Labor Regulations Section 1.404c-1, which is incorporated herein by this reference. The Committee shall take such actions as it deems necessary or appropriate in its discretion to cause the Plan to comply with such requirements, including, but not limited to, providing Participants with the right to request and receive written confirmation of their investment instructions. Further, the Committee shall take such actions as it deems necessary or appropriate in its discretion (a) to ensure that confidentiality procedures with respect to a Participant's ownership of Common Stock and the exercise of ownership rights with respect to such Common Stock are adequate and utilized, and (b) to appoint an independent fiduciary to carry out such actions as the Committee determines involve the potential for undue influence on Participants with regard to the direct or indirect exercise of shareholder rights with respect to Common Stock.

8.8 Mirant Stock Fund. All Mirant Stock received by the Plan pursuant to Sections 9.1(c) and 9.1(d) shall be held in a "Mirant Stock Fund." Participants may direct investments out of the Mirant Stock Fund and into the other Investment Funds in accordance with the procedures of this Article VIII.

SouthernCompanySavingsPlan2002.txt

However, Participants may not direct investments into the Mirant Stock Fund and, should a Participant elect to direct investments out of the Mirant Stock Fund, he may not again direct any amount attributable to such investments back into the Mirant Stock Fund. In no event shall the Mirant Stock Fund remain as an Investment Fund under the Plan later than the end of the calendar quarter which includes the five-year anniversary of the date Mirant Stock is first held in the Mirant Stock Fund. The Mirant Stock Fund shall be treated as a portion of the Plan which is not an employee stock ownership plan in accordance with Treasury Regulation Section 1.410(b)-7(c)(2).

<PAGE>

ARTICLE IX

MAINTENANCE AND VALUATION OF PARTICIPANTS' ACCOUNTS

9.1        Establishment of Accounts.

(a) An Account shall be established for each Participant. In addition, subaccounts shall be established for each Participant to reflect all Elective Employer Contributions, Voluntary Participant Contributions, Employer Matching Contributions, Rollover Contributions, and rollover contributions from the SEPCO Plan (and the earnings and/or losses on each subaccount). Each Participant will be furnished a statement of his Account at least annually and upon any distribution.

(b) The Committee shall also establish a subaccount known as a Participant's SEPCO Transferred Account to reflect the Participant's interest in the Plan resulting from the merger of the SEPCO Plan into this Plan effective as of January 1, 1993. To the extent that a Participant's Salary Deferral Account, Employer Contribution Account, and Rollover Account (as those terms were defined under the SEPCO Plan), were transferred to this Plan from the SEPCO Plan, such accounts shall retain their character as participant deferral, employer, or rollover contributions, respectively, and the Committee shall establish and maintain such bookkeeping accounts as it deems necessary to account for such contributions, and any subsequent earnings or losses attributable thereto, under this Plan.

(c) Upon the distribution by the Southern Company to its shareholders of the Mirant Stock held by the Southern Company pursuant to a tax-free spin-off under Code Section 355 or such similar transaction, the Committee shall establish a subaccount known as a Participant's "Mirant Account" to reflect the Participant's interest in the Mirant Stock received by the Plan (other than Mirant Stock transferred to the Plan as described in Section 9.1(d)) pursuant to such transaction. To the extent that shares of Mirant Stock are attributable to Common Stock in a Participant's subaccounts which reflect Elective Employer Contributions, Voluntary Participant Contributions, Employer Matching Contributions, Rollover Contributions, and amounts in a Participant's SEPCO Transferred Account, the shares of Mirant Stock attributable to each shall retain their character as Elective Employer Contributions, Voluntary Participant Contributions, Employer Matching Contributions, Rollover Contributions, and amounts in a Participant's SEPCO Transferred Account, respectively, and the Committee shall establish and maintain such bookkeeping accounts as it deems necessary to account for such Mirant Stock, and any subsequent earnings or losses attributable thereto, under this Plan.

Page 27

SouthernCompanySavingsPlan2002.txt

(d) Upon the transfer to the Plan of the Mirant Stock distributed to The Southern Company Employee Stock Ownership Plan ("ESOP") in connection with a transaction described in Section 9.1(c), the Committee shall establish a subaccount known as a Participant's "Transferred ESOP Account" to reflect the Participant's interest in the Plan attributable to the Mirant Stock transferred to the Plan from the ESOP. The Committee shall establish and maintain separate bookkeeping accounts within the Transferred ESOP Account for amounts attributable to the Mirant Stock that was distributed on Common Stock which had been held in the ESOP for more than two years as of the date of transfer, amounts attributable to Mirant Stock that was distributed on Common Stock which had been held in the ESOP for more than one year but less than two years as of the date of transfer, and amounts attributable to Mirant Stock that was distributed on Common Stock which had been held in the ESOP for less than one year as of the date of transfer, respectively.

9.2 Valuation of Investment Funds. Except as provided in Section 12.13 of the Plan, a Participant's Account in respect of his interest in each Investment Fund shall be credited or charged, as the case may be, as of each Valuation Date with the dividends, income, gains, appreciation, losses, depreciation, forfeitures, expenses, and other transactions with respect to such Investment Fund for the Valuation Date as of which such credit or charge accrued. Such credits or charges to a Participant's Account shall be made in such proportions and by such method or formula as shall be deemed by the Committee to be necessary or appropriate to account for each Participant's proportionate beneficial interest in the Trust Fund in respect of his interest in each Investment Fund. Investments of each Investment Fund shall be valued at their fair market values as of each Valuation Date as determined by the Trustee, and such valuation shall conclusively establish such value.

9.3 Rights in Investment Funds. Nothing contained in this Article IX shall be deemed to give any Participant any interest in any specific property in any Investment Fund or any interest, other than the right to receive payments or distributions in accordance with the Plan or the right to instruct the Trustee how to vote Common Stock as provided in Section 14.3.

<PAGE>

ARTICLE X

VESTING

10.1 Vesting. The amount to the credit of a Participant's Account shall at all times be fully vested and nonforfeitable.

<PAGE>

ARTICLE XI

WITHDRAWALS AND LOANS

11.1     Withdrawals by Participants.
Page 28

SouthernCompanySavingsPlan2002.txt
--------------------------

(a) Subject to the provisions of Article XII, this Section 11.1, and Sections 11.2 through 11.6, a Participant may make withdrawals from his Account effective as of any Valuation Date in the order of priority listed below:

(1) All or a portion of the value of his Account attributable to Voluntary Participant Contributions (not including any earnings or appreciation thereon) made prior to January 1, 1987;

(2) All amounts described above, plus all or a portion of the value of his Account attributable to Voluntary Participant Contributions, plus a ratable portion of the earnings and/or appreciation on Voluntary Participant Contributions;

(3) All amounts described above, plus effective April 1, 1997, all or a portion of the value of his Account attributable to Rollover Contributions (including earnings and appreciation thereon);

(4) All amounts described above, plus the value of his Transferred ESOP Account as described in Section 9.1(d); provided, however, that the amount in his Transferred ESOP Account attributable to Mirant Stock that was distributed on Common Stock which had been held in the ESOP for less than two years as of the date of transfer may not be distributed until the first day of the month following the two-year anniversary of the date such Common Stock was contributed to the ESOP;

(5) All amounts described above, plus up to fifty percent (50%) of the value of his Account attributable to Employer Matching Contributions (including earnings and appreciation thereon) allocated to his Account; provided, however, that said Participant shall have participated in the Plan for not less than sixty (60) months at the time of the withdrawal;

(6)(A) For Participants who have not attained age 59 1/2 or separated from service with the Affiliated Employers (within the meaning of Code Section 401(k)(2)(B)(i)(I)), all amounts described above, plus all or a portion of the value of his Account attributable to Elective Employer Contributions (not including any earnings or appreciation thereon for Plan Years beginning after December 31, 1988); and

(B) For Participants who have attained age 59 1/2 or separated from service with the Affiliated Employers (within the meaning of Code Section 401(k)(2)(B)(i)(I)), all amounts described above, plus all or a portion of the value of his Account attributable to any earnings or appreciation on Elective Employer Contributions.

For purposes of this Section 11.1, any individual who becomes a Participant solely because a Transferred ESOP Account is established on behalf of such individual shall be treated as participating in the Plan as of the date such Transferred ESOP Account is established.

(b) Notwithstanding the foregoing, withdrawals from a
Page 29

SouthernCompanySavingsPlan2002.txt
Participant's SEPCO Transferred Account shall be made in accordance with Article XVIII.

11.2 Notice of Withdrawal. Notice of withdrawal must be given by a Participant in accordance with the procedures established by the Committee, and if such withdrawal would constitute an eligible rollover distribution (within the meaning of Code Section 402(c)(4)), the consent and notice requirements of Section 12.10 must be satisfied. Payment of a withdrawal shall be made as soon as practicable and in accordance with Section 12.10, if applicable.

11.3 Form of Withdrawal. All distributions under this Article XI shall be made in the form of cash, provided that with respect to any distribution which is attributable to Common Stock the Participant shall have the right to demand that such portion of the distribution be made in the form of Common Stock to the extent of the whole number of shares of Common Stock in his Account. Such demand must be made in accordance with the procedures established by the Committee.

11.4 Minimum Withdrawal. No distribution under this Article XI shall be permitted in an amount which has a value of less than $300, unless the value of the amount available under the selected option is less than $300, in which case such available amount will be distributed.

11.5 Source of Withdrawal. Withdrawals shall be made in accordance with the instructions of the Participant from each of the Investment Funds in which the amount to be distributed is invested. The value of the amount to be distributed under any option listed in Section 11.1 shall be determined as soon as practicable in accordance with the procedures established by the Committee.

11.6        Requirement of Hardship.
            ------------------------

(a) Except as provided in (e) below, a withdrawal pursuant to Section 11.1(a)(6)(A), in addition to the other requirements of Article XI, shall be permitted only if the Committee determines that the withdrawal is to be made on account of an immediate and heavy financial need of the Participant, the amount of the withdrawal does not exceed such financial need, and the amount of the withdrawal is not reasonably available from other resources of the Participant.

(b) For purposes of this Section 11.6, the following shall be deemed to be immediate and heavy financial needs:

(1) Medical expenses described in Section 213(d) of the Code, including but not limited to, expenses for

(i) The diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body;

(ii) transportation primarily for and essential to such expenses referred to in (i) above; or

(iii) insurance (including amounts paid as premiums under part B of Title XVIII of the Social Security Act) relating to medical expenses referred to in (i) or (ii) above, provided such expenses are incurred by the Participant, the Participant's spouse or any person whom the Participant may properly claim as a dependent on his federal income tax return or are necessary for such persons to obtain the medical
Page 30

SouthernCompanySavingsPlan2002.txt
care described above; or

(2) Purchase (excluding mortgage payments) of a principal residence for the Participant; or

(3) Payment of tuition, related educational fees, and room and board expenses, for the next twelve (12) months of post-secondary education for the Participant, the Participant's spouse or child or children, or any person the Participant may properly claim as a dependent on his federal income tax return; or

(4) The need to prevent eviction of the Participant from his principal residence or foreclosure on the mortgage of the Participant's principal residence; or

(5) Any other need which the Commissioner of the Internal Revenue Service, through the publication of revenue rulings, notices, or other documents of general applicability, deems to be immediate and heavy.

(c) For purposes of this Section 11.6, a withdrawal shall be deemed necessary to satisfy an immediate and heavy financial need if:

(1) The distribution is not in excess of the amount of the immediate and heavy financial need of the Participant, including any amounts necessary to pay any federal, state, or local income taxes or penalties reasonably anticipated to result from the distribution;

(2) The Participant has obtained all distributions and all nontaxable loans currently available to him under all plans maintained by an Affiliated Employer;

(3) The Participant agrees to suspend all elective employer contributions and voluntary participant contributions to all plans of an Affiliated Employer for at least six (6) months after receipt of the distribution under this Section 11.6; and

(4) The Participant agrees not to make elective contributions to this Plan or any other qualified or non-qualified deferred compensation plan sponsored by an Affiliated Employer (including stock purchase, stock option or similar plans) during the Participant's taxable year immediately following the taxable year of the hardship distribution in excess of the Participant's applicable elective deferral limits under Section 402(g) of the Code for such taxable year less the amount for the taxable year of the hardship distribution.

(d) When all suspensions pursuant to this Section 11.6 are ended, Elective Employer Contributions and/or Voluntary Participant Contributions may be resumed by the Participant (if the Participant is then eligible and elects to resume such contributions) beginning with the Participant's first payroll period commencing after all suspensions are ended, and Employer Matching Contributions by his Employing Company also shall be resumed. There shall be no make up of any contributions by a Participant or by an Employing Company with respect to a period of suspension.

(e) Notwithstanding (a) above, if a Participant has attained age 59 1/2 or severed from employment with the Affiliated Employers

SouthernCompanySavingsPlan2002.txt
(within the meaning of Code Section 401(k)(2)(B)(i)(I)), he shall be
permitted to make a withdrawal pursuant to Section 11.1(a)(6)(A), even
if such withdrawal is not on account of hardship.

11.7        Loans to Participants.

(a) The Committee may, in its sole discretion, direct the
Trustee to make a loan or loans from the Trust Fund to any Participant
(other than a Participant with an existing Plan loan in arrears) (1)
who is an Employee on the active payroll of an Employing Company or is
a cooperative education employee, (2) who is receiving long-term
disability payments under a plan maintained by his Employing Company,
(3) who is on a leave of absence authorized by his Employing Company,
or (4) who is a party in interest as defined in Section 3(14) of ERISA.
All loan applications shall be made in accordance with the procedures
established by the Committee, which shall form a part of this Plan.
Such procedures shall establish the terms and conditions of loans under
the Plan, including the events constituting default, and shall be
consistent with the provisions of this Section 11.7.

(b) The total amount of all loans outstanding to any one
Participant under all qualified plans maintained by an Affiliated
Employer shall not exceed the lesser of (1) $50,000, reduced by the
excess of the highest outstanding balance of loans from all qualified
plans maintained by an Affiliated Employer during the twelve-month
period ending on the day before a loan is made, over the outstanding
balance of any loans to the Participant from all qualified plans
maintained by an Affiliated Employer on the date the loan is made, or
(2) fifty percent (50%) of such Participant's Account as of the
Valuation Date coinciding with or next following the date the loan
application is made. The minimum amount of any loan shall not equal
less than $1,000.

(c) The principal amount of a loan shall be obtained pro
rata from each Investment Fund in which the Participant's Account is
invested at that time such loan is obtained.

(d) The Committee shall adopt and follow uniform and
nondiscriminatory procedures in making loans under this Plan to make
certain that such loans (1) are available to all Participants on a
reasonably equivalent basis, (2) are not made available to Highly
Compensated Employees, officers, or shareholders in an amount greater
than the amount made available to other Participants, (3) bear a
reasonable rate of interest, and (4) are adequately secured. The
repayment of such loans by any Participant who is an Employee on the
active payroll of an Employing Company shall be made through payroll
deduction. The minimum amount of any loan repayment shall not equal
less than $20.00, and such repayment shall extend for a period certain
of at least twelve (12) months (unless repaid in full), but not to
exceed fifty-eight (58) months, expressed in any number of whole months
(including the month the loan is made). The term of any loan may be for
a period certain of more than fifty-eight (58) months, but not to
exceed fifteen (15) years, only if the proceeds of such loan are used
to acquire any dwelling used or, within a reasonable period of time, to
be used as the principal residence of the Participant.

(e) The Committee shall direct the Trustee to obtain from
the Participant such note and adequate security as it may require. All
loans made pursuant to this Section 11.7 shall be secured by the
Participant's Account, and no other types of collateral may be used to
secure a loan from the Plan. Notwithstanding the provisions of Section
17.2, if a Participant defaults on a loan under the Plan or if the
Participant's employment terminates prior to full repayment thereof, in

SouthernCompanySavingsPlan2002.txt

addition to any other remedy provided in the loan instruments or by law, the Committee may direct the Trustee to charge against that portion of the Participant's Account which secures the loan the amount required to fully repay the loan. Under no circumstances, however, shall any unpaid loan be charged against a Participant's Account until permitted by applicable law. This Section authorizes only the making of bona fide loans and not distributions, and before resort is made against a Participant's Account for his failure to repay any loan, such other reasonable efforts to collect the same shall be made by the Committee as it deems reasonable and practical under the circumstances.

(f) No distribution shall be made to any Participant unless and until all unpaid loans to such Participant have either been paid in full or deducted from the Participant's Account.

(g) All loans made under this Section 11.7 shall be considered earmarked investments of the Participant's Account, and any repayment of principal and interest shall be reinvested in accordance with the Participant's investment direction in effect on the date of such repayment pursuant to Article VIII of the Plan.

11.8 Special Waiver for Participants Employed in the United Kingdom. A Participant shall be entitled to sign a waiver of his right to make withdrawals or loans from his Account under the provisions of this Article XI with respect to the Elective Employer Contributions and Employer Matching Contributions credited to his Account to the extent necessary to ensure that such contributions are not taxable in the United Kingdom. The purpose of such waiver is to meet the requirements of the Department of Inland Treasury of the United Kingdom for excluding such Elective Employer and Employer Matching Contributions from taxable income in the United Kingdom. Such waiver shall be made on a form prescribed by the Committee from time to time in accordance with the requirements of the Department of Inland Treasury of the United Kingdom.

<PAGE>

## ARTICLE XII

### DISTRIBUTION TO PARTICIPANTS

12.1        Distribution upon Retirement.

(a) Subject to the provisions of Article XVIII, if a Participant's employment with the Affiliated Employers is terminated as a result of his retirement pursuant to the defined benefit pension plan of an Affiliated Employer, in addition to the withdrawal options under Section 11.1, the entire balance credited to his Account shall be payable to him in the manner set forth in this Section 12.1 at such time requested by the Participant pursuant to Section 12.6 and in accordance with the procedures established by the Committee. The distribution shall commence as soon as practicable after the Valuation Date selected by the Participant in one of the following ways:

(1)      In a single lump sum distribution; or

(2) In annual installments not to exceed twenty (20), as selected by the Participant, or the Participant's life expectancy. The amount of cash and/or the number of shares of Common Stock and/or Mirant Stock in each installment shall be equal to the proportionate value as of

Page 33

SouthernCompanySavingsPlan2002.txt
each Valuation Date immediately preceding payment of the balance then to the credit of the Participant in his Account determined by dividing the amount credited to his Account as of such Valuation Date by the number of payments remaining to be made.

If a Participant who is receiving installment payments shall establish to the satisfaction of the Committee, in accordance with principles and procedures established by the Committee which are applicable to all persons similarly situated, that a financial emergency exists in his affairs, such as illness or accident to the Participant or a member of his immediate family or other similar contingency, the Committee may, for the purpose of alleviating such emergency, accelerate the time of payment of some or all of the remaining installments. If a Participant dies before receiving all of the amount to the credit of his Account in accordance with this paragraph (2), the amount remaining to the credit of his Account at his death shall be distributed to his Beneficiary as soon as practicable in accordance with Section 12.4.

(b) Notwithstanding a Participant's election to defer the receipt of the benefits under (a) above, the Committee shall direct payment in a single lump sum to such Participant if the balance of his Account does not exceed $5,000 in accordance with the requirements of Code Section 411(a)(11). The Committee shall not cash-out any Participant whose Account balance exceeds $5,000 without the written consent of the Participant.

12.2 Distribution upon Disability. If a Participant's employment with the Affiliated Employers is terminated prior to his Normal Retirement Date by reason of his total and permanent disability, as determined by the Social Security Administration and evidenced in a writing provided to the Committee, such disabled Participant, in addition to the withdrawal options under Section 11.1, shall be entitled to receive the entire value credited to his Account at such time as requested by the Participant or such legal representative pursuant to Section 12.6 and in accordance with the procedures established by the Committee. Any distribution pursuant to this Section 12.2 shall be made in a single lump sum as soon as practicable after the selected Valuation Date.

Notwithstanding the foregoing, the Committee shall direct payment in a single lump sum to such Participant or his legal representative if the balance of such Participant's Account does not exceed $5,000 in accordance with the requirements of Code Section 411(a)(11).

12.3 Distribution upon Death. If a Participant's employment with the Affiliated Employers is terminated by reason of death, the entire balance credited to the Participant's Account shall be distributed as soon as practicable to the Participant's surviving Beneficiary or Beneficiaries in a lump sum.

12.4 Designation of Beneficiary in the Event of Death. A Participant may designate a Beneficiary or Beneficiaries (who may be designated contingently) to receive all or part of the amount credited to his Account in case of his death before his receipt of all of his benefits under the Plan, provided that the Beneficiary of a married Participant shall be the Participant's Surviving Spouse, unless such Surviving Spouse shall consent in a writing witnessed by a notary public, which writing acknowledges the effect of the Participant's designation of a Beneficiary other than such Surviving Spouse. However, if such Participant establishes to the satisfaction of the Committee that such written consent may not be obtained because the Surviving Spouse cannot be located or because of such other circumstances as the Secretary of the Treasury may by regulations prescribe, a designation by such Participant without the consent of the Surviving Spouse shall be valid.

SouthernCompanySavingsPlan2002.txt

Any consent necessary under this Section 12.4 shall be valid and effective only with respect to the Surviving Spouse who signs the consent or, in the event of a deemed consent, only with respect to a designated Surviving Spouse.

A designation of Beneficiary may be revoked by the Participant without the consent of any Beneficiary (or the Participant's Surviving Spouse) at any time before the commencement of the distribution of benefits. A Beneficiary designation or change or revocation of a Beneficiary designation shall be made in accordance with the procedures established by the Committee.

If no designated Beneficiary shall be living at the death of the Participant and/or such Participant's Beneficiary designation is not valid and enforceable under applicable law or the procedures of the Committee, such Participant's Beneficiary or Beneficiaries shall be the person or persons in the first of the following classes of successive preference, if then living:

(a)     the Participant's spouse on the date of his death,

(b)     the Participant's children, equally,

(c)     the Participant's parents, equally,

(d)     the Participant's brothers and sisters, equally, or

(e)     the Participant's executors or administrators.

Payment to such one or more persons shall completely discharge the Plan and the Trustee with respect to the amount so paid.

12.5      Distribution upon Termination of Employment.
          --------------------------------------------

(a) If a Participant's employment with the Affiliated Employers is terminated for any reason other than in accordance with Sections 12.1, 12.2, and 12.3, the balance to the credit of the Participant's Account shall be payable in a single lump sum. Such lump sum distribution shall be made as soon as practicable after the Participant's termination of employment, provided that one of the following conditions is met:

(1) the Participant's Account Balance does not exceed $5,000 in accordance with Code Section 411(a)(11), or

(2) in accordance with Section 12.10, the Participant elects to receive a distribution of his Account.

(b) A Participant who does not receive a distribution under Section 12.5(a)(1) may elect to defer the commencement of the distribution of his Account following the termination of his employment until a later Valuation Date, provided that such distribution shall commence not later than the date required under Section 12.6 of the Plan. In addition to the withdrawal options under Section 11.1, any deferred distribution shall commence as soon as practicable after the Valuation Date selected by the Participant.

12.6      Commencement of Benefits.
          ------------------------

(a) Notwithstanding any other provision of the Plan, and except as further provided in Section 12.6(b) below, if the Participant does not elect to defer commencement of his benefit payments, the
Page 35

SouthernCompanySavingsPlan2002.txt
payment of his benefits shall begin at the Participant's election no
later than the sixtieth (60th) day after the close of the Plan Year in
which the latest of the following events occurs:

> (1) the Participant attains the earlier of age
> sixty-five (65) or his Normal Retirement Date,

> (2) the Participant's tenth (10th) anniversary of
> participation under the Plan, or

> (3) the Participant's severance from employment with
> the Affiliated Employers.

(b) In no event shall the distribution of amounts in a
Participant's Account commence later than the April 1 of the calendar
year following the later of the calendar year in which the Participant
attains age 70 1/2 or terminates employment with the Affiliated
Employers, in accordance with regulations prescribed by the Secretary
of the Treasury. The foregoing requirements in this Section 12.6(b)
shall not be applied to restrict the implementation of any written
designation given to the Committee by a Participant prior to January 1,
1984, with regard to the method of distribution of his Account, if such
method was permissible under the Plan and Code prior to January 1,
1984. Notwithstanding the foregoing, the payment of benefits to a
Participant who is a five percent (5%) owner of The Southern Company or
an Affiliated Employer (as determined pursuant to Code Section 416)
with respect to the Plan Year ending in the calendar year in which the
Participant attains age 70 1/2 shall begin not later than April 1, of
the calendar year following the calendar year in which the Participant
attains age 70 1/2 regardless of the Participant's termination from
employment. In addition, any Participant who attains age 70 1/2 on or
after January 1, 1996, but prior to January 1, 1999, may elect to have
payment of his benefits begin no later than April 1 of the calendar
year following the calendar year during which the Participant attains
age 70 1/2, regardless of the Participant's termination of employment.]

Any distribution made under this Plan shall be made in
accordance with the minimum distribution requirements of Code Section
401(a)(9), including the incidental death benefits requirements under
Code Section 401(a)(9)(G) and the Treasury Regulations thereunder.

With respect to distributions under the Plan made in calendar
years beginning on or after January 1, 2001, the Plan will apply the
minimum distribution requirements of Code Section 401(a)(9) in
accordance with the regulations under Code Section 401(a)(9) that were
proposed in January 2001, notwithstanding any provision of the Plan to
the contrary. This amendment shall continue in effect until the end of
the last calendar year beginning before the effective date of final
regulations under Code Section 401(a)(9) or such other date specified
in guidance published by the Internal Revenue Service.

12.7 Transfer between Employing Companies. A transfer by a Participant
from one Employing Company to another Employing Company shall not affect his
participation in the Plan. A transfer by a Participant from an Employing Company
to an Affiliated Employer that is not an Employing Company shall not be deemed
to be a termination of employment with an Employing Company.

12.8 Distributions to Alternate Payees. If the Participant's Account
under the Plan shall become subject to any domestic relations order which (a) is
a qualified domestic relations order satisfying the requirements of Section
414(p) of the Code and (b) requires the immediate distribution in a single lump
sum of the entire portion of the Participant's Account required to be segregated
for the benefit of an alternate payee, then the entire interest of such
Page 36

SouthernCompanySavingsPlan2002.txt

alternate payee shall be distributed in a single lump sum within ninety (90) days following the Employing Company's notification to the Participant and the alternate payee that the domestic relations order is qualified under Section 414(p) of the Code, or as soon as practicable thereafter. Such distribution to an alternate payee shall be made even if the Participant has not separated from the service of the Affiliated Employers. Any other distribution pursuant to a qualified domestic relations order shall not be made earlier than the Participant's termination of service, or his attainment of age fifty (50), if earlier, and shall not commence later than the date the Participant's (or his Beneficiary's) benefit payments otherwise commence. Such distribution to an alternate payee shall be made only in a manner permitted under Articles XI or XII of the Plan and only to the extent the Participant would be eligible for such distribution option.

12.9 Requirement for Direct Rollovers. Notwithstanding any provision of the Plan to the contrary that would otherwise limit a Distributee's election under this Article XII, a Distributee may elect, at the time and in the manner prescribed by the Committee, to have any portion of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover.

12.10 Consent and Notice Requirements. If the value of the vested portion of a Participant's Account derived from Employing Company and Employee contributions exceeds $5,000 determined in accordance with the requirements of Code Section 411(a)(11), the Participant must consent to any distribution of such vested account balance prior to his Normal Retirement Date. The consent of the Participant shall be obtained within the ninety-day period ending on the first day of the first period for which an amount is payable as an annuity or in any other form under this Plan.

The Committee shall notify the Participant of the right to defer any distribution until the Participant's Account balance is no longer immediately distributable. Such notification shall include a general description of the material features and an explanation of the relative values of the operational forms of benefit available under the Plan in a manner that would satisfy the notice requirements of Section 417(a)(3) of the Code; such notification shall be provided no less than 30 days and no more than 90 days prior to the annuity starting date.

Distributions may commence less than 30 days after the notice required under Section 1.411(a)-11(c) of the Treasury Regulations is given, provided that:

    (a)    the Committee informs the Participant that the Participant has a right to a period of at least 30 days after receiving the notice to consider the decision of whether or not to elect a distribution and a particular distribution option, and

    (b)    the Participant, after receiving the notice, affirmatively elects a distribution.

12.11 Form of Payment. All distributions under this Article XII shall be made in the form of cash, provided that the person entitled to such distribution may demand that the portion of any distribution which is attributable to Common Stock or Mirant Stock be distributed in the form of such Common Stock or Mirant Stock, respectively, to the extent of the whole number of shares in the Participant's Account, with a cash adjustment for any fractional shares.

12.12 Partial Distribution upon Termination of Employment. If a Participant's employment with the Affiliated Employers is terminated and such Participant is deemed not to have separated from service within the meaning of

Page 37

SouthernCompanySavingsPlan2002.txt

Code Section 401(k)(2)(B)(i)(I), such Participant, in addition to the withdrawal options available under Article XI, shall be entitled to elect a lump sum distribution of the entire balance to the credit of his Account less the amount credited to his Elective Employer Contribution subaccount. The amounts credited to his Elective Employer Contribution subaccount may be distributed in a lump sum distribution at such time permitted pursuant to Code Section 401(k)(2)(B)(i) and Section 4.4(c) hereof. Such lump sum distributions shall otherwise be subject to this Article XII.

12.13 Distribution of Dividends Payable on Common Stock. Each Participant may elect whether (i) to receive a cash distribution of all or a portion of the dividends payable on the shares of Common Stock credited to the Participant's Account as of the record date of the Common Stock or (ii) to have such dividends paid to the Plan and reinvested in Common Stock credited to the Participant's Account. The election of a Participant whether to receive a cash distribution of dividends shall remain in effect until such election is changed by the Participant. In the event a Participant fails to make an election with respect to the dividends payable on any shares of Common Stock credited to the Participant's Account, such Participant shall be deemed to have elected to have the dividends payable on such shares paid to the Plan and reinvested in Common Stock credited to the Participant's Account. Upon the death of a Participant, such Participant shall be deemed to have elected to have the dividends payable on all shares of Common Stock credited to the Participant's Account reinvested in Common Stock, notwithstanding any election in effect at the time of the Participant's death.

A Participant may change his election whether to receive a cash distribution of dividends at any time. However, with respect to each dividend on Common Stock, the election, or deemed election, of a Participant which is in effect on the last day of the first month in the calendar quarter which includes the record date for such dividend (the "Election Deadline") shall apply with respect to the dividends payable on the shares of Common Stock credited to the Participant's Account on such record date. In any event, all elections and deemed elections shall be irrevocable as of the Election Deadline. Participants are 100% vested in dividends payable on Common Stock. Payment of cash distributions under this Section 12.13 shall be made to the Plan and to Participants, as the case may be, as soon as administratively practicable following the payable date of the dividends. The Committee may establish such administrative procedures as it deems necessary or appropriate to effect the elections under this Section 12.13.

In addition to the foregoing, with respect to dividends paid in 2001 to the Plan on the shares of Common Stock credited to a Participant's Account as of any record date in 2001 which were not distributed in cash to such Participant ("Accumulated 2001 Dividends"), such Participant may elect in accordance with the requirements of this paragraph and procedures established by the Committee whether (i) to receive a cash distribution of all or a portion of his Accumulated 2001 Dividends or (ii) to have such Accumulated 2001 Dividends remain invested in the Participant's Account. In the event a Participant fails to make an election with respect to Accumulated 2001 Dividends, such Participant shall be deemed to have elected to have such dividends remain invested in the Participant's Account. Any election, or deemed election, whether to receive a cash distribution of Accumulated 2001 Dividends shall be irrevocable as of the deadline established by the Committee by which Participants must make an election with respect to Accumulated 2001 Dividends. The payment of cash distributions of Accumulated 2001 Dividends shall be made to Participants after a reasonable election period but in any event within ninety (90) days after the end of the Plan Year ending on December 31, 2001. The Committee may establish such administrative procedures as it deems necessary or appropriate to effect the distribution of Accumulated 2001 Dividends, including limiting the amount of Accumulated 2001 Dividends a Participant may receive in cash based on the balance of the various subaccounts in the Participant's Account (as described in Section 9.1) at the time the distribution is made and designating the Investment

Page 38

SouthernCompanySavingsPlan2002.txt

Funds from which such distributions are withdrawn. The provisions of this paragraph shall not apply to dividends paid to the Plan in 2001 which the Participant elected in 2001 to receive in cash.

<PAGE>

## ARTICLE XIII

### ADMINISTRATION OF THE PLAN

**13.1 Membership of Committee.** The Plan shall be administered by the Committee, which shall consist of the individuals then serving in the positions of Vice President, System Compensation and Benefits of The Southern Company; Senior Vice-President, Human Resources of The Southern Company; and Comptroller of The Southern Company or any other position or positions that succeed to the duties of the foregoing positions. The Committee shall be chaired by the Senior Vice-President, Human Resources of The Southern Company and may select a Secretary (who may, but need not, be a member of the Committee) to keep its records or to assist it in the discharge of its duties.

**13.2 Acceptance and Resignation.** Any person appointed to be a member of the Committee shall signify his acceptance in writing to the Chairman of the Committee. Any member of the Committee may resign by delivering his written resignation to the Committee and such resignation shall become effective upon delivery or upon any later date specified therein.

**13.3 Transaction of Business.** A majority of the members of the Committee at the time in office shall constitute a quorum for the transaction of business at any meeting. Any determination or action of the Committee may be made or taken by a majority of the members present at any meeting thereof or without a meeting by a resolution or written memorandum concurred in by a majority of the members then in office.

**13.4 Responsibilities in General.** The Committee shall administer the Plan and shall have the discretionary authority, power, and the duty to take all actions and to make all decisions necessary or proper to carry out the Plan and to control and manage the operation and administration of the Plan. The Committee shall have the discretion to interpret the Plan, including any ambiguities herein, and to determine the eligibility for benefits under the Plan in its sole discretion. The determination of the Committee as to any question involving the general administration and interpretation of the Plan shall be final, conclusive, and binding on all persons, except as otherwise provided herein or by law, and may be relied upon by the Company, all Employing Companies, the Trustee, the Participants, and their Beneficiaries. Any discretionary actions to be taken under the Plan by the Committee with respect to Employees and Participants or with respect to benefits shall be uniform in their nature and applicable to all persons similarly situated.

**13.5 Committee as Named Fiduciary.** For the purpose of compliance with the provisions of ERISA, the Committee shall be deemed the administrator of the Plan as the term "administrator" is defined in ERISA, and the Committee shall be, with respect to the Plan, a named fiduciary as that term is defined in ERISA. For the purpose of carrying out its duties, the Committee may, in its discretion, allocate its responsibilities under the Plan among its members and may, in its discretion, designate persons (in writing or otherwise) other than members of the Committee to carry out such responsibilities of the Committee under the Plan as it may see fit.

**13.6 Rules for Plan Administration.** The Committee may make and enforce

SouthernCompanySavingsPlan2002.txt

rules and regulations for the administration of the Plan consistent with the provisions thereof and may prescribe the use of such forms or procedures as it shall deem appropriate for the administration of the Plan.

13.7 Employment of Agents. The Committee may employ independent qualified public accountants, as such term is defined in ERISA, who may be accountants to The Southern Company and any Affiliated Employer, legal counsel who may be counsel to The Southern Company and any Affiliated Employer, other specialists, and other persons as the Committee deems necessary or desirable in connection with the administration of the Plan. The Committee and any person to whom it may delegate any duty or power in connection with the administration of the Plan, the Company and the officers and directors thereof shall be entitled to rely conclusively upon and shall be fully protected in any action omitted, taken, or suffered by them in good faith in reliance upon any independent qualified public accountant, counsel, or other specialist, or other person selected by the Committee, or in reliance upon any tables, evaluations, certificates, opinions, or reports which shall be furnished by any of them or by the Trustee.

13.8 Co-Fiduciaries. It is intended that to the maximum extent permitted by ERISA, each person who is a fiduciary (as that term is defined in ERISA) with respect to the Plan shall be responsible for the proper exercise of his own powers, duties, responsibilities, and obligations under the Plan and the Trust, as shall each person designated by any fiduciary to carry out any fiduciary responsibilities with respect to the Plan or the Trust. No fiduciary or other person to whom fiduciary responsibilities are allocated shall be liable for any act or omission of any other fiduciary or of any other person delegated to carry out any fiduciary or other responsibility under the Plan or the Trust.

13.9 General Records. The Committee shall maintain or cause to be maintained an Account (and any separate subaccount) which accurately reflects the interest of each Participant, as provided for in Section 9.1, and shall maintain or cause to be maintained all necessary books of account and records with respect to the administration of the Plan. The Committee shall mail or cause to be mailed to Participants reports to be furnished to Participants in accordance with the Plan or as may be required by ERISA. Any notices, reports, or statements to be given, furnished, made, or delivered to a Participant shall be deemed duly given, furnished, made, or delivered when addressed to the Participant and delivered to the Participant in person or mailed by ordinary mail to his address last communicated to the Committee (or its delegate) or of his Employing Company.

13.10 Liability of the Committee. In administering the Plan, except as may be prohibited by ERISA, neither the Committee nor any person to whom it may delegate any duty or power in connection with administering the Plan shall be liable for any action or failure to act except for its or his own gross negligence or willful misconduct; nor for the payment of any amount under the Plan; nor for any mistake of judgment made by him or on his behalf as a member of the Committee; nor for any action, failure to act, or loss unless resulting from his own gross negligence or willful misconduct; nor for the neglect, omission, or wrongdoing of any other member of the Committee. No member of the Committee shall be personally liable under any contract, agreement, bond, or other instrument made or executed by him or on his behalf as a member of the Committee.

13.11 Reimbursement of Expenses and Compensation of Committee. Members of the Committee shall be reimbursed by the Company for expenses they may individually or collectively incur in the performance of their duties. Each member of the Committee who is a full-time employee of the Company or of any Employing Company shall serve without compensation for his services as such member; each other member of the Committee shall receive such compensation, if any, for his services as the Board of Directors may fix from time to time.

Page 40

SouthernCompanySavingsPlan2002.txt
     13.12 Expenses of Plan and Trust Fund. The expenses of establishment and administration of the Plan and the Trust Fund, including all fees of the Trustee, auditors, and counsel, shall be paid by the Company or the Employing Companies. Notwithstanding the foregoing, to the extent provided in the Trust Agreement, certain administrative expenses may be paid from the Trust Fund either directly or through reimbursement of the Company or the Employing Companies. Any expenses directly related to the investments of the Trust Fund, such as stock transfer taxes, brokerage commissions, or other charges incurred in the acquisition or disposition of such investments, shall be paid from the Trust Fund (or from the particular Investment Fund to which such fees or expenses relate) and shall be deemed to be part of the cost of such securities or deducted in computing the proceeds therefrom, as the case may be. Investment management fees for the Investment Funds shall be paid from the particular Investment Fund to which they relate either directly or through reimbursement of the Company or the Employing Companies unless the Company or the Employing Companies do not elect to receive reimbursement for payment of such expenses. Taxes, if any, on any assets held or income received by the Trustee and transfer taxes on the transfer of Common Stock from the Trustee to a Participant or his Beneficiary shall be charged appropriately against the Accounts of Participants as the Committee shall determine. Any expenses paid by the Company pursuant to Section 13.11 and this section shall be subject to reimbursement by other Employing Companies of their proportionate shares of such expenses as determined by the Committee.

     13.13 Responsibility for Funding Policy. The Pension Fund Investment Review Committee of The Southern Company System shall have responsibility for providing a procedure for establishing and carrying out a funding policy and method for the Plan consistent with the objectives of the Plan and the requirements of Title I of ERISA.

     13.14 Management of Assets. The Committee shall not have responsibility with respect to control or management of the assets of the Plan. The Trustee shall have the sole responsibility for the administration of the assets of the Plan as provided in the Trust Agreement, except to the extent that an investment advisor (who qualifies as an Investment Manager as that term is defined in ERISA) who is appointed by the Pension Fund Investment Review Committee shall have responsibility for the management of the assets of the Plan, or some part thereof (including powers to acquire and dispose of the assets of the Plan, or some part thereof).

     13.15 Notice and Claims Procedures. Consistent with the requirements of ERISA and the regulations thereunder of the Secretary of Labor from time to time in effect, the Committee shall:

         (a) provide adequate notice in writing to any Participant or Beneficiary whose claim for benefits under the Plan has been denied, setting forth specific reasons for such denial, written in a manner calculated to be understood by such Participant or Beneficiary, and

         (b) afford a reasonable opportunity to any Participant or Beneficiary whose claim for benefits has been denied for a full and fair review of the decision denying the claim.

     13.16 Bonding. Unless otherwise determined by the Board of Directors or required by law, no member of the Committee shall be required to give any bond or other security in any jurisdiction.

     13.17 Multiple Fiduciary Capacities. Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan, and any fiduciary with respect to the Plan may serve as a fiduciary with respect to the Plan in addition to being an officer, employee, agent, or other representative of a party in interest, as that term is defined in ERISA.

Page 41

SouthernCompanySavingsPlan2002.txt
13.18 Change in Administrative Procedures. Notwithstanding any
provision in the Plan to the contrary, the Committee shall be authorized to take
whatever actions it deems necessary or appropriate in its discretion to
implement administrative procedures, including, but not limited to, suspending
plan participation (to the extent permitted by applicable law,) and suspending
changes in investment directions and fund transfers, even though otherwise
permitted or required under the Plan.

<PAGE>

ARTICLE XIV

TRUSTEE OF THE PLAN

14.1 Trustee. The Company has entered into a Trust Agreement with the
Trustee to hold the funds necessary to provide the benefits set forth in the
Plan. If the Board of Directors so determines, the Company may enter into a
Trust Agreement or Trust Agreements with additional trustees. Any Trust
Agreement may be amended by the Company from time to time in accordance with its
terms. Any Trust Agreement shall provide, among other things, that all funds
received by the Trustee thereunder will be held, administered, invested, and
distributed by the Trustee, and that no part of the corpus or income of the
Trust held by the Trustee shall be used for or diverted to purposes other than
for the exclusive benefit of Participants or their Beneficiaries, except as
otherwise provided in the Plan. Any Trust Agreement may also provide that the
investment and reinvestment of the Trust Fund, or any part thereof may be
carried out in accordance with directions given to the Trustee by any Investment
Manager or Investment Managers (as that term is defined in ERISA) who may be
appointed by the Pension Fund Investment Review Committee. The Board of
Directors may remove any Trustee or any successor Trustee, and any Trustee or
any successor Trustee may resign. Upon removal or resignation of a Trustee, the
Board of Directors shall appoint a successor Trustee.

14.2 Purchase of Common Stock. As soon as practicable after receipt of
funds applicable to the purchase of Common Stock, the Trustee shall purchase
Common Stock or cause Common Stock to be purchased. Such Common Stock may be
purchased on the open market or by private purchase (including private purchases
directly from The Southern Company); provided that (a) no private purchase may
be made at any price greater than the last sale price or highest current
independent bid price, whichever is higher, for Common Stock on the New York
Stock Exchange, plus an amount equal to the commission payable in a stock
exchange transaction; (b) if such private purchase shall be a purchase of Common
Stock directly from The Southern Company, no commission shall be paid with
respect thereto unless such commission satisfies the requirements of Prohibited
Transaction Class Exemption 75-1; and (c) the Trustee may purchase Common Stock
directly from The Southern Company under The Southern Investment Plan, as from
time to time amended, or under any other similar plan made available to holders
of record of shares of Common Stock which may be in effect from time to time, at
the purchase price provided for in such plan. The Trustee may hold in cash, and
may temporarily invest funds applicable to the purchase of Common Stock in
short-term United States obligations, other obligations guaranteed by the United
States Government, commercial paper, or certificates of deposit, and if the
Trustee so determines, may transfer such funds to money market funds utilized by
the Trustee for qualified employee benefit trusts.

14.3 Voting of Common Stock. Before each annual or special meeting of
shareholders of The Southern Company, there shall be sent to each Participant a
copy of the proxy soliciting material for the meeting, together with a form
requesting instructions to the Trustee on how to vote the shares of Common Stock

SouthernCompanySavingsPlan2002.txt

credited to such Participant's Account as of the record date of the Common Stock. If a Participant does not provide the Trustee or its designated agent with timely voting instructions for the Trustee, the Pension Fund Investment Review Committee of The Southern Company System or its delegate may direct the Trustee how to vote such Participant's shares. If the Pension Fund Investment Review Committee of The Southern Company System or its delegate does not provide the Trustee or its designated agent with timely voting instructions, the Trustee, if required to do so by applicable law, may vote such Participant's shares. The Pension Fund Investment Review Committee of The Southern Company System or its delegate may direct the Trustee with respect to voting unallocated shares of Common Stock, if any. If the Pension Fund Investment Review Committee of The Southern Company System or its delegate does not provide the Trustee or its designated agent with timely voting instructions, the Trustee, if required to do so by applicable law, may vote such unallocated shares. Procedures similar to those described above shall also apply to voting the Mirant Stock credited to each Participant's Account.

14.4 Voting of Other Investment Fund Shares. The Pension Fund Investment Review Committee or its delegate may direct the Trustee with respect to voting the shares in any Investment Fund other than the Company Stock Fund or Mirant Stock Fund. To the extent an Investment Manager has been designated with respect to an Investment Fund, such Investment Manager (and not the Pension Fund Investment Review Committee) shall direct the Trustee with respect to voting the shares in such Investment Fund. If the Investment Manager does not direct the Trustee with respect to voting such shares, the Pension Fund Investment Review Committee may direct the Trustee with respect to voting such shares. If the Pension Fund Investment Review Committee does not provide the Trustee or its designated agent with timely voting instructions, the Trustee, if required to do so by applicable law, may vote such shares.

14.5 Uninvested Amounts. The Trustee may keep uninvested an amount of cash sufficient in its opinion to enable it to carry out the purposes of the Plan.

14.6 Independent Accounting. The Board of Directors shall select a firm of independent public accountants to examine and report annually on the financial position and the results of operation of the Trust forming a part of the Plan.

<PAGE>

## ARTICLE XV

### AMENDMENT AND TERMINATION OF THE PLAN

15.1 Amendment of the Plan. The Plan may be amended or modified by the Board of Directors pursuant to its written resolutions at any time and from time to time; provided, however, that no such amendment or modification shall make it possible for any part of the corpus or income of the Trust Fund to be used for or diverted to purposes other than for the exclusive benefit of Participants or their Beneficiaries under the Plan, including such part as is required to pay taxes and administration expenses of the Plan. The Plan may also be amended or modified by the Committee (a) if such amendment or modification does not involve a substantial increase in cost to any Employing Company, or (b) as may be necessary, proper, or desirable in order to comply with laws or regulations enacted or promulgated by any federal or state governmental authority and to maintain the qualification of the Plan under Sections 401(a) and 501(a) of the Code and the applicable provisions of ERISA as provided in regulations prescribed by the Secretary of the Treasury.

SouthernCompanySavingsPlan2002.txt

No amendment to the Plan shall have the effect of decreasing a Participant's vested interest in his Account, determined without regard to such amendment, as of the later of the date such amendment is adopted or the date it becomes effective. In addition, if the vesting schedule of the Plan is amended, any Participant who has completed at least three (3) Years of Service and whose vested interest is at any time adversely affected by such amendment may elect to have his vested interest determined without regard to such amendment during the election period defined under Section 411(a)(10) of the Code. Finally, no amendment shall eliminate an optional form of benefit in violation of Code Section 411(d)(6).

15.2 Termination of the Plan. It is the intention of the Employing Companies to continue the Plan indefinitely. However, the Board of Directors pursuant to its written resolutions may at any time and for any reason suspend or terminate the Plan or suspend or discontinue the making of contributions of all Participants and of contributions by all Employing Companies. Any Employing Company may, by action of its board of directors and approval of the Board of Directors, suspend or terminate the making of contributions of Participants in the employ of such Employing Company and of contributions by such Employing Company.

In the event of termination of the Plan or partial termination or upon complete discontinuance of contributions under the Plan by all Employing Companies or by any one Employing Company, the amount to the credit of the Account of each Participant whose Employing Company shall be affected by such termination or discontinuance shall be determined as of the next Valuation Date and shall be distributed to him or his Beneficiary thereafter at such time or times and in such nondiscriminatory manner as is determined by the Committee in compliance with the restrictions on distributions set forth in Code Section 401(k).

15.3 Merger or Consolidation of the Plan. The Plan shall not be merged or consolidated with nor shall any assets or liabilities thereof be transferred to any other plan unless each Participant of the Plan would (if the Plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately prior to the merger, consolidation, or transfer (if the Plan had then terminated).

15.4 Transfer of Plan Assets. Notwithstanding any provision of the Plan to the contrary, upon the distribution by the Southern Company to its shareholders of the Mirant Stock held by the Southern Company pursuant to a tax-free spin-off under Code Section 355 or such similar transaction, the Accounts of certain Participants who shall be identified in accordance with the Employee Matters Agreement entered into between the Southern Company and Mirant ("Agreement") shall be transferred to a retirement plan established by Mirant which is intended to constitute a qualified retirement plan under Code Section 401(a). The Committee shall determine the time of such transfers and shall establish such rules and procedures as its deems necessary or appropriate to effect the transfers, except that all actions with respect to the transfers shall be taken in a manner consistent with the Agreement.

<PAGE>

## ARTICLE XVI

### TOP-HEAVY REQUIREMENTS

SouthernCompanySavingsPlan2002.txt

16.1 Top-Heavy Plan Requirements. For any Plan Year the Plan shall be determined to be a top-heavy plan, the Plan shall provide the minimum allocation requirement of Section 16.3.

16.2 Determination of Top-Heavy Status.
---------------------------------

(a) For any Plan Year commencing after December 31, 1983, the Plan shall be determined to be a top-heavy plan, if, as of the Determination Date, the sum of the Aggregate Accounts of Key Employees under this Plan exceeds 60% of the Aggregate Accounts of all Employees entitled to participate in this Plan.

(b) For any Plan Year commencing after December 31, 1983, the Plan shall be determined to be a super-top-heavy plan, if, as of the Determination Date, the sum of the Aggregate Accounts of Key Employees under this Plan exceeds 90% of the Aggregate Accounts of all Employees entitled to participate in this Plan.

(c) In the case of a Required Aggregation Group, each plan in the group will be considered a top-heavy plan if the Required Aggregation Group is a Top-Heavy Group. No plan in the Required Aggregation Group will be considered a top-heavy plan if the Aggregation Group is not a Top-Heavy Group.

In the case of a Permissive Aggregation Group, only a plan that is part of the Required Aggregation Group will be considered a top-heavy plan if the Permissive Aggregation Group is a Top-Heavy Group. A plan that is not part of the Required Aggregation Group but that has nonetheless been aggregated as part of the Permissive Aggregation Group will not be considered a top-heavy plan even if the Permissive Aggregation Group is a Top-Heavy Group.

(d) For purposes of this Article XVI, if any Employee is a non-Key Employee for any Plan Year, but such Employee was a Key Employee for any prior Plan Year, such Employee's Present Value of Accrued Retirement Income and/or Aggregate Account balance shall not be taken into account for purposes of determining whether this Plan is a top-heavy or super-top-heavy plan (or whether any Aggregation Group which includes this Plan is a Top-Heavy Group). In addition, if an Employee or former Employee has not performed any services for any Employing Company maintaining the Plan at any time during the one-year period ending on the Determination Date, the Aggregate Account and/or Present Value of Accrued Retirement Income shall be excluded in determining whether this Plan is a top-heavy or super-top-heavy plan.

(e) Only those plans of the Affiliated Employers in which the Determination Dates fall within the same calendar year shall be aggregated in order to determine whether such plans are top-heavy plans.

16.3 Minimum Allocation for Top-Heavy Plan Years.
---------------------------------------------

(a) Notwithstanding anything herein to the contrary, for any top-heavy Plan Year, the Employing Company contribution allocated to the Account of each non-Key Employee shall be an amount not less than the lesser of: (1) 3% of such Participant's compensation for that Plan Year, or (2) a percentage of that Participant's compensation not to exceed the percentage at which contributions are made under the Plan for the Key Employee for whom such percentage is highest for that Plan Year.

Page 45

SouthernCompanySavingsPlan2002.txt

(b) For purposes of the minimum allocation of Section 16.3(a), the percentage allocated to the Account of any Key Employee shall be equal to the ratio of the Employing Company contributions allocated on behalf of such Key Employee divided by the compensation of such Key Employee for that Plan Year. Employer Matching Contributions shall be taken into account for purposes of satisfying the minimum contribution allocation requirements under Code Section 416(c)(2) and the Plan.

(c) For any top-heavy Plan Year, the minimum allocations of Section 16.3(a) shall be allocated to the Accounts of all non-Key Employees who are Participants and who are employed by the Affiliated Employers on the last day of the Plan Year.

(d) Notwithstanding the foregoing, in any Plan Year in which a non-Key Employee is a Participant in both this Plan and a defined benefit plan, and both such plans are top-heavy plans, the Affiliated Employers shall not be required to provide a non-Key Employee with both the full separate minimum defined benefit and the full separate defined contribution plan allocations. Therefore, if a non-Key Employee is participating in a defined benefit plan maintained by the Affiliated Employers and the minimum benefit under Code Section 416(c)(1) is provided the non-Key Employee under such defined benefit plan, the minimum allocation provided for above shall not be applicable, and no minimum allocation shall be made on behalf of the non-Key Employee. Alternatively, the Employing Company may satisfy the minimum allocation requirement of Code Section 416(c)(2) for the non-Key Employee by providing any combination of benefits and/or contributions that satisfy the safe harbor rules of Treasury Regulation Section 1.416-1(M-12).

<PAGE>

## ARTICLE XVII

### GENERAL PROVISIONS

17.1 Plan Not an Employment Contract. The Plan shall not be deemed to constitute a contract between an Affiliated Employer and any Employee, nor shall anything herein contained be deemed to give any Employee any right to be retained in the employ of an Employing Company or to interfere with the right of an Employing Company to discharge any Employee at any time and to treat him without regard to the effect which such treatment might have upon him as a Participant.

17.2 No Right of Assignment or Alienation. Except as may be otherwise permitted or required by law, no right or interest in the Plan of any Participant or Beneficiary and no distribution or payment under the Plan to any Participant or Beneficiary shall be subject in any manner to anticipation, alienation, sale, transfer (except by death), assignment (either at law or in equity), pledge, encumbrance, charge, attachment, garnishment, levy, execution, or other legal or equitable process, whether voluntary or involuntary, and any attempt to so anticipate, alienate, sell, transfer, assign, pledge, encumber, charge, attach, garnish, levy, or execute or enforce any other legal or equitable process against the same shall be void, nor shall any such right, interest, distribution, or payment be in any way liable for or subject to the debts, contracts, liabilities, engagements, or torts of any person entitled to such right, interest, distribution, or payment. If any Participant or Beneficiary is adjudicated bankrupt or purports to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge any such right, interest,

Page 46

SouthernCompanySavingsPlan2002.txt
distribution, or payment, voluntarily or involuntarily, or if any action shall
be taken which is in violation of the provisions of the immediately preceding
sentence, the Committee may hold or apply or cause to be held or applied such
right, interest, distribution, or payment or any part thereof to or for the
benefit of such Participant or Beneficiary in such manner as is in accordance
with applicable law. In addition, a Participant's benefits may be offset
pursuant to a judgment, order, or decree issued (or settlement agreement entered
into) on or after August 5, 1997, if and to the extent that such offset is
permissible or required under Code Section 401(a)(13).

Notwithstanding the above, the Committee and the Trustee shall comply
with any domestic relations order (as defined in Section 414(p)(1)(B) of the
Code) which is a qualified domestic relations order satisfying the requirements
of Section 414(p) of the Code. The Committee shall establish procedures for (a)
notifying Participants and alternate payees who have or may have an interest in
benefits which are the subject of domestic relations orders, (b) determining
whether such domestic relations orders are qualified domestic relations orders
under Section 414(p) of the Code, and (c) distributing benefits which are
subject to qualified domestic relations orders.

17.3 Payment to Minors and Others. If the Committee determines that any
person entitled to a distribution or payment from the Trust Fund is an infant or
a minor, is incompetent, or is unable to care for his affairs by reason of
physical or mental disability, it may cause all distributions or payments
thereafter becoming due to such person to be made to any other person for his
benefit, without responsibility to follow the application of payments so made.
Payments made pursuant to this provision shall completely discharge the Company,
the Trustee, and the Committee with respect to the amounts so paid. No person
shall have any rights under the Plan with respect to the Trust Fund, or against
the Trustee or any Employing Company, except as specifically provided herein.

17.4 Source of Benefits. The Trust Fund established under the Plan
shall be the sole source of the payments or distributions to be made in
accordance with the Plan. No person shall have any rights under the Plan with
respect to the Trust Fund, or against the Trustee or any Employing Company,
except as specifically provided herein.

17.5 Unclaimed Benefits. If the Committee is unable, within five (5)
years after any distribution becomes payable to a Participant or Beneficiary, to
make or direct payment to the person entitled thereto because the identity or
whereabouts of such person cannot be ascertained, notwithstanding the mailing of
due notice to such person at his last known address as indicated by the records
of either the Committee or his Employing Company, then such benefit or
distribution will be disposed of as follows:

(a) If the whereabouts of the Participant is unknown to the
Committee, distribution will be made to the Participant's Beneficiary
or Beneficiaries.

Payment to such one or more persons shall completely
discharge the Company, the Trustee, and the Committee with respect to
the amounts so paid.

(b) If none of the persons described in (a) above, can be
located, then the benefit payable under the Plan shall be forfeited and
shall be applied to reduce future Employer Matching Contributions.
Notwithstanding the foregoing sentence, such benefit shall be
reinstated if a claim is made by the Participant or Beneficiary for the
forfeited benefit.

In the event the Committee makes or directs a payment to the person
entitled thereto but the check for such payment remains un-cashed for a period
of 180 days, the Committee shall take such actions as it deems reasonable to
Page 47

SouthernCompanySavingsPlan2002.txt

determine the whereabouts of such person. If the whereabouts of the person is unknown or the check remains un-cashed, the Committee shall direct that such check be cancelled. In the event the person entitled to such payment subsequently requests payment, the Committee shall direct such payment to such person in the amount of the previous check.

17.6 Governing Law. The provisions of the Plan and the Trust shall be construed, administered, and enforced in accordance with the laws of the State of Georgia, except to the extent such laws are preempted by the laws of the United States.

<PAGE>

## ARTICLE XVIII

## SPECIAL REQUIREMENTS FOR ACCOUNT BALANCES

## ATTRIBUTABLE TO ACCRUED BENEFITS

## TRANSFERRED FROM THE SEPCO PLAN

18.1 SEPCO Transferred Accounts. Notwithstanding any other provisions of this Plan to the contrary, a Participant's SEPCO Transferred Account shall be subject to the requirements of this Article XVIII.

18.2 In-Service Withdrawals from SEPCO Transferred Accounts. Except as provided in this Section 18.2, a Participant shall be entitled to a distribution of his SEPCO Transferred Account at the same time he is entitled to a distribution of his Account under the applicable provisions of Article XII.

(a) Age 59 1/2. A Participant who has attained age 59 1/2 shall have the right to withdraw all or a portion of his SEPCO Transferred Account in accordance with Section 11.6(e) provided that he shall have first withdrawn all other amounts available to him in accordance with the terms and order of priority set forth in Section 11.1.

(b) Hardship. A Participant who meets the requirements for hardship set forth in Section 11.6 hereof shall be entitled to withdraw amounts determined necessary to relieve such hardship from his SEPCO Transferred Account, provided that he shall have first withdrawn all other amounts available to him in accordance with the terms and order of priority set forth in Section 11.1.

18.3 Loans from SEPCO Transferred Accounts. Subject to the provisions of Section 11.7, a Participant may request that a loan be made to him from his SEPCO Transferred Account, provided, however, that the Participant has first borrowed all other amounts available to him under the terms of the Plan.

A Participant must obtain the consent of his or her spouse, if any, to use any portion of his SEPCO Transferred Account as security for a loan. Within the ninety-day period ending on the date on which a loan is made to a Participant who is married, the Participant shall obtain and deliver to the Committee the written consent of the Participant's spouse (1) to the loan, and (2) to the reduction of the Participant's Account if the Participant's Account is reduced because of nonpayment or other default with respect to the loan. No further spousal consent shall be required in the event the Participant's Account is subsequently reduced with respect to such loan, even if the Participant is then married to a different spouse. A new spousal consent shall be required for

SouthernCompanySavingsPlan2002.txt
any subsequent loan to a Participant, if the Participant is then married.

18.4 Distribution of SEPCO Transferred Accounts. Notwithstanding any provisions of this Plan to the contrary, a Participant with a SEPCO Transferred Account shall be paid the vested benefits of the SEPCO Transferred Account upon retirement, death, total and permanent disability, or termination of employment as provided herein.

(a) All benefits from a Participant's SEPCO Transferred Account shall be distributed in accordance with the distribution options available under Article XII, with applicable spousal consent as provided under the SEPCO Plan, unless a Participant elects payment of benefits in the form of a life annuity pursuant to a written election filed with the Committee prior to commencement of distribution of benefits. The provisions of this Section 18.4 shall take precedence over any conflicting provisions of the Plan and shall apply to any Participant who has a SEPCO Transferred Account and who elects to receive payment of his benefits from his SEPCO Transferred Account in the form of a life annuity. A married Participant electing to receive benefits in the form of a life annuity shall receive the value of his benefit in the form of a qualified joint and survivor annuity, which shall provide an annuity for the life of the Participant with a survivor annuity for the life of the Participant's spouse which is either 50% or 100%, as elected by the Participant, of the amount of the annuity which is payable during the joint lives of the Participant and the Participant's spouse, and which is the actuarial equivalent of a single life annuity for the life of the Participant. An unmarried Participant who elects a life annuity shall receive the value of his benefits from his SEPCO Transferred Account in the form of an annuity for his lifetime.

(b) If the Participant's interest is to be distributed in other than a single sum, the amount required to be distributed for each calendar year, beginning with distributions for the first Distribution Calendar Year, must at least equal the quotient obtained by dividing the Participant's Benefit by the Applicable Life Expectancy.

(c) The minimum distribution required for the Participant's first Distribution Calendar Year must be made on or before the Participant's Required Beginning Date. The minimum distribution for other calendar years, including the minimum distribution for the Distribution Calendar Year in which the Participant's Required Beginning Date occurs, must be made on or before December 31 of that Distribution Calendar Year.

(d) If the Participant's benefit is distributed in the form of an annuity purchased from an insurance company, distributions thereunder shall be made in accordance with the requirements of Section 401(a)(9) of the Code and the proposed regulations thereunder.

(e)     Definitions.
        -----------

(1) "Applicable Life Expectancy" means the life expectancy calculated using the attained age of the Participant as of the Participant's birthday in the applicable calendar year reduced by one for each calendar year which has elapsed since the date life expectancy was first calculated. If life expectancy is being recalculated, the applicable life expectancy shall be the life expectancy as so recalculated. The applicable calendar year shall be the first Distribution Calendar Year, and if life expectancy is being recalculated such succeeding calendar year.
Page 49

SouthernCompanySavingsPlan2002.txt

(2) "Distribution Calendar Year" means a calendar
year for which a minimum distribution is required. For
distributions beginning before the Participant's death, the
first Distribution Calendar Year is the calendar year
immediately preceding the calendar year which contains the
Participant's Required Beginning Date.

(3) "Participant's Benefit" means the account
balance as of the last valuation date in the calendar year
immediately preceding the Distribution Calendar Year
(valuation calendar year) increased by the amount of any
contributions or forfeitures allocated to the account
balance as of dates in the valuation calendar year after the
valuation date and decreased by distributions made in the
valuation calendar year after the valuation date. If any
portion of the minimum distribution for the first
Distribution Calendar Year is made in the second
Distribution Calendar Year on or before the Required
Beginning Date, the amount of the minimum distribution made
in the second Distribution Calendar Year shall be treated as
if it had been made in the immediately preceding
Distribution Calendar Year.

(4) "Required Beginning Date" means April 1st of
the calendar year following the calendar year in which the
Participant attains age 70-1/2, in accordance with
regulations prescribed by the Secretary of the Treasury.

(f) Notwithstanding anything contained herein to the
contrary, the requirements of this Section shall apply to any
distribution of a Participant's interest and will take precedence over
any inconsistent provisions of this Plan. All distributions required
under this Section shall be determined and made in accordance with the
proposed regulations under Section 401(a)(9), including the minimum
distribution incidental benefit requirement of Section 1.401(a)(9)-2 of
the proposed regulations.

18.5 Code Section 411(d)(6) Protected Benefits. Notwithstanding any of
the foregoing, the provisions of this Article XVIII to effectuate the merger of
the SEPCO Plan into this Plan shall not decrease a Participant's accrued
benefit, except to the extent permitted under Section 412(c)(8) of the Code, and
shall not reduce or eliminate Code Section 411(d)(6) protected benefits
determined immediately prior to the date of such merger. The Committee shall
disregard any part of this Article XVIII or the Plan to the extent that
application of such would fail to satisfy this paragraph. If the Committee
disregards any portion of this Article XVIII or the Plan because it would
eliminate a protected benefit, the Committee shall maintain a schedule of any
such impacted early retirement option or other optional forms of benefit and the
Plan shall continue such for the affected Participants. Notwithstanding the
foregoing, any optional form of benefit provided under this Plan solely as a
result of the merger of the SEPCO Plan into this Plan shall be eliminated to the
extent permitted and in accordance with the regulations prescribed by the
Secretary of the Treasury under Code Section 411(d)(6), provided that the
elimination of such optional form of benefit shall not be effective before the
earlier of (a) the 90th day after the Participant receives a summary of material
modification describing the elimination of such optional form of benefit or (b)
January 1, 2002.

<PAGE>

SouthernCompanySavingsPlan2002.txt
IN WITNESS WHEREOF, the Company has caused this amendment and restatement of The Southern Company Employee Savings Plan effective as of January 1, 2002, to be executed this _____ day of _____, 2002.

EMPLOYEE SAVINGS PLAN COMMITTEE

_____

_____

<PAGE>

APPENDIX A - EMPLOYING COMPANIES

The Employing Companies as of January 1, 2002 are:

Alabama Power Company
Georgia Power Company
Gulf Power Company
Mississippi Power Company

Savannah Electric and Power Company
Southern Communications Services, Inc.
Southern Company Energy Solutions, Inc.
Southern Company Services, Inc.
Southern Nuclear Operating Company, Inc.

</TEXT>
</DOCUMENT>

Page 51

# EXHIBIT 2

# Employee Savings Plan (ESP)

*This section constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933.*
*July 15, 2002*

*The following is a summary of your benefits available under the Employee Savings Plan offered by the Company. The terms of the Plan document will control in the event of any conflict between the Plan document and this summary.*

The Company offers the Employee Savings Plan to encourage you to save, to provide income for your retirement, and as a way to buy Company stock.*

\* *Common stock of Southern Company.*

Major highlights of the Employee Savings Plan (ESP) include:
- Unless you are a "highly compensated employee" (HCE), you can contribute 1% to 25% of your pay through before-tax or after-tax payroll deduction;
- If you are an HCE, you can contribute 1% to 12% of your pay on a before-tax basis and 1% to 3% on an after-tax basis;
- Currently, each pay period the Company matches 75% of your contributions on up to 6% of your pay for that period;
- You can invest your contributions in one or a combination of various investment options;
- Company contributions initially are invested in the Company Stock Fund;
- Investment earnings, before-tax contributions, and Company matching contributions are not taxable until you receive them; and
- The Plan is an employee stock ownership plan (except the Mirant stock fund) designed to invest primarily in Company stock.

## ELIGIBILITY
You are eligible to participate in the Plan as of your first day of employment if you are a:
- regular full-time employee;
- regular part-time employee; or
- cooperative education student hired before January 1, 1995.

If you are subject to a collective bargaining agreement, you are eligible to participate only upon agreement by the Company and the representative of your bargaining unit.

You are not eligible to participate in the Plan if you are classified (even if the classification is in error) as:
- A leased employee;
- Subject to a collective bargaining agreement (unless your participation is agreed upon);
- A temporary employee;
- An independent contractor; or
- A cooperative education student hired on or after January 1, 1995.

## FORMER PERFORMANCE SHARING PLAN PARTICIPANTS
If you were a participant in the Performance Sharing Plan (PSP) and had your PSP account balance transferred to the Plan as part of the 2002 merger of the PSP into the Plan, you became a participant in the Plan as a result (if you were not already a participant in the Plan). You may make contributions to the Plan, however, only if you meet the requirements specified in the **Eligibility** section above.

## LEAVES OF ABSENCE AND PARTICIPATION
While you are on an authorized unpaid leave of absence, you may not contribute to your account, and the Company will not make any matching contributions. However, you continue to be a Plan participant. This means that the money in your account will continue to experience investment gains or losses. When you return from your leave, contributions may start again if you are eligible.

## IF YOU ARE REHIRED
If you leave employment with the Company, you are eligible to participate in the Plan immediately when you are rehired.

## HOW TO PARTICIPATE

ou will get enrollment information when you become eligible. Once eligible, you may enroll by calling Merrill Lynch at 1-800-369-9890 or through the internet at www.benefits.ml.com. You will need your Social Security Number and Merrill Lynch Personal Identification Number (PIN) to enroll. Generally, your deductions will begin the following pay period. Of course, participation is voluntary, and your participation is not affected if you transfer among Employing Companies* unless required by a collective bargaining agreement.

\* Employing Companies as of January 1, 2002 are:
  Alabama Power Company
  Georgia Power Company
  Gulf Power Company
  Mississippi Power Company
  Savannah Electric and Power Company
  Southern Communications Services, Inc.
  Southern Company Energy Solutions LLC
  Southern Company Services, Inc.
  Southern Nuclear Operating Company, Inc.

## CONTRIBUTIONS TO YOUR ACCOUNT

### YOUR CONTRIBUTIONS
You may contribute from 1% to 25% of your pay on a before- tax or after-tax basis. Your combined before- and after-tax contributions may not be more than 25%. If you are a "highly compensated employee", you may contribute only from 1% to 12% of your pay on a before-tax basis, and 1% to 3% of your pay on an after-tax basis. Under the Internal Revenue Code, you are a highly compensated employee for a given year if you earned more than a certain amount in the prior year. You are a highly compensated employee for 2002 if you earned more than $85,000 in 2001. For 2003, the limit is $90,000 earned in 2002.

Pay for this Plan includes:
  • salary or wages including all amounts
    contributed to the Flexible Benefits Plan;
  • monthly shift and monthly 7-day schedule differentials;
  • geographic premiums;
  • monthly customer service premiums;
  • monthly nuclear plant premiums; and
  • commissions paid to sales commission based
    employees and certain nonproductive pay items for
    appliance sales salespersons.

Your pay is determined before deductions for taxes and Social Security. It does not include amounts over $200,000 (as indexed by law from time to time); all awards under incentive pay plans of Employing Companies; overtime pay; any hourly shift differentials or substitution pay. It also does not include reimbursable expenses, including (but not limited to): moving

expenses, travel and entertainment expenses, imputed income for automobile expenses, tax preparation expenses, and health and life insurance premiums.

The maximum before-tax contribution is $11,000 for 2002 (this limit may be adjusted in future years). Contributions for highly compensated employees may be limited to less than $11,000.

## CHANGING YOUR CONTRIBUTION
You may change or stop your before-tax or after-tax contribution percentage at any time. Changes generally will be effective in the next pay period. To make the change, call 1-800-369-9890 or perform the transaction through the internet at www.benefits.ml.com. You will need your Social Security Number and Merrill Lynch Personal Identification Number (PIN) to make the change. Of course, employer matching contributions also stop when you are not contributing.

### IF YOUR SALARY CHANGES
If your salary changes during the year, the dollar amount of your payroll deductions will be automatically changed to reflect the percentages you elected. You do not have to make the change yourself.

## COMPANY CONTRIBUTIONS
In 2002, the Company will contribute 75% of your contributions (both before-tax and after-tax) that do not exceed 6% of your pay for each pay period during which you make a contribution. For example, in 2002, if your eligible pay is $1,800 and you contribute 6% to the Plan before-tax ($108 per paycheck deduction), the Company will contribute another $81. Remember that you will receive a greater matching contribution if you contribute 6% for the entire year than if you contribute 12% for the first six months and stop contributing for the next six months. The Company may change the amount it contributes from year to year.

## INVESTING YOUR ACCOUNT

### YOUR CONTRIBUTIONS
You may invest your contributions in one or more of various investment options in increments of 1%. The same investment choice will apply to both before-tax and after-tax contributions. The Trustee credits the contributions to an account established in your name and invests your account according to your investment decisions.

The options are offered to give you a choice of different investment risks and strategies that will help you meet your personal financial goals. The Plan is intended to be an "ERISA Section 404(c) Plan." This means that Plan fiduciaries will not be responsible for any losses in your account as a result of

your investment decisions. Normally, a fiduciary may be responsible for losses in your account if the losses occurred as a result of a breach of the fiduciary's duties under the Plan. However, you are responsible for your investment choices. There is no guarantee against losses, and you assume all investment risks.

## COMPANY MATCHING CONTRIBUTIONS

Company matching contributions are invested automatically in the Southern Company Stock Fund. However, you may elect at any time to redirect the investment of all or any portion of the Company stock in your matching contribution account to any other investment option

## FORMER PERFORMANCE SHARING PLAN CONTRIBUTIONS

Amounts transferred into the Plan from the Performance Sharing Plan (PSP) as a result of the merger of the PSP into the Plan were placed in the Company matching contribution account. Generally, such assets were invested in the same Plan investment options as those in which they had been invested in the PSP. The exception to this is where the former PSP account contained a GoalManager Portifolio that differed from the GoalManager Portifolio investment within the Plan. In such case, the PSP GoalManager Portifolio balance was transferred into the GoalManager Portifolio that existed within the Plan.

## VOTING YOUR SHARES

You may vote your shares of Company stock. You will receive a form for this purpose along with proxy solicitation material for each annual or special meeting of shareholders. If you do not vote your shares, the Company's Pension Fund Investment Review Committee or the Trustee may vote your shares.

The Stockholder Services Department of Southern Company Services, Inc. processes your proxy vote of the shares of Company stock in your account. Stockholder Services follows procedures to make sure your vote is confidential. Stockholder Services employees are subject to background checks and are required to sign an oath of confidentiality. Access to the proxies is controlled so that unauthorized personnel do not look at the proxies. The Committee (or its delegate) is responsible for reviewing the confidentiality procedures of Stockholder Services to make sure that such procedures are adequate and utilized. Please write to the Committee if you would like to learn more about these confidentiality procedures.

## INVESTMENT OPTIONS

A brief description of the investment options is provided below. The Committee and Merrill Lynch will periodically provide you with a more detailed description.

## MERRILL LYNCH RETIREMENT PRESERVATION TRUST

The Trust seeks to provide preservation of participants' investments, liquidity and current income that is typically higher than money market funds. The Trust invests primarily in a broadly-diversified portfolio of Guaranteed Investment Contracts (GICs, including BICs, synthetic GICs and separate accounts) and in obligations of U.S. government and U.S. government agency securities. The Trust also invests in high-quality money market securities.

## PIMCO TOTAL RETURN FUND (CLASS A)

The Fund seeks to maximize total return, consistent with preservation of capital and prudent investment management. Under normal circumstances, the Fund invests at least 65% of its total assets in a diversified portfolio of fixed-income securities of varying maturities.

## UBS U.S. EQUITY FUND (CLASS A)

The Fund seeks to maximize total return, consisting of capital appreciation and current income, while controlling risk. The Fund seeks to achieve its objective by investing in a wide range of equity securities of U.S. companies that are traded on major stock exchanges as well as in the over-the-counter market.

## MERCURY HW INTERNATIONAL VALUE FUND (CLASS I)*

The Fund seeks to provide current income and long-term growth of income, accompanied by growth of capital. The Fund attempts to achieve its objective through a policy of investing at least 65% of its total assets in equity securities in at least three non-U.S. markets.

## MERRILL LYNCH GLOBAL ALLOCATION FUND, INC. (CLASS A)*

The Fund seeks high total investment return consistent with prudent risk. The Fund has a fully managed investment policy utilizing U.S. and foreign equity, debt and money market securities, the combination of which will be varied from time to time, both with respect to types of securities and markets, in response to changing market and economic trends.

## MERRILL LYNCH EQUITY INDEX TRUST (TIER III)

The trust seeks to replicate the total return of the Standard & Poor's 500 composite stock price index (S&P 500® index). This index is a means to measure the performance of a broad base of large U.S. corporations. The trust invests primarily in a portfolio of equity securities (stocks) designed to substantially equal or "match" the performance of this index. ("S&P 500" is a registered trademark of the McGraw-Hill companies.)

## MERRILL LYNCH SMALL CAP VALUE FUND, INC. (CLASS A)

The Fund seeks long-term growth of capital. The Fund
nphasizes securities of relatively small-market-capitalization
companies that Fund management believes have special
investment value, as well as emerging growth companies
regardless of size. Because small-capitalization stock prices
have experienced a greater degree of market volatility than
those of large-capitalization stocks, investors should consider
the Fund for long-term investment and should bear in mind
that the higher return potential of small-capitalization stocks is
accompanied by higher risk.

### FRANKLIN SMALL-MID CAP GROWTH FUND (CLASS A)*
The Fund seeks long-term capital growth. Under normal
market conditions, the Fund invests at least 80% of its net
assets in equity securities of U.S. small-capitalization
companies and in the equity securities of mid-capitalization
companies. Because small-capitalization stock prices have
experienced a greater degree of market volatility than those of
large-capitalization stocks, investors should consider the Fund
for long-term investment and should bear in mind that the
higher return potential of small-capitalization stocks is
accompanied by higher risk.

### LOOMIS SAYLES SMALL CAP VALUE FUND (ADMIN.CLASS)*
The Fund seeks long-term growth of capital. The Fund invests
-imarily in equity securities of small-capitalization companies
with good earnings growth potential and which are believed to
be undervalued by the market. Because small-capitalization
stock prices have experienced a greater degree of market
volatility than those of large-capitalization stocks, investors
should consider the Fund for long-term investment and should
bear in mind that the higher return potential of small-
capitalization stocks is accompanied by higher risk.

### DAVIS NEW YORK VENTURE FUND, INC. (CLASS A)*
The Fund seeks growth of capital. The Fund invests primarily
in common stocks. Predominantly, the Fund invests in equity
securities of companies with market capitalizations of at least
$5 billion, although it can invest in issues of smaller-
capitalization companies. Because small-capitalization stock
prices have experienced a greater degree of market volatility
than those of large-capitalization stocks, investors should
consider the Fund for long-term investment and should bear in
mind that the higher return potential of small-capitalization
stocks is accompanied by higher risk.

### DAVIS REAL ESTATE FUND (CLASS A)*
The Fund seeks total return through a combination of growth
and income. The Fund invests primarily in securities of
companies principally engaged in or related to the real estate
industry; which own significant real estate assets; or which
-rimarily invest in real estate financial instruments. Keep in
.iind, funds that invest exclusively in one sector of the

economy carry additional risk and the possibility of substantial
volatility due to adverse political, economic or other
developments.

### PUTNAM GROWTH OPPORTUNITIES FUND (CLASS A)*
The Fund seeks capital appreciation. The Fund invests
primarily in common stocks of U.S. companies that
management believes will benefit from the major long-term
trends in the economy, business conditions, consumer behavior
or public perceptions of the environment. The Fund may also
invest in securities of companies that, although not included in
any sectors that management believes may benefit from such
trends, are expected to experience above-average potential
growth. Because the Fund's emphasis is on a relatively limited
number of issuers and sectors of the economy at any given
time, the value of Fund shares may be more susceptible to any
single economic, political or regulatory development than a
more diversified mutual fund.

### SOUTHERN COMPANY COMMON STOCK
Southern Company common stock gives you an additional
opportunity to share in the ownership of your company, with
the potential for capital appreciation. As there are no other
forms or types of investments in this option, the value of the
stock stands on its own. This option is a single stock
investment. It generally carries more risk than do the mutual
funds offered through the Plan.

### MIRANT CORPORATION COMMON STOCK
Following the spin-off of Mirant Corporation from the
Company, Mirant stock was distributed to all holders of
Southern Company common stock. The Mirant stock
attributable to the Southern Company stock you held under the
Plan at the spin-off is held in a special Mirant stock fund. In
addition, the Mirant stock attributable to the Southern
Company stock you held under The Southern Company
Employee Stock Ownership Plan ("ESOP") as of the spin-off
was transferred from the ESOP to the Plan and is held in a
subaccount within the Mirant stock fund ("Transferred ESOP
Account"). You may not direct additional amounts into this
fund.

## GOALMANAGER<sup>SM</sup> PORTFOLIOS

CONSERVATIVE PORTFOLIO
This portfolio invests 50% of its assets in the Merrill Lynch
Retirement Preservation Trust, 30% in the PIMCO Total
Return Fund and 20% between the Merrill Lynch Equity Index
Trust (15%) and the Mercury HW International Value Fund
(5%). The primary objective is to maintain the value of your
investment. An investor accepts the possibility of lower-than-
average potential returns in order to minimize the risk of
principal loss.

MODERATE PORTFOLIO
This portfolio invests 10% of its assets in the Merrill Lynch
Retirement Preservation Trust, 40% in the PIMCO Total
Return Fund and 50% among the Merrill Lynch Equity Index
Trust (30%), the Mercury HW International Value Fund (15%)
and the Merrill Lynch Small Cap Value Fund, Inc. (5%) The
primary investment objective is to seek to maintain a balance
between income and growth. An investor accepts some risk to
help achieve potential growth of principal, while still requiring
current income.

MODERATE TO AGGRESSIVE PORTFOLIO
This portfolio invests 30% of its assets in the PIMCO Total
Return Fund and 70% among the Merrill Lynch Equity Index
Trust (23%), the UBS U.S. Equity Fund (22%), the Mercury
HW International Value Fund (15%) and the Merrill Lynch
Small Cap Value Fund, Inc. (10%) The primary investment
objective is to seek above-average potential returns over a
number of years. An investor accepts some price volatility to
help achieve potential growth of principal.

AGGRESSIVE PORTFOLIO
This portfolio invests 100% of its assets among the Merrill
Lynch Equity Index Trust (30%), the UBS U.S. Equity Fund
(30%), the Mercury HW International Value Fund (25%) and
the Merrill Lynch Small Cap Value Fund, Inc. (15%) The
primary investment objective is to seek above-average
potential returns over a number of years. An investor accepts
the possibility of higher-than-average price volatility in order
to help achieve potential growth of principal.

*These funds may invest in foreign securities. Keep in mind investments in
foreign securities involve special risks, including foreign currency risk and
the possibility of substantial volatility due to adverse political, economic or
other developments.*

*GoalManager is a service mark of Merrill Lynch & Co., Inc.*

## WHERE TO FIND ADDITIONAL

## FUND INFORMATION
You may contact Merrill Lynch to request a prospectus for
Plan funds. Periodically, the Committee and Merrill Lynch
will provide you with current information about the
performance of the investment options. You should carefully
look over this information. If you still have questions or
concerns, review any other information you think may help
and talk to a professional investment advisor or financial
planner.

On occasion, investment options previously listed will change
upon recommendation of Southern Company's Pension Fund
Investment Review Committee (PFIRC). Southern Company
will communicate any changes before the change takes effect.

## CHANGING YOUR INVESTMENT MIX
You may change your investment election each pay period for
future contributions, and you may transfer your current
account balance from one fund to another on any business day.
Transfers to and from the Southern Company Stock Fund will
be made within 3 business days. To make a change, call 1-
800-369-9890 or complete the transaction through the Internet
at **www.benefits.ml.com.** You will need your Social Security
Number and Merrill Lynch Personal Identification Number
(PIN) to make your change.

With respect to the special Mirant stock fund, you may direct
investment out of the fund and into the other investment funds
if you wish. However, you may not direct investments into the
Mirant stock fund. In addition, if you direct investment out of
the Mirant stock fund, you may not again direct any amount
attributable to such investment back into the Mirant stock
fund. In any event, the Mirant stock fund will remain an
investment option under the Plan only until June 30, 2006.

## ROLLOVERS FROM OTHER PLANS
Regular full-time and regular part-time employees may roll
over a distribution from a retirement plan of a previous
employer. In order to roll over a distribution from another
plan, a distribution must meet certain requirements:
  - It must be an eligible rollover distribution from a
    qualified plan, a 403(b) plan or a 457 plan, or from an
    IRA containing only distributions from a qualified trust
    and earnings thereon;
  - The rollover amount must be deposited into the Plan
    within 60 days following the date the eligible
    employee receives the distribution from the former
    employer's plan;

- It may be an eligible distribution payable to a spouse beneficiary; and
- The rollover, other than rollovers of distributions to a spouse beneficiary, must occur within 18 months from the date of the eligible employee's employment or reemployment with the Company. Rollovers of distributions to a spouse beneficiary may occur without regard to the first 18 months of employment limit.

The amount rolled into the Employee Savings Plan is 100% vested and will be eligible for withdrawals, loans, and distributions. Amounts rolled into the Employee Savings Plan must be in cash and will be invested according to the employee's investment election. To roll over a distribution from another employer's plan into the Employee Savings Plan, call the Compensation and Benefits Department at 1-800-422-7685.

## YOUR SAVINGS PLAN ACCOUNT

Under the Employee Savings Plan, an individual account will be established in your name. As long as you participate, your account will be credited with your before-tax and after-tax contributions, Company matching contributions and any rollover contributions you have made to this Plan. Your account will reflect any changes in the value of your account resulting from any earnings, gains, or losses that might occur.

All funds will be valued on each business day of the New York Stock Exchange to reflect the dollar value of your interest in each fund.

At least quarterly, you will receive a detailed account statement, which will show your current account balance, investment choices, and breakdown of contributions.

## VESTING

You are always fully vested in your entire account. This means that you will be entitled to your entire account balance when you leave the Company.

## WITHDRAWALS FROM YOUR ACCOUNT

The Employee Savings Plan is designed for long-term savings goals, and therefore withdrawals are limited.

You may withdraw your own after-tax contributions and rollover contributions at any time. However, you may withdraw before-tax contributions only in case of hardship (as described below), after you reach age 59½ or after you separate from service with the Company. You may withdraw our Company matching contributions after you participate in the Plan for five years.

Your withdrawal will be taken from your accounts in the following order:
- After-tax contributions credited before January 1, 1987;
- After-tax contributions credited after December 31, 1986, and earnings and appreciation on after-tax contributions;
- Rollover contributions and earnings and appreciation thereon;
- Transferred ESOP Account balance (provided the Southern Company common stock to which the Mirant stock is attributable has been held in the ESOP and the Plan for a total of at least two years);
- Company matching contributions, including earnings (only after you participate for five years);
- Before-tax contributions, not including earnings and appreciation thereon for plan years beginning after December 31, 1988 (only for hardship or after age 59½ or after separation from service); then
- The rest of your account balance (only after age 59 ½ or after separation from service).

The minimum withdrawal is $300. The $300 minimum applies only when the amount available for withdrawal is $300 or more. If it is less than $300, a withdrawal must be for the total amount.

### HARDSHIP WITHDRAWAL

You may take a hardship withdrawal for an immediate and heavy financial need provided you do not have other reasonably available resources.

You may take a hardship withdrawal only if:
- It is not more than the amount of the immediate and heavy financial need recognized by the Committee as a hardship (including anticipated taxes); and
- You have obtained all distributions and all non-taxable loans available under all Company plans.

## FORMS OF PAYMENT

A withdrawal of Company matching contributions will be made in cash unless you ask for shares of Company stock. A withdrawal of your own contributions will be taken from the funds as you direct. If you withdraw your contributions from the Company Stock Fund, the payment will also be in cash unless you ask for shares of Company stock.

A withdrawal of Mirant stock will be made in cash unless you ask for shares of Mirant stock.

## LOANS

ou are eligible for a loan if you are:

- An active employee or a cooperative education student;
- Receiving long-term disability payments from the Company;
- On an approved leave of absence from the Company; or
- A "party in interest" as defined by ERISA.

You are not eligible for a loan at any time your payments are not current under an existing Plan loan.

You may request a loan from your account by calling 1-800-369-9890.

### LIMITS

The minimum amount of a loan is $1,000. At any one time, you are only permitted to have two general purpose and one residential loan outstanding.

The total amount of all outstanding loans may not be more than 50% of your account balance at the time of the loan application. Your loans must also be limited so they are not more than $50,000 less the highest outstanding loan balance during the previous 12 months.

The total of all ESP loan payments deducted each pay period may not exceed 20% of your bi-weekly base pay.

### TERMS OF LOAN

The term of a loan may not be less than 12 months or more than 58 months. However, if the loan is to be used to buy your principal residence, the term may be up to 15 years.

The interest rate is established by the Committee and provided to you at the time a request is made for a loan. It will be similar to interest rates charged by persons in the business of lending money under similar circumstances and will be fixed for the duration of your loan.

The balance of your account secures the loan.

You will pay back the loan plus interest through substantially equal payroll deductions amortized over the term of the loan. Your payments will be reinvested according to your investment elections at the time of repayment. You may repay an outstanding loan in full with a personal check (if $500 or less), cashier's check, or money order.

If you leave the Company with an outstanding loan balance, the loan will be charged against your account before Plan funds are distributed. The Committee is also authorized to pursue any other action provided by the law to satisfy the loan. Your loan amount will be taken pro rata from the funds in which you are invested in the following order:

- Before-tax contributions, including earnings:
- Company matching contributions, including earnings;
- Rollover contributions, including earnings;
- After-tax contributions credited after December 31, 1986, including earnings on all after-tax contributions; then
- After-tax contributions credited before January 1, 1987.

## DISTRIBUTIONS FROM THE PLAN

You may receive a distribution from your account when you:

- Leave the Company;
- Retire; or
- Become totally and permanently disabled as determined by the Social Security Administration.

In these cases, the value of your account will be distributed from the Plan as soon as practical after your request.

### IF YOU LEAVE THE COMPANY, BECOME DISABLED OR DIE

If you leave the Company, become disabled or die, you (or your beneficiary) may receive the total value of your account as a lump-sum payment. However, if you terminate employment with the Company, but your termination of employment does not constitute a "separation from service" in accordance with applicable law, your before-tax account may not be distributed to you at that time. Nevertheless, you may request a lump-sum distribution of the remainder of your account. Your before-tax account will be distributed at the time permitted by applicable law.

If your account value is $5,000 or less, you will automatically receive a lump-sum payment. If your account value is more than $5,000, you must request a distribution. In these cases, the value of your account will be distributed from the Plan as soon as practical after your request. You may defer the distribution of your account. However, except with respect to certain owners of the Company, you must begin receiving payments by April 1 of the calendar year following the later of the calendar year in which you reach age 70 ½ or terminate employment with the Company. If you die, your account balance will be distributed as soon as practical to your beneficiary.

## WHEN YOU RETIRE

When you retire under the Company's (or an affiliated company's) Pension Plan, you may choose to receive the value of your ESP account in one of two ways:

- Lump-sum payment.
- Annual installments — you may choose up to 20 annual installments, as long as they will not extend past your life expectancy. If you have a financial emergency, payments may be accelerated, subject to approval of the Committee.

Your payment automatically will be paid in a lump sum if your account balance is $5,000 or less. If the balance in your account is more than $5,000, you may defer the distribution of your account. However, except with respect to certain owners of the Company, you must begin receiving payments by April 1 of the calendar year following the later of the calendar year in which you reach age 70 ½ or terminate employment with the Company.

## YOUR BENEFICIARY

Your beneficiary is the person who will receive the total value of your account if you die. You should designate a beneficiary (or beneficiaries) in writing when you are enrolled in the Plan and file the designation with the Employee Service Center (ESC). You may change or revoke your beneficiary designation at any time by filing the change in writing with the ESC.

If you have designated more than one beneficiary, and one or more of these individuals dies before you, the benefit of the deceased beneficiary (or beneficiaries) will be allocated among the remaining beneficiaries in the same proportion as your initial designation.

If you do not designate a beneficiary or if no beneficiary survives you, your account will be distributed in the following order of preference:

- Your surviving spouse;
- Your surviving children (equally);
- Your surviving parents (equally);
- Your surviving brothers and sisters (equally); then
- Your trust or estate.

If you have been married for at least one year, your beneficiary must be your spouse. You may only choose another beneficiary if your spouse consents to another beneficiary by signing a statement witnessed by a notary public. Your spouse's written consent must be timely filed with the Employee Service Center and state that your spouse understands the effect of your designating someone other than your spouse as your beneficiary.

## FORM OF PAYMENT

All distributions will be made in cash. However, you may ask to have your shares of Company stock and/or Mirant stock distributed as stock. Any partial shares will be paid in cash.

## ROLLOVERS AND WITHHOLDING

When you become eligible to receive a distribution under the Plan, in most cases you may choose to have your distribution directly rolled over to another qualified plan or an individual retirement account (IRA). Hardship withdrawals, annual installment distributions of 10 or more years and distributions which are required to be made after you reach age 70 ½ are not eligible to be rolled over. If you do not elect a direct rollover of a distribution eligible to be rolled over, the Plan is required by law to withhold 20% of your distribution for federal income taxes. You will get a detailed notice regarding your options when you request a withdrawal or distribution.

## DISTRIBUTION OF DIVIDENDS

Southern Company may pay cash dividends on the shares of Company stock allocated to your account. When paid, they are credited to your ESP account and reinvested in Southern Company stock, unless you elect during the first month of any calendar quarter (i.e. January, April, July or October) to receive all or a portion of future quarterly dividends in cash. To do this, use the web site at http://www.benefits.ml.com or call Merrill Lynch at 1-800-369-9890. Your election remains in effect until you change it (but it can only be changed during the months of January, April, July or October).

Dividends paid to you in cash are treated as taxable income in the year they are received.

## CLAIMING BENEFITS

To receive benefits under the Plan, you or your beneficiary must call Merrill Lynch at 1-800-369-9890. All claims for benefits under the Plan are subject to review before payment.

For more information about what happens if your claim is denied, see the **Administrative Information** section.

## TAX IMPLICATIONS

You will be subject to current income tax on all after-tax contributions you make to the Plan and will not be allowed to deduct these contributions for income tax purposes.

The Plan is intended to be qualified under Section 401(a) of the Internal Revenue Code. Before-tax contributions, Company matching contributions, and all earnings in your account will not be considered taxable income as long as they stay in the Plan. Payments from the Plan in the form of

withdrawals or distribution at termination of employment, retirement, disability, or death may result in taxable income to you or your beneficiary (to the extent you have not already paid tax on these amounts).

Withdrawals or distributions from the Plan before age 59 ½ may be subject to an additional 10% tax on early distributions.

Tax laws are changed frequently, so that the tax laws in effect today may not be the same when you make a withdrawal or receive a distribution. You may wish to contact a qualified tax counselor.

## EFFECT ON OTHER BENEFITS

Generally, there will be no effect on your other employee benefits when you participate in the Plan. Your full salary will continue to be recognized as the basis for such benefits as life insurance, disability, and pension. Also, pay increases will be figured on your unreduced salary.

## OTHER INFORMATION

### ASSIGNMENT

Except as otherwise required by law, you may not assign, pledge, or transfer the rights to your benefits to anyone else. Any attempts to do so will void your interest in the Plan. Notwithstanding the foregoing, your Plan benefits may be offset pursuant to a judgment, order, decree, or settlement agreement entered into on or after August 5, 1997, if such offset is permitted or required by applicable law.

### QUALIFIED DOMESTIC RELATIONS ORDERS

A state court may order that your spouse, former spouse, or other alternate payee is entitled to receive a portion or all of your benefits under the Plan. For example, a court may issue this type of order in the event you and your spouse divorce. Under federal law, however, your alternate payee may receive some of your Plan benefits only if the Committee receives what is known as a "Qualified Domestic Relations Order" (QDRO) signed by the court. The Committee has established procedures for notifying you or anyone entitled to benefits that are the subject of a court order and for establishing whether a court order is a QDRO. The procedures include a sample QDRO that may be of help to you in drafting a court order to meet your particular situation. If you would like a copy of the procedures and the sample, call the Compensation and Benefits Department at 1-800-422-7685.

DISTRIBUTIONS UNDER A QDRO

A court order cannot require that any of your benefits be paid to your alternate payee at any time or in any form that is not otherwise authorized under the Plan. The Plan provides, however, that a distribution can be made under a QDRO to your alternate payee within 90 days following the Committee's notification to you and your alternate payee that a court order is a QDRO, or as soon as practical thereafter. This distribution can be made even if you have not separated from the Company. Distribution of an alternate payee's benefit must begin by the time your account distribution begins.

## MAXIMUM CONTRIBUTIONS AND BENEFITS

There are limits on the amounts that may be contributed on your behalf to Company-sponsored individual account retirement plans. The limit in each year is the lesser of 100% of your compensation or $40,000, which may be adjusted periodically by the IRS. The amounts that are included in figuring the limits are:

- Before-tax and after-tax contributions;
- Company matching contributions; and
- Company contributions to the Employee Stock Ownership Plan.

## IF THE PLAN BECOMES TOP-HEAVY

If the sum of the account balances for certain highly-paid key employees participating in the Plan is more than 60% of the sum of the account balances for all participants, then the Plan will be a top-heavy plan. In this case, a minimum contribution allocation will apply to all top-heavy plan years. The Plan is not presently a top-heavy plan, and it is unlikely that the Plan in its present form will be a top-heavy plan in the foreseeable future. However, you will be notified if the Plan ever becomes top-heavy.

## THE PENSION BENEFIT GUARANTY CORPORATION

The Pension Benefit Guaranty Corporation (PBGC) is a government agency established to secure certain retirement benefits from employee pension plans. However, the PBGC does not insure individual account plans, so the Employee Savings Plan is not insured by the PBGC.

## YOUR RIGHTS UNDER ERISA

As a participant in the Plan, you have certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). Please refer to the **Administrative Information** section.

PLAN ADMINISTRATOR DISCRETION

The Plan Administrator has the exclusive discretionary authority to:

- Interpret the Plan;
- Decide all questions of eligibility for benefits; and
- Determine the amount of these benefits.

The Plan Administrator's decisions are final.

## PLAN TERMINATION AND AMENDMENT

The Company intends to continue this Plan indefinitely. However, the Company, through its Board of Directors, reserves the right to terminate or amend the Plan at any time and for any reason without notice. In addition, the Committee can make certain amendments.

## ADMINISTRATIVE INFORMATION FOR THE EMPLOYEE SAVINGS PLAN

| | |
|---|---|
| **Formal Plan Name** | The Southern Company Employee Savings Plan |
| **Type of Plan** | Stock bonus, employee stock ownership and defined contribution pension plan |
| **Plan Administrator** | Southern Company Employee Savings Plan Committee<br>Southern Company Services, Inc.<br>270 Peachtree Street, N.W.<br>Bin 943<br>Atlanta, GA 30303<br>(404) 506-0831 (Committee Secretary)<br><br>The Plan is administered through a contract with<br>Merrill Lynch, Pierce, Fenner & Smith Incorporated<br>1400 Merrill Lynch Drive<br>Mail Stop # 04-4N-G<br>Pennington, NJ 08534 |
| **Plan Sponsor** | Southern Company Services, Inc.<br>270 Peachtree Street, N.W.<br>Atlanta, GA 30303<br>(404) 506-0831<br>For a list of affiliated companies that have adopted the Plan, contact the Plan Administrator. |
| **Plan Year** | Calendar year (January 1 to December 31) |
| **Plan Number** | 002 |
| **Employer Identification Number of Plan Sponsor** | 63-0274273 |
| **Trustee** | Merrill Lynch Trust Company, FSB<br>1600 Merrill Lynch Drive<br>Pennington, NJ 08534 |
| **Agent for Service of Legal Process** | Chairman, Southern Company Employee Savings Plan Committee<br>270 Peachtree Street, N.W.<br>Atlanta, GA 30303<br><br>Service of legal process may also be made on the Trustee of the Plan. |

## PLAN FUNDING

The Employee Savings Plan is funded through employee contributions and Company matching contributions. Employee and Company contributions are held in a trust fund and invested in the funds available under the Plan.

Southern Company Services and its affiliated companies normally pay the Trustee's fees and other administrative costs. Brokerage commissions, transfer taxes, and any other expenses resulting from purchases and sales of securities will be charged to the various investment funds.

In addition, for Company matching contributions, investment management fees for all funds, except Company stock and Mirant stock, are deducted from fund earnings. For your contributions, investment management fees for the Merrill Lynch Retirement Preservation Trust and the Merrill Lynch Equity Index Trust are paid by the Company and investment management fees for all other funds are deducted from fund earnings.

There is a $.05 fee for each share of Southern Company stock and a $.10 fee for each share of Mirant stock bought or sold in the Plan.

## PERFORMANCE OF THE FUNDS[1]

The following tables are intended to illustrate the past performance of the investment funds.

| GoalManager Portfolio | YEARLY TOTAL INVESTMENT RETURNS | | | ANNUALIZED RATE OF RETURN FOR PERIOD ENDING MARCH 31, 2002 | | |
|---|---|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 1 Yr. | 5 Yr. | 10 Yr. |
| GoalManager Conservative Model Portfolio | 5.05 | 6.05 | | | 6.48 | N/A |
| GoalManager Moderate Model Portfolio[3] | 7.49 | 6.39 | -0.72 | 4.24 | 8.32 | N/A |
| GoalManager Moderate to Aggressive Model Portfolio[4] | 7.23 | 6.12 | 0.67 | 6.71 | 7.23* | N/A |
| GoalManager Aggressive Model Portfolio | 11.52 | 3.99 | | | 6.57 | N/A |

| Fund | YEARLY TOTAL INVESTMENT RETURNS[6] | | | ANNUALIZED RATE OF RETURN FOR PERIOD ENDING MARCH 31, 2002 | | | FUND INCEPTION DATE |
|---|---|---|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 1 Yr. | 5 Yr. | 10 Yr. | |
| PIMCO Total Return Fund (Class A) | -0.75 | 11.58 | 8.97 | 6.67 | 7.92 | 7.49* | 01/97 |
| Mercury HW International Value Fund (Class I) | 23.43 | 2.15 | -12.81 | -1.77 | 4.87 | 9.77 | 10/90 |
| Merrill Lynch Equity Index Trust (Tier III)[8] | 20.95 | -9.04 | -11.91 | .24 | 10.20 | 13.39* | 09/92 |
| Franklin Small-Mid Cap Growth Fund (Class A) | 97.08 | -9.80 | -20.53 | 1.82 | 11.84 | 15.70 | 02/92 |
| Davis New York Venture Fund, Inc. (Class A) | 17.59 | 9.92 | -11.41 | -2.01 | 11.34 | 15.43 | 02/69 |
| Putnam Growth Opportunities Fund (Class A) | 51.37 | -26.60 | -32.22 | -11.08 | 6.49 | 10.14* | 10/95 |
| Mirant Corporation Common Stock | N/A | N/A | -43.42 | -59.30 | N/A | N/A | N/A |

* Inception date is used when the investment option has been in existence for less than one, five or ten years. The returns for the GoalManager[SM] Model Portfolios are calculated from the inception date of the most recently introduced investment option in the model. The inception date of the GoalManager Conservative and Moderate Model Portfolios is January 14, 1997, the date Class A Shares of the PIMCO Total Return Fund were introduced. The inception date of the GoalManager Moderate to Aggressive and Aggressive Model Portfolios is June 30, 1997, the date shares of the UBS U.S. Equity Fund were introduced.

| Merrill Lynch Retirement Preservation Trust** 30-Day Annual Effective Yield | | | | | |
|---|---|---|---|---|---|
| 07/31/01 | 6.55% | 08/31/01 | 6.48% | 09/30/01 | 6.39% |
| 10/31/01 | 6.28% | 11/30/01 | 6.32% | 12/31/01 | 6.26% |
| 1/31/02 | 6.06% | 02/28/02 | 6.12% | 03/31/02 | 6.19% |

** The 30-day annual effective yield, unaudited, is from Merrill Lynch Investment Management. As is common practice in the GIC Market, the Merrill Lynch Retirement Preservation Trust yields are always quoted on an annual effective basis.

## SOUTHERN COMPANY STOCK

| SOUTHERN COMPANY | STOCK CLOSING PRICES |
|---|---|
| 52 Week High 03/31/02 | $35.2900 |
| 52 Week Low 03/31/02 | $21.4700 |
| Close 03/31/02 | $26.4900 |

This information is authorized for distribution only when accompanied or preceded by a current prospectus for the mutual funds described herein. For more information about the investment options described herein, including management fees, all charges and expenses and the special considerations associated with the risks of global and international investing, including currency risk, request a prospectus. Please read the prospectus or prospectuses carefully before you decide to invest.

1   NOTE: Investments in the above investment options are neither insured nor guaranteed. In addition, the investment return and principal values of these investments will fluctuate so that an investor's shares or units, when redeemed, may be worth more or less than their original cost.

All total return and average annual total return figures assume reinvestment of all dividend and capital gains distributions at net asset value on the ex-dividend date and reflect the fact that no sales load is charged to participants in eligible 401(k) plans; results would be lower if the sales charges were deducted. Furthermore, please be advised that there are other charges and expenses that apply to the investment options, such as management fees, which are reflected in their net investment return.

2   The GoalManager$^{SM}$ Conservative Model shows hypothetical results (price changes plus income and capital gains distributions) which are based on the past performance of each of the investment options in the Model as indicated below. Figures assume that no loads, commissions or fees (other than represented in the expense ratio for each investment option) are deducted from the investments in the Model. The GoalManager Conservative Model assumes investment of 50% of the assets in the stable value investment option (Merrill Lynch Retirement Preservation Trust), 30% in the bond fund (PIMCO Total Return Fund), and 20% in the stock funds (15% Merrill Lynch Equity Index Trust and 5% Mercury HW International Value Fund). In calculating the hypothetical performance, the model was rebalanced on a quarterly basis to maintain the percentages shown above which reflect the percentages established by the Plan Sponsor for this Model.
This Model has the lowest risk of the four Models because of the higher percentage of assets in the stable value and bond fund investments.

3   The GoalManager$^{SM}$ Moderate Model shows hypothetical results (price changes plus income and capital gains

distributions) which are based on the past performance of each of the investment options in the Model as indicated below. Figures assume that no loads, commissions or fees (other than those represented in the expense ratio for each investment option) are deducted from the investments in the Model. The GoalManager Moderate Model assumes investment of 10% of the assets in the stable value investment option (Merrill Lynch Retirement Preservation Trust), 40% in the bond fund (PIMCO Total Return Fund), and 50% in the stock funds (30% Merrill Lynch Equity Index Trust, 5% Merrill Lynch Small Cap Value Fund, Inc. and 15% Mercury HW International Value Fund). In calculating the hypothetical performance, the Model was rebalanced on a quarterly basis to maintain the percentages shown above which reflect the percentages established by the Plan Sponsor for this Model. This Model has a higher level of risk than the Conservative Model because of the higher percentage of assets in the stock fund investments.

4   The GoalManager$^{SM}$ Moderate to Aggressive Model shows hypothetical results (price changes plus income and capital gains distributions) which are based on the past performance of each of the investment options in the Model as indicated below. Figures assume that no loads, commissions or fees (other than those represented in the expense ratio for each investment option) are deducted from the investments in the Model. The GoalManager Moderate to Aggressive Model assumes investment of 30% of the assets in the bond fund (PIMCO Total Return Fund), and 70% in the stock funds (23% Merrill Lynch Equity Index Trust, 22% UBS U.S. Equity Fund, 10% Merrill Lynch Small Cap Value Fund, Inc. and 15% Mercury HW International Value Fund). In calculating the hypothetical performance, the Model was rebalanced on a quarterly basis to maintain the percentages shown above which reflect the percentages established by the Plan Sponsor for this Model. This Model has a higher level of risk than the Moderate Model because of the higher percentage of assets in the stock fund investments.

5   The GoalManager$^{SM}$ Aggressive Model shows hypothetical results (price changes plus income and capital gains distributions) which are based on the past performance of each of the investment options in the Model as indicated below. Figures assume that no loads, commissions or fees (other than those represented in the expense ratio for each investment option) are deducted from the investments in the Model. The GoalManager Aggressive Model assumes investment of 100% of the assets in the stock funds (30% Merrill Lynch Equity Index Trust, 30% UBS U.S. Equity Fund, 15% Merrill Lynch Small Cap Value Fund, Inc. and 25% Mercury HW International Value Fund). In calculating the hypothetical performance, the Model was rebalanced on a quarterly basis to maintain the percentages shown above which reflect the percentages established by the Plan Sponsor for this Model. Because 100% of its assets are invested in

stock funds, both the risk and potential return of this Model are the highest of the four Models.

Each year ending December 31. These performance figures reflect the fact that no sales load is charged to participants in this Plan. The annualized rates of return and total return data assume reinvestment of income, dividends. and capital gains distributions and reflect changes in net asset value. A breakdown of total return figures into their interest and capital components can be found in each mutual fund prospectus. **This data reflects past performance which is no guarantee of future performance.** Principal value of all funds except the Merrill Lynch Retirement Preservation Trust will fluctuate, and the value of shares redeemed may be more or less than cost. Investment returns for all funds will fluctuate. The Merrill Lynch Retirement Preservation Trust seeks to maintain a constant $1.00 net asset value per share, although this outcome cannot be assured. An investment in the Merrill Lynch Retirement Preservation Trust is neither insured nor guaranteed by the U.S. Government.

7   The Merrill Lynch Retirement Preservation Trust (MLRPT) is a collective trust maintained by Merrill Lynch Trust. Merrill Lynch Asset Management. LP provides nondiscretionary advice to Merrill Lynch Trust. Although MLRPT seeks to preserve the value of your investment at $1.00 per unit, it is possible to lose money by investing in MLRPT. MLRPT is neither insured nor guaranteed by the Federal Deposit Insurance Corporation or any other government agency. The returns do not reflect the inclusion of a management fee.

8   Returns for the Merrill Lynch Equity Index Trust (MLEIT) Tier III do not reflect a management fee. MLEIT is a collective trust maintained by Merrill Lynch Trust. Merrill Lynch Investment Management. LP provides nondiscretionary investment advice to Merrill Lynch Trust.

9   The performance of the Loomis Sayles Small Cap Value Fund Retail Share Class is used for historical perspective only. The Admin. Share Class of the Loomis Sayles Small Cap Value Fund, which began trading on January 1, 1998. is available to participants in this plan. The Admin. Share Class is subject to an ongoing 12b-1 account maintenance fee of 0.25%. If the Admin. Share Class had been in existence, the returns would have been lower due to the impact of the higher expense ratio.

*GoalManager is a service mark of Merrill Lynch & Co.. Inc*

## SECURITIES REPORTING REQUIREMENTS

This summary is a prospectus prepared and distributed by the ompany in compliance with the Securities Act of 1933 (the "Securities Act"). A registration statement under the Securities

Act has been filed with the Securities and Exchange Commission ("SEC") with respect to approximately 10,000,000 shares of the Company stock, $5 par value, issued in connection with the Plan. Southern Company is the issuer of the Company stock offered by the Plan. The principal executive offices of Southern Company are located at:

> 270 Peachtree Street, N.W.
> Atlanta, GA 30303
> (404) 506-5000

No person has been authorized to give any information or to make any representation with regard to the Plan or Company stock not contained in this summary and, if given or made, such information or representation must not be relied upon as having been authorized. This summary does not constitute an offer of any securities other than the registered securities to which it relates (Company stock), or an offer to any person in any jurisdiction where such offer would be unlawful. The delivery of this summary at any time other than the date hereof does not imply that the information herein is correct as of any time subsequent to the date hereof.

Southern Company is subject to the information requirements of the Securities Exchange Act of 1934. As a result, Southern Company files reports and other information with the Securities and Exchange Commission (SEC). You may see these reports, proxy statements, and other information at the offices of the SEC at Room 1024, Judiciary Plaza, 450 Fifth Street, N.W., Washington, D.C.; 500 West Madison Street, Suite 1400, Chicago, IL; and 13th Floor, Seven World Trade Center, New York, NY. Copies of this material can also be obtained at prescribed rates from the Public Reference Section of the SEC at 450 Fifth Street, N.W., Washington, D.C. 20549. Company stock is listed on the New York Stock Exchange.

The following documents filed by Southern Company with the SEC pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") are incorporated by reference into this Prospectus and are deemed to be a part hereof:

1.   *Southern Company's Annual Report on Form 10K for the year ended December 31, 2001.*

2.   The Plan's Annual Report on Form 11-K for the year ended December 31, 2001.

3.   Southern Company's Quarterly Reports on Form 10-Q for the quarter ended March 31, 2002.

4.   Southern Company's current report on Form 8-K filed February 13, 2002.

5.   *The description of the registrant's common stock contained in registration no. 333-64871 filed under the Securities Act.*

All other documents subsequently filed by Southern Company and the Plan with the SEC according to Section 13(a), 13(c), '4, or 15(d) of the Exchange Act prior to the termination of _ie additional Company stock offering are also considered included by reference in this summary as of their respective dates of filing.

You may ask for a free copy of (i) any or all of the documents which have been or may be incorporated by reference in this

summary other than exhibits to such documents unless the exhibits are likewise incorporated herein by reference, and (ii) the Plan's latest annual report filed pursuant to Section 15(d) of the Exchange Act, and (iii) any annual report, proxy statement or other communication distributed to Company shareholders generally.

Requests for such copies should be directed to:

Gregory F. Marshall
Southern Company Services, Inc.
270 Peachtree Street, N.W.
Bin 943
Atlanta, Georgia 30303
(404) 506-0831

# EXHIBIT 3

270 Peachtree Street NW
Atlanta, Georgia 30303

Tel 404.506.5000



**SOUTHERN COMPANY**

*Energy to Serve Your World*

Date:   September 3, 2003

From:   Human Resources

To:   Employee Saving Plan Participants

Re:   Information for ESP Participants About the Bankruptcy Filing of Mirant Corp.

**The following message is directed at those Southern Company Employee Savings Plan (ESP) participants who hold Mirant Corporation Common Stock through their participation in the ESP. If you do not currently own shares of Mirant Corp. in your ESP account, please disregard this message.**

On July 14, Mirant filed for bankruptcy protection after failing to meet a deadline to restructure its debts out of court. Mirant shares have subsequently been delisted by the New York Stock Exchange (NYSE) but continue to trade despite the bankruptcy filing and the delisting.

ESP participants holding Mirant shares in the ESP maintain the option of selling or holding those shares. Recently, Merrill Lynch has waived the commissions normally charged on Mirant shares sold within the ESP.

We hope you find this information helpful. As a continuing reminder, information about Mirant and its efforts to restructure can be found at www.mirant.com. Further information on Mirant can be found at www.benefits.ml.com. As it has in the past, the company encourages ESP participants to seek information from a variety of sources regarding Mirant.

# EXHIBIT 4

SouthernCompanySavingsPlanTrustAgreement2002.txt

```
<DOCUMENT>
<TYPE>EX-4
<SEQUENCE>4
<FILENAME>ex4_e.txt
<DESCRIPTION>EXHIBIT 4(E)
<TEXT>
```

Exhibit 4(e)

TRUST AGREEMENT
between
MERRILL LYNCH TRUST COMPANY, FSB as the Trustee
and
SOUTHERN COMPANY SERVICES, INC. as the Employer

Trust Agreement entered into as of July 1, 2002 by and between SOUTHERN COMPANY SERVICES, INC. (the "Employer") and Merrill Lynch Trust Company, FSB (the "Trustee"), with respect to a trust ("Trust") forming part of the Southern Company Employee Savings Plan (the "Plan").

The Employer and the Trustee hereby agree as follows:

ARTICLE I

STATUS OF TRUST AND APPOINTMENT
AND ACCEPTANCE OF TRUSTEE

1.01 Status of Trust. The Trust is intended to be a qualified trust under section 401(a) of the Internal Revenue Code of 1986, as amended from time to time (the "Code"), and exempt from taxation pursuant to section 501(a) of the Code.

1.02 Appointment of Trustee. The Employer represents that all necessary action has been taken for the appointment of the Trustee as trustee of the Trust and that the Trust Agreement constitutes a legal, valid and binding obligation of the Employer.

1.03 Acceptance of Appointment. The Trustee accepts its appointment as trustee of the Trust.

1.04 Title of Trust. The Trust shall be known as the Southern Company Employee Savings Plan Trust.

1.05 Effectiveness. This Trust Agreement shall not become effective until executed and delivered by both the Employer and the Trustee.

ARTICLE II

ADMINISTRATIVE AND INVESTMENT FIDUCIARIES

2.01 Named Administrative and Investment Fiduciaries. For purposes of this Trust Agreement, the term "Named Administrative Fiduciary" refers to the committee or its designee named or provided for in the Plan as responsible for the administration and operation of the Plan, and the term "Named Investment Fiduciary" refers to the committee or its designee provided for in the Plan as responsible for the investment and management of Plan assets to the extent provided for in this Trust Agreement. The Named Administrative Fiduciary and the

```
<PAGE>
```

such committee or its designee(s) is not named or provided for in the Plan, or if so named or provided for, is not then serving, the Employer shall be the Named Administrative Fiduciary or the Named Investment Fiduciary or both, as the case may be.

SouthernCompanySavingsPlanTrustAgreement2002.txt

2.02 Identification of Named Fiduciaries and Designees. The Named Administrative Fiduciary and the Named Investment Fiduciary under the Plan shall each be identified to the Trustee in writing by the Employer, and specimen signatures of each, or of each member thereof, as appropriate, shall be provided to the Trustee by the Employer. The Employer shall promptly give written notice to the Trustee of a change in the identity either of the Named Administrative Fiduciary or the Named Investment Fiduciary, or any member thereof, as appropriate, and until such notice is received by the Trustee, the Trustee shall be fully protected in assuming that the identity of the Named Administrative Fiduciary or Named Investment Fiduciary, and the members thereof, as appropriate, is unchanged. Each person authorized in accordance with the Plan to give a direction to the Trustee on behalf of the Named Administrative Fiduciary or the Named Investment Fiduciary shall be identified to the Trustee by written notice from the Employer or the Named Administrative Fiduciary or the Named Investment Fiduciary, as the case may be, and such notice shall contain a specimen of the signature. The Trustee shall be entitled to rely upon each such written notice as evidence of the identity and authority of the persons appointed until a written cancellation of the appointment, or the written appointment of a successor, is received by the Trustee from the Employer, the Named Administrative Fiduciary or the Named Investment Fiduciary, as the case may be.

## ARTICLE III

### RECEIPTS AND TRUST FUND

3.01 Receipt by Trustee. The Trustee shall receive in cash or other assets acceptable to the Trustee all contributions paid or delivered to it which are allocable under the Plan and to the Trust and all transfers paid or delivered under the Plan to the Trust from a predecessor trustee or another trust (including a trust forming part of another plan qualified under section 401(a) of the Code), provided that the Trustee shall not be obligated to receive any such contribution or transfer unless prior thereto or coincident therewith, as the Trustee may specify, the Trustee has received such reconciliation, allocation, investment or other information concerning, or such direction, instruction or representation with respect to, the contribution or transfer or the source thereof as the Trustee may require. The Trustee shall have no duty or authority to (a) require any contributions or transfers to be made under the Plan or to the Trustee, (b) compute any amount to be contributed or transferred under the Plan to the Trustee, or (c) determine whether amounts received by the Trustee comply with the Plan.

3.02 Trust Fund. For purposes of this Trust Agreement, the "Trust Fund" consists of all money and other property received by the Trustee pursuant to Section 3.01 hereof, increased by any income or gains on or increment in such assets and decreased by any investment loss or expense, benefit or disbursement paid pursuant to this Trust Agreement. The Trustee shall hold the Trust Fund,

2

<PAGE>

without distinction between principal and income, as a nondiscretionary trustee pursuant to the terms of this Trust Agreement. Assets of the Trust may, in the Trustee's discretion, be held in an account maintained with an affiliate of the Trustee.

3.03 Additional Trust Fund. Notwithstanding any other provision of this Trust Agreement, to the extent that assets of the Plan are held in trust by a trustee other than the Trustee (such other trustee to be referred to as a "Second Trustee"), the Employer shall have created two trust funds under the Plan. The appointment of a Second Trustee shall be deemed a representation by

SouthernCompanySavingsPlanTrustAgreement2002.txt
the Employer that the Plan contains all appropriate provisions relating to the
Second Trustee. The Trustee (i) shall discharge its duties and responsibilities
hereunder solely with respect to those assets delivered into its possession,
(ii) shall have no duties, responsibilities or obligations with respect to
assets held in trust by the Second Trustee unless and until such assets are
delivered to the Trustee and (iii) except as otherwise required under the
Employee Retirement Income Security Act of 1974, as amended from time to time
("ERISA"), shall have no liability or responsibility for the acts or omissions
of the Second Trustee. To the extent that assets of the Plan are held in trust
by multiple trustees other than the Trustee, the foregoing shall apply to each
such other trustee.

## ARTICLE IV

### PAYMENTS, ADMINISTRATIVE DIRECTIONS
### AND EXPENSES

4.01 Payments by Trustee. Payments of money or property from the Trust Fund
shall be made by the Trustee upon direction from the Named Administrative
Fiduciary or its designee. Payments by the Trustee shall be transmitted to the
Named Administrative Fiduciary or its designee for delivery to the proper payees
or to payee addresses supplied by the Named Administrative Fiduciary or its
designee, and the Trustee's obligation to make such payments shall be satisfied
upon such transmittal. The Trustee shall have no obligation to determine the
identity of persons entitled to payments under the Plan or their addresses.

4.02 Named Administrative Fiduciary's Directions . Directions from or on
behalf of the Named Administrative Fiduciary or its designee shall be
communicated to the Trustee or the Trustee's designee only in a manner and in
accordance with procedures acceptable to the Trustee. The Trustee's designee
shall not, however, be empowered to implement any such directions except in
accordance with procedures acceptable to the Trustee. The Trustee shall have no
liability for following any such directions or failing to act in the absence of
any such directions. The Trustee shall have no liability for the acts or
omissions of any person making or failing to make any direction under the Plan
or this Trust Agreement nor any duty or obligation to review any such direction,
act or omission.

4.03 Disputed Payments. If a dispute arises over the propriety of the
Trustee making any payment from the Trust Fund, the Trustee may withhold the
payment until the dispute has been resolved by a court of competent jurisdiction
or settled by the parties to the dispute. The Trustee may consult legal counsel
and shall be fully protected in acting upon the advice of counsel.

3

<PAGE>

4.04 Trustee's Compensation and Expenses. If the Employer so elects in a
manner satisfactory to the Trustee, the Employer shall (a) pay the Trustee
compensation for its services under this Trust Agreement in accordance with the
Trustee's fee schedule in effect and applicable at the time such compensation
becomes payable, and (b) pay or reimburse the Trustee for all expenses incurred
by the Trustee in connection with or relating to the performance of its duties
under this Trust Agreement or its status as Trustee, including reasonable
attorneys' fees. If the Employer does not so elect, such compensation and
expenses shall be charged against and withdrawn from the Trust Fund as provided
below.

Until paid by the Employer or charged against and withdrawn from the Trust
Fund, as the case may be, the Trustee's compensation and expenses shall be a
lien upon the Trust Fund. The Trustee is authorized to charge the Trust Fund for
and withdraw from the Trust Fund, without direction from the Named
Administrative Fiduciary or any other person, the amount of any such fees or

SouthernCompanySavingsPlanTrustAgreement2002.txt
expenses which the Employer has not elected to pay and the amount of any such fees or expenses which the Employer has so elected to pay but which remain unpaid for a period of 60 days after presentation of a statement for such amount to the Employer. Trust Fund assets shall be applied to pay such fees and expenses in the following priority by asset category to the extent thereof held at the time of withdrawal in the Trust Fund subfund or account to which the fee or expense is allocated: (i) uninvested cash balances; (ii) shares of any money market fund or funds held in the Trust Fund; and (iii) any other Trust Fund assets. The Trustee is authorized to allocate its fees and expenses among these subfunds or accounts to which the fees or expenses pertain in such manner as the Trustee deems appropriate under the circumstances unless prior to such allocation the Employer or the Named Administrative Fiduciary specifies the manner in which the allocation is to be made. The Trustee is also authorized but not required to sell any shares or other assets referred to above to the extent necessary for the purpose.

By signing this Trust Agreement, the Employer authorizes the Trustee and/or its affiliates to receive payments from certain mutual funds (and/or collective trusts) for which no affiliate of the Trustee acts as investment manager or adviser (or from the principal distributors and/or advisors of those funds or trusts), in connection with the performance of reasonable and necessary services (including recordkeeping, subaccounting, account maintenance, administrative and other shareholder services). Because different mutual funds (or collective trusts) may be subject to different fee arrangements, the Employer should contact the Trustee or its designee to obtain further details on any specific fee arrangements that may be applicable to investments under the Plan.

4.05 Taxes. The Trustee is authorized, with or without direction from the Named Administrative Fiduciary or any other person, to withdraw from the Trust Fund and pay any federal, state or local taxes, charges or assessments of any kind levied or assessed against the Trust or assets thereof. Until paid, such taxes shall be a lien against the Trust Fund. The Trustee shall give notice to the Named Administrative Fiduciary of its receipt of a demand for any such taxes, charges or assessments. The Trustee shall not be personally liable for any such taxes, charges or assessments.

4.06 Expenses of Administration. Expenses incurred by the Employer, the Named Administrative Fiduciary, the Named Investment Fiduciary, any Investment Manager designated pursuant to Section 5.02 or any other persons designated to

4

<PAGE>

act on behalf of the Employer, the Named Administrative Fiduciary or the Named Investment Fiduciary, including reimbursement for expenses incurred in the performance of their respective duties, shall be the obligation of the Employer or other person specified in the Plan. Such expenses, however, may be paid from the Trust Fund upon the written direction to the Trustee of the Named Administrative Fiduciary.

4.07 Restriction on Alienation. Except as provided in Section 4.08 or under section 401(a)(13) of the Code, the interest of any Plan participant or beneficiary in the Trust Fund shall not be subject to the claims of such person's creditors and may not be assigned, sold, transferred, alienated or encumbered. Any attempt to do so shall be void; and the Trustee shall disregard any attempt. Trust assets shall not in any manner be liable for or subject to debts, contracts, liabilities, engagement or torts of any Plan participant or beneficiary, and benefits shall not be considered an asset of any such a person in the event of the person's insolvency or bankruptcy.

4.08 Payment on Court Order. The Trustee is authorized to make any payments directed by court order in any action in which the Trustee is a party or

SouthernCompanySavingsPlanTrustAgreement2002.txt
pursuant to a "qualified domestic relations order" under section 414(p) of the
Code; provided that the Trustee shall not make such payment if the Trustee is
indemnified and held harmless by the Employer in a manner satisfactory to the
Trustee against all consequences of such failure to pay. The Trustee is not
obligated to defend actions in which the Trustee is named but shall notify the
Employer or Named Administrative Fiduciary of any such action and may tender
defense of the action to the Employer, the Named Administrative Fiduciary or the
participant or beneficiary whose interest is affected. The Trustee may in its
discretion defend any action in which the Trustee is named and any expenses,
including reasonable attorneys' fees, incurred by the Trustee in that connection
shall be paid or reimbursed in accordance with Section 4.04 hereof.

## ARTICLE V

### INVESTMENTS

5.01 Investment Management. The Named Investment Fiduciary shall manage the
investment of the Trust Fund except insofar as (a) a person (an "Investment
Manager") who meets the requirements of section 3(38) of ERISA has authority to
manage Trust assets as referred to in Section 5.02 hereof or (b) the Plan
provides for participant or beneficiary direction of the investment of assets
allocable under the Plan to the accounts of such participants and beneficiaries.
In the latter situation, a list of the participants and beneficiaries and such
information concerning them as the Trustee may specify shall be provided by the
Employer or the Named Administrative Fiduciary to the Trustee and/or such
person(s) as are necessary for the implementation of the directions in
accordance with the procedure acceptable to the Trustee. Except as required by
ERISA, the Trustee shall invest the Trust Fund as directed by the Named
Investment Fiduciary, an Investment Manager or a Plan participant or
beneficiary, as the case may be, and the Trustee shall have no discretionary
control over, nor any other discretion regarding, the investment or reinvestment
of any asset of the Trust. The Trustee may limit the categories of assets in
which the Trust Fund may be invested.

It is understood that the Trustee may, from time to time, have on hand
funds which are received as contributions or transfers to the Trust which are

5

<PAGE>

awaiting investment or funds from the sale of Trust assets which are awaiting
reinvestment. Absent receipt by the Trustee of a direction from the proper
person for the investment or reinvestment of such funds or otherwise prior to
the application of funds in implementation of such a direction, the Trustee
shall in accordance with the Trustee's normal procedures in this regard cause
such funds to be invested in shares of the money market fund acceptable to the
Trustee as the Employer or Named Investment Fiduciary may in writing to the
Trustee specify for this purpose from time to time. Any such fund may be
sponsored, managed or distributed by an affiliate of the Trustee. The Employer
or the Named Investment Fiduciary, as the case may be, hereby acknowledges that
prior to any such specification it has read or will have read the then current
prospectus for the specified fund.

5.02 Investment Managers . The Employer or the Named Investment Fiduciary
may appoint one or more Investment Managers, who may be an affiliate of the
Trustee, to direct the Trustee in the investment of all or a specified portion
of the assets of the Trust. Any such Investment Manager shall be directed by the
Employer or the Named Investment Fiduciary, as the case may be, to act in
accordance with the procedures referred to in Section 5.04. The Named Investment
Fiduciary shall notify the Trustee in writing before the effectiveness of the
appointment or removal of any Investment Manager. If there is more than one
Investment Manager whose appointment is effective under the Plan at any one
Page 5

SouthernCompanySavingsPlanTrustAgreement2002.txt
time, the Trustee shall, upon written instructions from the Employer or the
Named Investment Fiduciary, establish separate funds for control by each such
Investment Manager. The funds shall consist of those Trust assets designated by
the Employer or the Named Investment Fiduciary.

5.03 Direction of Voting and Other Rights. Notwithstanding anything in the
Plan document to the contrary:

(a) The voting and other rights in securities or other assets held in the
Trust shall be exercised by the Trustee as directed by the Named Investment
Fiduciary or other person who at the time has the right referred to in Section
5.01 hereof to select the investment or reinvestment of the security or other
asset involved to be held in the Trust, provided that such voting and other
rights in any "employer security" with respect to the Plan within the meaning of
Section 407(d)(1) of ERISA ("Employer Securities") which is held in an account
under the Plan over which a Plan participant or beneficiary has control as to
specific assets to be held therein or which is held in an account which consists
solely or primarily of Employer Securities shall be exercised by the Plan
participant or beneficiary having an interest in that account.

(b) If (i) a Plan participant or beneficiary, with respect to Employer
Securities, or an Investment Manager with any right under Section 5.03(a) to
direct a voting or other decision with respect to any security or other asset
held in the Trust does not communicate any decision on the matter to the Trustee
or the Trustee's designee by the time prescribed by the Trustee or the Trustee's
designee for that purpose or (ii) the Trustee notifies the Named Investment
Fiduciary either that it does not have precise information as to the securities
or other assets involved allocated on the applicable record date to the accounts
of all participants and beneficiaries or (iii) time constraints make it unlikely
that participant, beneficiary or Investment Manager direction, as the case may
be, can be received on a timely basis, then the decision shall be the
responsibility of the Named Investment Fiduciary and the Named Investment

6

<PAGE>

Fiduciary shall communicate such direction to the Trustee on a timely basis.

(c) If the Named Investment Fiduciary with any right under the Plan or this
Trust Agreement to direct a voting or other decision with respect to any
security or other asset held in the Trust, does not communicate any decision on
the matter to the Trustee or the Trustee's designee by the time prescribed by
the Trustee for that purpose, the Trustee may, at the cost of the Employer,
obtain advice from a bank, insurance company, investment adviser or other
investment professional (including any affiliate of the Trustee) or retain an
Investment Manager or other independent fiduciary with full discretion to make
the decision.

(d) Except as required by ERISA, the Trustee shall follow all directions
above-referred to in this Section and shall have no duty to exercise voting or
other rights relating to any such security or other asset.

5.04 Investment Directions . Directions for the investment or reinvestment
of Trust assets or directions of a type referred to in Section 5.03 from the
Employer, the Named Investment Fiduciary, an Investment Manager or a Plan
participant or beneficiary, as the case may be, shall, in a manner and in
accordance with procedures acceptable to the Trustee, be communicated to and
implemented by, as the case may be, the Trustee, the Trustee's designee or, with
the Trustee's consent, the broker/dealer designated for the purpose by the
Employer or the Named Investment Fiduciary. Communication of any such direction
to such a designee or broker/dealer shall conclusively be deemed an
authorization to the designee or broker/dealer to implement the direction even
Page 6

SouthernCompanySavingsPlanTrustAgreement2002.txt

though coming from a person other than the Trustee. The Trustee shall have no liability for its or any other person's following such directions or failing to act in the absence of any such directions. The Trustee shall have no liability for the acts or omissions of any person directing the investment or reinvestment of Trust Fund assets or making or failing to make any direction referred to in Section 5.03. Neither shall the Trustee have any duty or obligation to review any such investment or other direction, act or omission or, except upon receipt of a proper direction, to invest or otherwise manage any asset of the Trust which is subject to the control of any such person or to exercise any voting or other right referred to in Section 5.03.

5.05 Communication of Proxy and Other Materials. The Employer or Named Administrative Fiduciary shall establish a procedure acceptable to the Trustee for the timely dissemination to each person entitled to direct the Trustee or its designee as to a voting or other decision called for thereby or referred to therein of all proxy and other materials bearing on the decision. In the case of Employer Securities, at such time as proxy or other materials bearing thereon are disseminated generally to owners of Employer Securities in accordance with applicable law, the Employer shall cause a copy of such proxy or other materials to be delivered directly to the Trustee and, thereafter, shall promptly deliver to the Trustee such number of additional copies of the proxy or other materials as the Trustee may request.

5.06 Common and Collective Trust Funds . Any person authorized to direct the investment of Trust assets may, if the Trustee and the Named Investment Fiduciary so permit, direct the Trustee to invest such assets in a common or collective trust maintained by the Trustee or its affiliate for the investment of assets of qualified trusts under section 401(a) of the Code, individual retirement accounts under section 408(a) of the Code and plans of governmental

7

<PAGE>

units described in section 818(a)(6) of the Code. The documents governing any such common or collective trust fund maintained by the Trustee or its affiliate, and in which Trust assets have been invested, are hereby incorporated into this Trust Agreement by reference.

ARTICLE VI

RESPONSIBILITIES AND INDEMNITY

6.01 Relationship of Fiduciaries. Each fiduciary of the Plan and the Trust shall be solely responsible for its own acts or omissions. The Trustee shall have no duty to question any other Plan fiduciary's performance of fiduciary duties allocated to such other fiduciary pursuant to the Plan. The Trustee shall not be responsible for the breach of responsibility by any other Plan fiduciary except as required under ERISA.

6.02 Benefit of Participants. Each fiduciary shall, within the meaning of the Code and ERISA, discharge its duties with respect to the Trust solely in the interest of participants in the Plan and their beneficiaries and for the exclusive purpose of providing benefits to such participants and beneficiaries and defraying reasonable expenses of administering the Plan.

6.03 Status of Trustee. The Trustee acknowledges its status as a "fiduciary" of the Plan within the meaning of ERISA.

6.04 Location of Indicia of Ownership. Except as permitted by ERISA, the Trustee shall not maintain the indicia of ownership of any assets of the Trust outside the jurisdiction of the district courts of the United States.

SouthernCompanySavingsPlanTrustAgreement2002.txt

6.05 Trustee's Reliance. The Trustee shall have no duty to inquire whether directions by the Employer, the Named Administrative Fiduciary, the Named Investment Fiduciary or any other person conform to the Plan, and the Trustee shall be fully protected in relying on any such direction communicated in accordance with procedures acceptable to the Trustee from any person who the Trustee reasonably believes is a proper person to give the direction. The Trustee shall have no liability to any participant, any beneficiary or any other person for payments made, any failure to make payments, or any discontinuance of payments, on direction of the Named Administrative Fiduciary, the Named Investment Fiduciary or any designee of either of them or for any failure to make payments in the absence of directions from the Named Administrative Fiduciary or any person responsible for or purporting to be responsible for directing the investment of Trust assets. The Trustee shall have no obligation to request proper directions from any person. The Trustee may request instructions from the Named Administrative Fiduciary or the Named Investment Fiduciary and shall have no duty to act or liability for failure to act if such instructions are not forthcoming. The Trustee shall have no responsibility to determine whether the Trust Fund is sufficient to meet the liabilities under the Plan, and shall not be liable for payments or Plan liabilities in excess of the Trust Fund.

6.06 Indemnification. Except as prohibited by ERISA, the Employer hereby indemnifies the Trustee against, and shall hold the Trustee harmless from, any and all loss, claims, liability, and expense, including reasonable attorneys'

8

<PAGE>

fees, imposed upon the Trustee or incurred by the Trustee as a result of any acts taken, or any failure to act, in accordance with the directions from the Named Administrative Fiduciary, Named Investment Fiduciary, Investment Manager (other than an Investment Manager which is an affiliate of the Trustee) or any other person specified in Article IV or V hereof, or any designee of any such person, or by reason of the Trustee's good faith execution of its duties with respect to the Trust, including, but not limited to, its holding of assets of the Trust as provided for in Section 3.02, unless the loss, claim, liability or expense involved resulted from the negligence or willful misconduct of the Trustee. The Employer's obligations in the forgoing regard shall be satisfied promptly on request by the Trustee.

6.07 Protection of Designees. To the extent that any designee of the Trustee is performing a function of the Trustee under this Trust Agreement, the designee shall have the benefit of all of the applicable limitations on the scope of the Trustee's duties and liabilities, all applicable rights of indemnification granted hereunder to the Trustee and all other applicable protections of any nature afforded to the Trustee.

ARTICLE VII

POWERS OF TRUSTEE

7.01 Nondiscretionary Investment Powers . At the direction of the person authorized to direct such action as referred to in Article V hereof, but limited to those assets or categories of assets acceptable to the Trustee as referred to in Section 5.01, the Trustee, or the Trustee's designee or a broker/dealer as referred to in Section 5.04, is authorized and empowered:

(a) To invest and reinvest the Trust Fund, together with the income therefrom, in common stock, preferred stock, convertible preferred stock, bonds, debentures, convertible debentures and bonds, mortgages, notes, commercial paper and other evidences of indebtedness (including those issued by the Trustee), shares of mutual funds (which funds may be sponsored, managed or offered by an

SouthernCompanySavingsPlanTrustAgreement2002.txt
affiliate of the Trustee), guaranteed investment contracts, bank investment
contracts, other securities, policies of life insurance, annuity contracts,
options, options to buy or sell securities or other assets, and all other
property of any type (personal, real or mixed, and tangible or intangible);

(b) To deposit or invest all or any part of the assets of the Trust in
savings accounts or certificates of deposit or other deposits in a bank or
savings and loan association or other depository institution, including the
Trustee or any of its affiliates; provided that, with respect to such deposits
with the Trustee or an affiliate, the deposits bear a reasonable interest rate;

(c) To hold, manage, improve, repair and control all property, real or
personal, forming part of the Trust Fund; to sell, convey, transfer, exchange,
partition, lease for any term, even extending beyond the duration of this Trust,
and otherwise dispose of the same from time to time;

(d) To have, respecting securities, all the rights, powers and privileges
of an owner, including the power to give proxies, pay assessments and other sums
deemed by the Trustee necessary for the protection of the Trust Fund; to vote
any corporate stock either in person or by proxy, with or without power of

9

<PAGE>

substitution, for any purpose; to participate in voting trusts, pooling
agreements, foreclosures, reorganizations, consolidations, mergers and
liquidations, and in connection therewith to deposit securities with or transfer
title to any protective or other committee; to exercise or sell stock
subscriptions or conversion rights; and, regardless of any limitation elsewhere
in this instrument relative to investments by the Trustee, to accept and retain
as an investment any securities or other property received through the exercise
of any of the foregoing powers;

(e) Subject to Section 5.01 hereof, to hold in cash such portion of the
Trust Fund which it is directed to so hold pending investments, or payment of
expenses, or the distribution of benefits;

(f) To take such actions as may be necessary or desirable to protect the
Trust from loss due to the default on mortgages held in the Trust including the
appointment of agents or trustees in such other jurisdictions as may seem
desirable, to transfer property to such agents or trustees, to grant to such
agents such powers as are necessary or desirable to protect the Trust Fund, to
direct such agent or trustee, or to delegate such power to direct, and to remove
such agent or trustee;

(g) To settle, compromise or abandon all claims and demands in favor of or
against the Trust Fund;

(h) To invest in any common or collective trust fund of the type referred
to in Section 5.06 hereof maintained by the Trustee or its affiliate;

(i) To exercise all of the further rights, powers, options and privileges
granted, provided for, or vested in trustees generally under the laws of the
state in which the Trustee has its principal place of business, so that the
powers conferred upon the Trustee herein shall not be in limitation of any
authority conferred by law, but shall be in addition thereto;

(j) To borrow money from any source and to execute promissory notes,
mortgages or other obligations and to pledge or mortgage any trust assets as
security, subject to applicable requirements of the Code and ERISA; and

(k) To maintain accounts at, execute transactions through, and lend on an
Page 9

SouthernCompanySavingsPlanTrustAgreement2002.txt
adequately secured basis stocks, bonds or other securities to, any brokerage or other firm, including any firm which is an affiliate of the Trustee.

7.02 Additional Powers of Trustee. To the extent necessary or which it deems appropriate to implement its powers under Section 7.01 or otherwise to fulfill any of its duties and responsibilities as trustee of the Trust Fund, the Trustee shall have the following additional powers and authority:

(a) to register securities, or any other property, in its name or in the name of any nominee, including the name of any affiliate or the nominee name designated by any affiliate, with or without indication of the capacity in which property shall be held, or to hold securities in bearer form and to deposit any securities or other property in a depository or clearing corporation;

10

<PAGE>

(b) to designate and engage the services of, and to delegate powers and responsibilities to, such agents, representatives, advisers, counsel and accountants as the Trustee considers necessary or appropriate, any of whom may be an affiliate of the Trustee or a person who renders services to such an affilia te, and, as a part of its expenses under this Trust Agreement, to pay their reasonable expenses and compensation;

(c) to make, execute and deliver, as Trustee, any and all deeds, leases, mortgages, conveyances, waivers, releases or other instruments in writing necessary or appropriate for the accomplishment of any of the powers listed in this Trust Agreement; and

(d) generally to do all other acts which the Trustee deems necessary or appropriate for the protection of the Trust Fund.

ARTICLE VIII

RECORDS, ACCOUNTINGS AND VALUATIONS

8.01 Records. The Trustee shall maintain or cause to be maintained accurate records and accounts of all Trust transactions and assets. The records and accounts shall be available at reasonable times during normal business hours for inspection or audit by the Named Administrative Fiduciary and the Named Investment Fiduciary or any person designated for the purpose by either of them.

8.02 Accountings. Within 60 days following the close of each fiscal year of the Plan or the effective date of the removal or resignation of the Trustee, the Trustee shall file with the Named Administrative Fiduciary a written accounting setting forth all transactions since the end of the period covered by the last previous accounting. The accounting shall include a listing of the assets of the Trust showing the value of such assets at the close of the period covered by the accounting. On direction of the Named Administrative Fiduciary, and if previously agreed to by the Trustee, the Trustee shall submit to the Named Administrative Fiduciary interim valuations, reports or other information pertaining to the Trust. The Named Administrative Fiduciary may approve the accounting by written approval delivered to the Trustee or by failure to deliver written objections to the Trustee within 60 days after receipt of the accounting. Any such approval shall be binding on the Employer, the Named Administrative Fiduciary, the Named Investment Fiduciary and, to the extent permitted by ERISA, all other persons.

8.03 Valuation. The assets of the Trust shall be valued as of each valuation date under the Plan at fair market value as determined by the Trustee based upon such sources of information as it may deem reliable, including, but not limited to, stock market quotations, statistical evaluation services, newspapers of general circulation, financial publications, advice from

Page 10

SouthernCompanySavingsPlanTrustAgreement2002.txt
investment counselors or brokerage firms, or any combination of sources. The
reasonable costs incurred in establishing values of the Trust Fund shall be a
charge against the Trust Fund, unless paid by the Employer.

11

<PAGE>

When the Trustee is unable to arrive at a value based upon information from
independent sources, it may rely upon information from the Employer, Named
Administrative Fiduciary, Named Investment Fiduciary, appraisers, or other
sources, and shall not incur any liability for inaccurate valuation based in
good faith upon such information.

8.04 Loans. In the event that participant loans are available under the
Plan, the Trustee shall reflect one aggregate balance for participant loans
under the Plan and shall reflect changes thereto only as directed by the
Employer or Named Administrative Fiduciary. The Trustee has no responsibility
with respect to maintenance of promissory notes or monitoring of loan
amortization schedules.

ARTICLE IX

RESIGNATION AND REMOVAL OF TRUSTEE

9.01 Resignation. The Trustee may resign at any time upon at least 60 days'
written notice to the Employer.

9.02 Removal. The Employer may remove the Trustee upon at least 60 days'
written notice to the Trustee.

9.03 Appointment of a Successor. Upon resignation or removal of the
Trustee, the Employer shall appoint a successor trustee. Upon failure of the
Employer to appoint, or the failure of the effectiveness of the appointment by
the Employer of, a successor trustee by the effective date of the resignation or
removal, the Trustee may apply to any court of competent jurisdiction for the
appointment of a successor.

Promptly after receipt by the Trustee of notice of the effectiveness of the
appointment of the successor trustee, the Trustee shall deliver to the successor
trustee such records as may be reasonably requested to enable the successor
trustee to properly administer the Trust Fund and all property of the Trust
after deducting therefrom such amounts as the Trustee deems necessary to provide
for expenses, taxes, compensation or other amounts due to or by the Trustee
pursuant to Sections 4.04 or 5.03 hereof not paid by the Employer prior to the
delivery.

9.04 Settlement of Account. Upon resignation or removal of the Trustee, the
Trustee shall have the right to a settlement of its account, which settlement
shall be made, at the Trustee's option, either by an agreement of settlement
between the Trustee and the Employer or by a judicial settlement in an action
instituted by the Trustee.

9.05 Expenses and Compensation. The Trustee shall not be obligated to
transfer Trust assets until the Trustee is provided assurance by the Employer
satisfactory to the Trustee that all fees and expenses reasonably anticipated
will be paid.

9.06 Termination of Responsibility and Liability. Upon settlement of the
account and transfer of the Trust Fund to the successor trustee, all rights and

12

<PAGE>

SouthernCompanySavingsPlanTrustAgreement2002.txt

privileges under this Trust Agreement shall vest in the successor trustee and all responsibility and liability of the Trustee with respect to the Trust and assets thereof shall, except as otherwise required by ERISA, terminate subject only to the requirement that the Trustee execute all necessary documents to transfer the Trust assets to the successor trustee.

## ARTICLE X

### AMENDMENT AND TERMINATION

10.01 Amendment. The Employer reserves the right to amend this Trust Agreement, provided that no amendment of this Trust Agreement or the Plan shall be effective which would (a) cause any assets of the Trust Fund to be used for, or diverted to, purposes other than the exclusive benefit of Plan participants or their beneficiaries other than an amendment permissible under the Code and ERISA, or (b) affect the rights, duties, responsibilities, obligations or liabilities of the Trustee without the Trustee's written consent. The Employer shall amend this Trust Agreement as requested by the Trustee to reflect changes in law which counsel for the Trustee advises the Trustee require such changes. Amendments to the Trust Agreement or a certified copy of the amendments shall be delivered to the Trustee promptly after adoption, and if practicable under the circumstances, any proposed amendment under consideration by the Employer shall be communicated to the Trustee to permit the Trustee to review and comment thereon in due course before the Employer acts on the proposed amendment.

10.02 Termination. The Trust may be terminated by the Employer upon at least 60 days' written notice to the Trustee. Upon such termination, and subject to Section 11.01 hereof, the Trust Fund shall be distributed as directed by the Named Administrative Fiduciary.

## ARTICLE XI

### MISCELLANEOUS

11.01 Exclusive Benefit Rule. Except as provided in Section 11.02, or as otherwise permitted or required by ERISA or the Code, no asset of the Trust shall be used for, or diverted to, purposes other than the exclusive benefit of Plan participants or their beneficiaries or for the reasonable expenses of administering the Plan and Trust until all liabilities for benefits due Plan participants or their beneficiaries have been satisfied.

11.02 Refunds to Employer. The Trustee shall, upon the written direction of the Named Administrative Fiduciary which shall include a certification that such action is proper under the Plan, ERISA and the Code specifying any relevant sections thereof, return to the Employer any amount referred to in section 403(c)(2) of ERISA.

11.03 Authorized Action. Any action to be taken under this Trust Agreement by an Employer or other person which is: (a) a corporation shall be taken by the board of directors of the corporation or any person or persons duly empowered by

13

<PAGE>

the board of directors to take the action involved, (b) a partnership shall be taken by an authorized general partner of the partnership, and (c) a sole proprietorship by the sole proprietor.

11.04 Text of Plan. The Employer represents that, prior to the execution of this Trust Agreement by both parties, it delivered to the Trustee the text of the Plan as in effect as of the date of this Trust Agreement. The Employer shall

SouthernCompanySavingsPlanTrustAgreement2002.txt
deliver to the Trustee promptly after adoption thereof a certified copy of any amendment of the Plan.

11.05 Conflict with Plan. The rights, duties, responsibilities, obligations and liabilities of the Trustee are as set forth in this Trust Agreement, and no provision of the Plan or any other document shall be deemed to affect such rights, duties, responsibilities, obligations and liabilities. If there is a conflict between provisions of the Plan and this Trust Agreement with respect to any subject involving the Trustee, including but not limited to the responsibility, authority or powers of the Trustee, the provisions of this Trust Agreement shall be controlling.

11.06 Failure to Maintain Qualification. If the Trust fails to qualify as a qualified trust under section 401(a) of the Code, or loses its status as such a qualified trust, the Employer shall immediately so notify the Trustee, and the Trustee shall, without further notice or direction, remove the Trust assets from any common or collective trust fund maintained by the Trustee or its affiliate for investments by qualified trusts.

11.07 Governing Law and Construction. This Trust Agreement and the Trust shall be construed, administered and governed under ERISA and other pertinent federal law, and to the extent that federal law is inapplicable, under the laws of the state in which the Trustee has its principal place of business. If any provision of this Trust Agreement is susceptible to more than one interpretation, the interpretation to be given is that which is consistent with the Trust being a qualified trust under section 401(a) of the Code. If any provision of this Trust Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions shall continue to be fully effective to the extent possible under the circumstances.

11.08 Successors and Assigns . This Trust Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

11.09 Gender. As used in this Trust Agreement, the masculine gender shall include the feminine and the neuter genders and the singular shall include the plural and the plural the singular, as the context requires.

11.10 Headings. Headings and subheadings in this Trust Agreement are for convenience of reference only and are not to be considered in the construction of the provisions of the Trust Agreement.

11.11 Counterparts. This Trust Agreement may be executed in several counterparts, each of which shall be deemed an original, and these counterparts shall constitute one and the same instrument which may be sufficiently evidenced by any one counterpart.

14

<PAGE>

IN WITNESS WHEREOF, the Employer and the Trustee have executed this Trust Agreement each by action of a duly authorized person.

| Merrill Lynch Trust Company, FSB | SOUTHERN COMPANY SERVICES, INC. |
|---|---|
| By: | By: |
| Name/Title: | Name/Title: |
| Date: | Date: |

SouthernCompanySavingsPlanTrustAgreement2002.txt

15

```
</TEXT>
</DOCUMENT>
```

# EXHIBIT 5


**SOUTHERN COMPANY**
*Energy to Serve Your World®*

# INFORMATION STATEMENT

---

### SPIN-OFF OF MIRANT CORPORATION
### (FORMERLY KNOWN AS SOUTHERN ENERGY, INC.)
### THROUGH THE DISTRIBUTION
### BY SOUTHERN COMPANY
### OF 272,000,000 SHARES OF
### MIRANT COMMON STOCK TO
### SOUTHERN COMPANY COMMON STOCKHOLDERS

This Information Statement is being sent to you because we are spinning off our Mirant Corporation ("Mirant") subsidiary to the holders of our common stock. We are effecting this spin-off by distributing approximately .39 of a share of Mirant common stock as a non-taxable distribution for each outstanding share of common stock of The Southern Company ("Southern Company"). The total number of Mirant shares to be distributed is 272,000,000. The Mirant shares will be distributed as of 5:00 p.m., Eastern Time, on April 2, 2001 (the "Distribution Date") to holders of record of Southern Company common stock at 5:00 p.m., Eastern Time, on March 21, 2001 (the "Record Date").

Mirant is a global competitive energy company with leading energy marketing and risk management expertise. The Southern Company Board of Directors has determined that it would be in the best interests of Southern Company stockholders to separate Mirant from Southern Company. In September 2000, Mirant completed an initial public offering of approximately 19.7 percent of its common stock. Following this spin-off, Southern Company will no longer own any shares of Mirant, and Mirant will be a fully independent, publicly traded company.

No vote of Southern Company stockholders is required in connection with the Mirant spin-off, and you are not required to take any action. This Information Statement contains details about the terms of the spin-off, certain tax consequences of the spin-off and Mirant common stock. It is for your information only. If you have questions after reviewing the Information Statement, please call the Information Agent at (866) 825-8875.

**Neither the Securities and Exchange Commission nor any state securities regulators have approved the Mirant common stock to be issued to you pursuant to this spin-off or determined if this Information Statement is accurate or adequate. Any representation to the contrary is a criminal offense.**

**The date of this Information Statement is March 6, 2001.**

## INFORMATION ABOUT THE SPIN-OFF

On February 19, 2001, the Southern Company Board of Directors approved the spin-off of Mirant to Southern Company's common stockholders. To effect this spin-off, the Southern Company Board approved the distribution of the 272,000,000 shares of Mirant common stock owned by Southern Company to holders of record of Southern Company common stock. These shares represent about 80.3 percent of the outstanding shares of Mirant common stock. The Mirant shares will be distributed as of 5:00 p.m., Eastern Time, on April 2, 2001.

You will not be required to pay any cash or other consideration for the shares of Mirant common stock distributed to you or to surrender or exchange your shares of Southern Company common stock to receive the distribution of Mirant common stock.

### The Number of Shares You Will Receive

The actual number of shares of Mirant common stock that will be distributed to you will be calculated as of the Record Date. The ratio that will be used to determine the number of Mirant common shares you will receive for each share of Southern Company common stock you own on the Record Date is calculated as follows:

272,000,000
(which is the total number of shares of Mirant common stock
to be distributed in the spin-off)

Divided by

The total number of shares of Southern Company common stock
outstanding at 5:00 p.m., Eastern Time, on March 21, 2001

We cannot now determine the actual number of shares of Mirant common stock to be distributed to you since that number can not be calculated until 5:00 p.m., Eastern Time, on the Record Date. Based on the number of shares of Southern Company common stock outstanding as of February 28, 2001, you would receive approximately .39 of a share of Mirant common stock for each share of Southern Company common stock that you own on the Record Date.

Promptly following the Record Date, we will announce the actual ratio representing the number of shares of Mirant common stock to be distributed in the spin-off in respect of each share of Southern Company common stock. This ratio will also be included in the distribution statement that will be mailed to each registered owner of Southern Company common stock and will be posted on our website at www.southerncompany.com.

### When and How You Will Receive the Mirant Shares

The Mirant shares will be distributed on April 2, 2001 by releasing our shares of Mirant common stock to Southern Company Services, Inc. (the "Distribution Agent"). As of 5:00 p.m., Eastern Time, on April 2, 2001, the Distribution Agent will cause the shares of Mirant common stock to be registered in accounts established in the ownership records of Mirant.

*Registered Holders.*   If you own shares in registered form (including shares for which you have certificates and any shares which you hold through the Southern Investment Plan), the Mirant shares distributed to you will be registered in your name and you will become the record holder of that number of shares of Mirant common stock.

*Street Name Holders.*   If your shares are held in a brokerage account or with a nominee, the distribution will be credited to the account of your brokerage firm or nominee. Your broker/nominee will in turn credit your account for the Mirant shares that you are entitled to receive. This could take up to two weeks from the Distribution Date.

*Sale of Fractional Shares.*   The Distribution Agent will not deliver any fractional shares of Mirant common stock in connection with the spin-off. Instead, the Distribution Agent has been instructed to aggregate the fractional shares and sell them through an independent broker-dealer on the open market. Such sales are expected to be made as soon as practicable after the Distribution Date. Holders who would otherwise receive a fractional Mirant share will receive instead a cash payment in the amount of a pro-rata share of the proceeds of the sales, net of commissions and charges.

*Book-Entry Registration.*   Mirant common stock will be issued in book-entry form through the Direct Registration System. Mirant's transfer agent and registrar, Mellon Investor Services, LLC, will hold your book-entry shares. If you wish to receive a physical certificate after the Distribution Date, you should contact Mirant's transfer agent (See page 8 for telephone number and address).

*Distribution Statement and Fractional Share Check.*   Following the Distribution Date, a distribution statement will be sent to you showing your ownership interest in Mirant common stock. You will also receive a check attached to the distribution statement for your pro rata share of the net proceeds from the sales of any fractional share and a Form 1099B reflecting your proceeds from the fractional share sales. We currently estimate that it will take up to 10 days from the Distribution Date to complete the mailings of distribution statements and checks for any fractional shares.

**Trading in Southern Company and Mirant Stock**

Beginning about March 19, 2001, and continuing through market close on April 2, 2001, the New York Stock Exchange ("NYSE") may establish two markets in Southern Company common stock, a "regular way" market and a "when-issued" market. Shares that trade in the "regular way" market will trade with the entitlement to shares of Mirant common stock to be distributed pursuant to the spin-off. Shares that trade on the "when-issued" market will trade without the entitlement to shares of Mirant common stock to be distributed pursuant to the spin-off. Therefore, if you own shares of Southern Company common stock at 5:00 p.m., Eastern Time, on the Record Date and sell those shares on the "regular way" market prior to market close on April 2, 2001, the Distribution Date, you will also be trading the shares of Mirant common stock that otherwise would have been distributed to you pursuant to the spin-off.

Furthermore, beginning about March 19, 2001, and continuing through market close on April 2, 2001, the NYSE may establish two markets in Mirant common stock, a "regular way" market and a "when-issued" market. The "regular way" market will be the same market for Mirant common stock that currently exists. The "when-issued" market will be a market for shares of Mirant that will be distributed to Southern Company stockholders on the Distribution Date.

3

Contracts made in the "when-issued" markets are contingent on the distribution of Mirant common shares pursuant to the spin-off. Settlement for these contracts would occur on April 6, 2001.

Following the distribution, Southern Company common stock will continue to be listed and traded on the NYSE under the symbol "SO." As a result of the distribution, the trading price of Southern Company common stock immediately following the distribution will likely be lower than the trading price of Southern Company common stock immediately prior to the distribution.

### Sales and Purchases of Shares through the Southern Investment Plan

During the period that the NYSE establishes two markets for Southern Company common stock, "regular way" and "when-issued," the Administrator for the Southern Investment Plan will suspend the purchase and sale of Southern Company common stock through the Plan. Southern Investment Plan participants who have questions regarding Plan sales and purchases during this period should contact SCS Stockholder Services.

## U.S. FEDERAL INCOME TAX CONSEQUENCES

*Tax-Free Status of the Spin-off.*   We have received a private letter ruling from the Internal Revenue Service ("IRS") stating that our distribution of whole shares of Mirant common stock to our common stockholders in connection with the spin-off will be tax-free to Southern Company and to our common stockholders for U.S. federal income tax purposes. This means that for U.S. federal income tax purposes:

- Southern Company common stockholders will not recognize a gain or loss by reason of the receipt of whole shares of Mirant common stock as a result of the spin-off; and

- Southern Company will not recognize a gain or loss by reason of the spin-off.

Although private letter rulings are generally binding on the IRS, our stockholders and we will not be able to rely on the ruling if any one of the factual representations or assumptions we made to obtain the ruling is incorrect in any material respect. We are not aware of any facts or circumstances that would cause any of these representations or assumptions to be incorrect in any material respect. Nevertheless, if the IRS subsequently held our spin-off to be taxable, the above consequences would not apply, and our common stockholders and we could be subject to tax.

*Subsequent Sale of Stock.*   If you sell your shares of Mirant common stock or Southern Company common stock after the distribution, you will recognize gain or loss on such sale based on the difference between the proceeds you receive from the sale and the tax basis allocated to the shares you sold as described below under "Allocation of Tax Basis." In most cases, this gain or loss will be a capital gain or loss, assuming that you held such shares as a capital asset, and will be a long-term or short-term gain or loss based on your holding period for such shares as described below under "Holding Period."

*Allocation of Tax Basis.*   Your tax basis for the Mirant common stock received in the spin-off will be determined based on your tax basis in the Southern Company common stock with respect to which your distribution of Mirant common stock was made. Following the spin-off, your aggregate tax basis in your shares of Southern Company common stock and Mirant common stock, including any fractional shares sold for cash as described above, will be the same as your tax basis in your shares of Southern Company common stock immediately prior to the spin-off. The aggregate tax basis in your shares of Southern Company common stock immediately prior to the spin-off will be allocated between your Southern Company common stock and Mirant common stock in proportion to the fair market value of Southern Company common stock and Mirant common stock at market close on April 2, 2001, the last trading day before the distribution.

*Additional Information to Help You Calculate Your New Tax Basis.*   Additional information will be sent to you with the distribution statement concerning the allocation of your tax basis in Southern Company common stock between your shares of Southern Company common stock and Mirant common

4

stock, including fractional shares. This information will also be posted on our web site at www.southerncompany.com.

*Holding Period.* The holding period for capital gains purposes of shares of Mirant common stock received in the distribution will include the holding period of the Southern Company common stock in respect of which the distribution was made, provided the stockholder holds the Southern Company common stock as a capital asset on the Distribution Date.

*Treatment of Fractional Shares.* If you receive cash in lieu of a fractional share of Mirant common stock as part of the spin-off, the cash will be treated for U.S. federal income tax purposes as paid in exchange for the fractional share of stock. You will realize a capital gain or loss, provided that the fractional share is considered to be held as a capital asset, measured by the difference between the cash you receive for the fractional share and your tax basis in that fractional share as described above. This capital gain or loss will be treated as a long-term or short-term gain or loss based on your holding period for the Southern Company common stock in respect of which you received your distribution of Mirant common stock.

*State, Local and Foreign Tax Consequences.* You should consult your own tax advisor regarding the state, local and foreign tax consequences of your receipt of shares of Mirant common stock and any payment for fractional shares.

*Tax Return Statement.* U.S. Treasury regulations require you to attach to your U.S. federal income tax return – for the year in which the spin-off occurs – a detailed statement setting forth certain information regarding the nature of the spin-off. The information necessary to comply with that requirement will be enclosed with the distribution statement. The *Information Statement to the Internal Revenue Service* **should be completed and attached to your 2001 tax return.** This form will also be posted on our web site at www.southerncompany.com.

*The summary of U.S. federal income tax consequences set forth above is for general information purposes only. Stockholders are advised to consult their own tax advisors as to the particular tax consequences to them of the spin-off, including the state, local, and (if applicable) foreign tax consequences.*

5

# INFORMATION ABOUT MIRANT

**Business Overview**

Mirant Corporation (formerly Southern Energy, Inc.) is a global competitive energy company with leading energy marketing and risk-management expertise. With an integrated business model, Mirant develops, constructs, owns and operates power plants and sells wholesale electricity, gas and other energy-related commodity products. Mirant has extensive operations in North America, Europe and Asia. Mirant has net ownership and leasehold interests in more than 18,000 megawatts (MW) of electric generating capacity around the world, including more than 12,000 MW in the United States. Currently, Mirant is approximately 80.3 percent owned by Southern Company; however, after the Distribution Date, Mirant will be a fully independent, publicly traded company.

In the Americas region, Mirant owns and leases power plants in North America with a total generation capacity of more than 12,000 MW and controls more than 2,500 MW of additional generating capacity through management contracts. Mirant also has projects under development or pending acquisition of more than 8,000 MW. Mirant Americas owns generation assets in California, Indiana, Maine, Maryland, Massachusetts, New York, Texas, Virginia and Wisconsin. Through Mirant Americas Energy Marketing, LP ("MAEM") (formerly Southern Company Energy Marketing, LP), Mirant markets and trades energy and energy-linked commodities, including electricity, gas, coal and emission allowances. MAEM is one of the leading electricity and gas marketers in the United States. In the Caribbean and South America, Mirant has ownership interests in electric utilities, power plants and transmission facilities. These assets are located in the Bahamas, Trinidad and Tobago, Brazil and Chile. Mirant is pursuing the sale of its Chilean subsidiary.

In Europe, Mirant has a 49 percent economic interest in Western Power Distribution, which distributes electricity to approximately 1.4 million customers in Southwest England, and a 49 percent economic interest in WPD Limited, which owns and operates the electricity network serving 1 million customers in South Wales and the water distribution and wastewater treatment business for all of Wales. WPD Limited is pursuing the sale of its water and wastewater treatment business. Mirant Europe also owns a 26 percent interest in Bewag AG, an electric utility serving more than 2 million customers in Berlin, Germany. Mirant Europe's marketing and risk management business began trading power in the Nordic energy markets in 1999. Mirant Europe began trading power in Germany, The Netherlands and Switzerland in 2000 and is currently preparing to start gas trading in the UK on the IPE (International Petroleum Exchange). Mirant Europe's other target markets for energy marketing and trading include Austria, Italy and central Europe.

In the Asia-Pacific region, Mirant has a net ownership interest in more than 3,400 MW of generation capacity in the Philippines and China, including 250 MW under construction. Most of Mirant Asia-Pacific's revenues are derived from long-term contracts with government entities or regional power boards and are predominantly linked to the U. S. dollar to mitigate foreign currency risk.

6

**Background of the Separation of Mirant from Southern Company**

Mirant was incorporated in Delaware on April 20, 1993 as a wholly owned subsidiary of Southern Company. In April 2000, Southern Company's Board of Directors determined that it would be in the best interests of Southern Company and its stockholders to spin off Mirant into a stand-alone, publicly traded company.

Mirant launched an initial public offering of approximately 19.7 percent of its common stock on September 26, 2000. Upon completion of the initial public offering, Southern Company owned approximately 80.3 percent of Mirant.

On February 19, 2001, the Southern Company Board of Directors approved the distribution of the remaining shares of Mirant common stock. The distribution is payable to Southern Company common stockholders who own shares of Southern Company common stock as of 5:00 p.m., Eastern Time, on March 21, 2001, as described in this Information Statement. After the spin-off, Southern Company will not own any shares of Mirant common stock, and Mirant will be a fully independent, publicly traded company.

**Southern Company's Continued Relationship with Mirant**

Southern Company has entered into agreements with Mirant related to the separation of their respective businesses. These separation agreements govern interim and ongoing relationships with Mirant. In particular, Southern Company has entered into an agreement under which Southern Company will continue to provide various interim services to Mirant, including financial, accounting, engineering and other services. Effective as of the time of the completion of the spin-off, executives of Southern Company who have been serving on Mirant's board of directors will no longer serve both companies.

**Mirant Common Stock**

Under Mirant's Amended and Restated Certificate of Incorporation, the authorized capital stock of the company is 2,000,000,000 shares of common stock, $0.01 par value, and 125,000,000 shares of preferred stock, $0.10 par value. As of February 28, 2001, there were 338,702,139 shares of Mirant common stock outstanding. Mirant common stock trades on the NYSE under the symbol "MIR." The CUSIP is 604675 10 8.

Mirant has a stockholders rights plan. Accordingly, one preferred share purchase right is attached to each share of Mirant common stock to be distributed. These rights would cause substantial dilution to any person or group who attempts to acquire a significant interest in Mirant without advance approval from Mirant's board of directors and thus could make an acquisition of control of Mirant more difficult.

**Market for Mirant Common Stock**

A public market was established for Mirant common stock as a result of Mirant's initial public offering in September 2000. The following table sets forth, for the period indicated, the high and low sale prices of Mirant common stock as reported on the NYSE. We urge you to obtain current quotations for Mirant common stock.

|  | High | Low |
|---|---|---|
| September 27, 2000 to February 28, 2001 ......................... | $31.88 | $20.56 |

7

**Mirant Transfer Agent**

The transfer agent and registrar for Mirant common stock is Mellon Investor Services, LLC. After April 2, 2001, the Distribution Date, you may contact the transfer agent regarding your Mirant account as follows:

| Phone | Correspondence | Internet |
|---|---|---|
| (866) Mirant1 (647-2681) | Mellon Investor Services | www.mellon-investor.com |
| Outside United States: | 85 Challenger Road | |
| (201) 329-8660 | Ridgefield Park, NJ 07660 | |

## WHERE YOU CAN FIND MORE INFORMATION

Mirant and Southern Company are each subject to the informational reporting requirements of the Securities Exchange Act of 1934, as amended. Accordingly, each company files registration statements, reports, proxy statements and other information with the Securities and Exchange Commission ("SEC") including financial statements. Mirant has been subject to the Securities Exchange Act reporting requirements for at least 90 days and is current in its reporting. If you would like more information about Mirant, we urge you to read Mirant's reports filed with the SEC. You may read and obtain copies (at prescribed rates) of Mirant's and Southern Company's reports at the Public Reference Section of the SEC at 450 Fifth Street, NW, Washington, D.C., 20549. You also may obtain these reports at the SEC's website at http://www.sec.gov. Please call the SEC at 1-800-SEC-0330 for further information on the public reference rooms. You may also inspect these reports at the New York Stock Exchange, Inc., 20 Broad Street, New York, New York 10005.

Southern Company and Mirant each maintain a website.

- Visit Southern Company's website at www.southerncompany.com
- Visit Mirant's website at www.mirant.com

You can also obtain more information about the spin-off from
the Information Agent by calling toll-free

**(866) 825-8875**