

FILED IN CLERK'S OFFICE
U.S.D.C - Atlanta

DEC - 6 2004

LUTHER D. THOMAS, Clerk
By: _____ Clerk
Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| Jimmy R. Woods, Individually and on behalf of a class of all others similarly situated, | : : : : | |
| Plaintiff, | : : | Civil Action No. 1:04-cv-1912-RWS |
| vs. | : : : | |
| Southern Company, Southern Company Services, Inc., Employee Savings Plan Committee, Michael D. Garrett, Charles D. McCrary, David M. Ratcliffe, H. Allen Franklin, Elmer B. Harris, Robert A. Bell, W. Dean Hudson, Ellen N. Lindemann, Christopher C. Womack, Craig R. Elder, Thomas A. Fanning, Robert M. Gilbert, Carson B. Harreld, William B. Hutchins, Kathleen S. King, Ronnie R. Labrato, Michael W. Southern, Kirby R. Willis, Gale E. Klappa, Allen L. Leverett, Pension Fund Investment Review Committee and Merrill Lynch Trust Company, FSB | : : : : : : : : : : : : : : : : : : : : : | |
| Defendants. | : : | |

## AMENDED COMPLAINT FOR VIOLATIONS OF ERISA

Plaintiff Jimmy R. Woods ("Plaintiff"), a participant in the Southern Company Employee Savings Plan (the "Plan"), on behalf of himself and a class of all others similarly situated, submits this Amended Complaint ("Complaint") and alleges as follows:

## INTRODUCTION

1. This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against fiduciaries of the Plan for the violations of ERISA alleged herein.

2. The action concerns the Plan, a retirement plan established and sponsored by Southern Company Services, Inc. ("SCS"), which is a wholly-owned subsidiary of Southern Company ("Southern" or the "Company").

3. The lawsuit is brought on behalf of the Plan and the participants and beneficiaries of the Plan for losses to the Plan during the Class Period (April 2, 2001 through the present) caused by the imprudent investment of Plan assets in Mirant stock.

4. The Plaintiff was an employee of Southern Company and a participant in the Plan. During the Class Period, the Plan held shares of Mirant Corporation ("Mirant") stock, and Plan participants, including Plaintiff, were provided with an

interest in such shares through a sub-account, known as the participant's "Mirant Account."[1]

5.      Plaintiff's claims arise from the failure of Defendants, fiduciaries of the Plan, to act solely in the interest of the Plan's participants and beneficiaries through Defendants' failure to exercise the required skill, care, prudence, and diligence in administering the Plan and investing the assets of the Plan.

6.      Specifically, Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their fiduciary duties in violation of ERISA by: (1) failing to prudently and loyally manage the Plan's investment in Mirant stock; (2) failing to provide participants with complete and accurate information regarding Mirant sufficient to advise participants of the true risks of investing their retirement savings in Mirant stock; and (3) failing to properly monitor the performance of persons who were appointed by Defendants to serve as Plan fiduciaries and to provide such persons with complete and accurate information regarding Mirant. Indicative of Defendants' fiduciary failures, Defendants failed to undertake any action to protect the Plan from losses as a result of the Plan's investment in Mirant

---

[1]  As detailed below, the Southern Company Employee Stock Ownership Plan ("ESOP") also held Mirant Corp. common stock ("Mirant stock") for at least a portion of the Class Period before those shares were transferred to the Plan.  Consequently, Plaintiff brings this action on behalf of those ESOP participants who were not members of the Plan independent of their membership of the ESOP and acquired Mirant stock on or about April 2, 2001.

stock due to the conflicts of interest possessed by Defendants regarding Mirant.

7.     As more fully explained below, during the Class Period, Defendants imprudently permitted the Plan to hold tens of millions of dollars of Mirant stock, which the Plan acquired when Mirant was spun-off from its parent company, Southern.  The Defendants did so despite the fact that they knew or should have known that Mirant was engaged in highly risky, unsustainable and illicit energy trading and accounting practices, was being seriously mismanaged, faced dire circumstances and, as a result, clearly was not an appropriate investment option for participant retirement savings.  Evincing Defendants' clear fiduciary breaches, Defendants continued to permit the Plan to hold and acquire Mirant stock, even after the well publicized liquidation of the Mirant plans' holdings of Mirant stock.[2]

8.     Prior to Mirant's downward spiral into bankruptcy, Mirant common stock holdings represented one of the largest single investments of the Plan.  As of December 31, 2001, the Plan held in excess of *$358 million* of Mirant stock.  Now, the stock is essentially *worthless*.  Thus, the Defendants' fiduciary breaches caused the Plan to suffer massive losses.

---

[2]  According to Southern's "Code of Ethics," which applies to the Company's and its subsidiaries directors, officers and employees, the "Southern Style" requires its members to "understand the law," how it is applicable to a given situation, "[t]ell the truth," and avoid even the appearance of a conflict of interest.  *See* http://investor.southerncompany.com/governance/ethics.cfm.  As demonstrated herein, in addition to the numerous breaches of their ERISA-mandated duties, Defendants fell woefully short of these requirements.

9.      This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. 1109, and 1132(a)(2).   In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3)), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

10.     Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for plan-wide relief for breaches of fiduciary duty, Plaintiff brings this as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.

## PARTIES

**Plaintiff**

13.     Jimmy R. Woods ("Plaintiff") worked for Southern and was a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7).  Plaintiff owned an interest in the Mirant stock held by the Plan in his Mirant Account during the Class Period.

**Defendants**

### Southern Company

14.     Southern Company ("Southern") is an Atlanta-based company with its principle place of business located within this judicial district at 270 Peachtree Street, N.W., Atlanta, Georgia 30303.  According to its filings with the Securities and Exchange Commission ("SEC"), the Company is a holding company managed by a core group of executive officers and its Board of Directors.  As more fully described below, in February 2001, Southern, through its Board of Directors, decided to spin-off its subsidiary, Mirant, by distributing Mirant stock to the Company's shareholders.  It is this action, which became effective April 2, 2001, that enabled the Plan to acquire Mirant stock.

15.     As discussed in more detail below, Southern is a Plan fiduciary in that it exercised responsibility for, among other things, the management of the Plan's

6

assets, as well as the appointment of Plan fiduciaries, including the Employee Savings Plan Committee members ("Plan Committee" or "ESP").[3]  Thus, Southern exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

### Southern Company Services, Inc.

16.    Southern Company Services, Inc. ("SCS") is a wholly-owned subsidiary of Southern with its principle place of business at 270 Peachtree Street, N.W., Atlanta, Georgia 30303.  According to the Company's SEC filings, SCS is the system service company that provides specialized services to Southern and its subsidiaries at cost.  Amongst the numerous services it provides are general and design engineering, purchasing, accounting and statistical analysis, finance and treasury, tax, information resources, marketing, auditing, insurance and pension administration and human resources management.  SCS has the third largest employee base in the Southern "family."

17.    According to the Company's Form 5500 filed with the Department of Labor for year ending December 31, 2001 ("2001 Form 5500"), SCS is the Plan's Sponsor.  Consequently, SCS is the Sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

_____
[3]    In addition, Southern also appointed members of the Employee Stock Ownership Plan

18.    As discussed in more detail below, SCS is a Plan fiduciary in that it exercised responsibility for, among other things, the management of the Plan's assets, as well as, through its Board of Directors, the appointment of Plan fiduciaries, including the Trustee.  Thus, SCS exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

**SCS's Board of Directors**

19.    The members of the SCS Board of Directors were fiduciaries of the Plan because they were responsible for appointing, removing, and, thus, monitoring the Trustee.  In addition, SCS acted through its Board in carrying out its plan-related fiduciary duties and responsibilities, and, thus, SCS's Board members were fiduciaries to the extent of their personal exercise of such responsibilities.  Thus, SCS's Board members exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

20.    Defendant Michael D. Garrett ("Garrett") serves as a Board member of SCS.  Further, he also serves as the President and CEO of Georgia Power, a subsidiary of Southern, and on Southern's "Management Council."  As a result of

---

Committee members ("ESOP Committee").

his position on SCS's Board, Defendant Garrett is a fiduciary within the meaning of ERISA in that he exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.

21.     Defendant Charles D. McCrary ("McCrary") serves as a Board member of SCS.  In addition, Defendant McCrary also serves as Executive Vice-President for Southern, President and CEO of Alabama Power, a subsidiary of Southern, and serves on Southern's "Management Council."  Due to his service on SCS's Board of Directors, Defendant McCrary is a fiduciary within the meaning of ERISA in that he exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.

22.     Defendant David M. Ratcliffe ("Ratcliffe") serves as a Board member of SCS.  As a result of the fiduciary responsibilities and functions described above, Defendant Garrett is a fiduciary within the meaning of ERISA in that he exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the

administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.  In addition to Defendant Ratcliffe's services on SCS' Board of Directors, Defendant Ratcliffe is also the Chairman, President and CEO of Southern and serves on its "Management Council."  Defendant Ratcliffe assumed the responsibilities of CEO and Chairman in July after Allen Franklin retired.

23.     Defendant H. Allen Franklin ("Franklin") served on SCS' Board of Directors during part of the Class Period.   As a result of the fiduciary responsibilities and functions described above, Defendant Franklin was a fiduciary within the meaning of ERISA in that he exercised discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.  For at least a portion of the Class Period, Defendant Franklin served as Chairman, President and CEO of Southern.

24.     Defendant Elmer B. Harris ("Harris") served on SCS's Board of Directors during part of the Class Period.   As a result of the fiduciary responsibilities and functions described above, Defendant Harris was a fiduciary within the meaning of ERISA in that he exercised discretionary authority or

10

discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.

25.    Collectively, Defendants Garrett, McCrary, Ratcliffe, Franklin and Harris are hereafter referred to as the "Director Defendants."

**ESP Committee Defendants**

26.    The "Southern Company Savings Plan Committee" ("Plan Committee" or "ESP Committee"[4]) is listed in SCS's 2001 Form 5500 as the "Plan administrator." The ESP Committee is comprised of the Vice President, System Compensation and Benefits, of the Southern Company; Senior Vice-President, Human Resources of the Southern Company; and Comptroller of the Southern Company. As discussed in more detail below, the Committee members were fiduciaries during the Class Period because the ESP Committee is the Named Fiduciary of the Plan, and, in this capacity, the ESP Committee members exercised responsibility for administering, controlling, and operating the Plan, and communicating with participants regarding Plan assets. Thus, the ESP Committee

---

[4]    According to Defendants' December 2 letter (Exhibit A) and other representations, the Committee, referred to in the Plan 13.1, is referred to as the Employee Savings Plan Committee and Plaintiffs will refer to it as the ESP Committee herein.

members exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

27. Defendant Robert A. Bell ("Bell") serves as a member of the ESP Committee. As a result of the fiduciary responsibilities and functions described above, Defendant Bell is a fiduciary within the meaning of ERISA in that he exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets. In his capacity as and ESP Committee member, Defendant Bell signed the Form S-8, filed with the SEC on July 22, 2002, registering an additional 15 million shares with the SEC for the Plan.

28. Defendant W. Dean Hudson ("Hudson") serves as a member of the ESP Committee. As a result of the fiduciary responsibilities and functions described above, Defendant Hudson is a fiduciary within the meaning of ERISA in that he exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets. Additionally, for at

least a portion of the Class Period, Defendant Hudson was the Company's Comptroller and Chief Accounting Officer.   Further, as described below, Defendant Hudson is also a member of the Pension Fund Investment Review Committee ("PFIRC") and is a fiduciary to that extent as well.   In addition, Defendant Hudson, as "Plan Administrator," signed the Form 5500s, filed with the Department of Labor ("DOL"), for years ending December 31, 2002 and 2001 for the Plan.

29.     Defendant Ellen N. Lindemann ("Lindemann") serves as a member of the ESP Committee, and for at least a portion of the Class Period served as the ESP Committee chairman.   As a result of the fiduciary responsibilities and functions described above, Defendant Lindemann is a fiduciary within the meaning of ERISA in that she exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.   Further, upon information and belief, Defendant Lindemann was also a member of the PFIRC (described herein) and was a fiduciary of the Plan in that capacity as well.

30.     Defendant Christopher C. Womack ("Womack") served as a member of the ESP Committee.   As a result of the fiduciary responsibilities and functions

13

described above, Defendant Womack was a fiduciary within the meaning of ERISA in that he exercised discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets. Additionally, for at least a portion of the Class Period, Defendant Womack was the Company's Senior Vice President, Human Resources, and Chief People Officer.

31.     Defendants Bell, Hudson, Lindemann and Womack are hereafter collectively referred to as the "ESP Committee Defendants."[5]

**Southern's Pension Fund Investment Review Committee**

32.     Southern Company's Pension Fund Investment Review Committee ("PFIRC") is comprised of Chief Financial Officers, or most senior financial officers, of select system companies within the Southern Family.  Specifically, according to the SCS Board meeting minutes establishing the PFIRC[6], the PFIRC is comprised of the following individuals: (i) CFO of Southern; (ii) CFO of Alabama Power Company ("Alabama Power"); (iii) CFO of Georgia Power

---

[5]  Because the ESOP Committee is comprised of persons occupying the same corporate positions with Southern as the ESP Committee (compare ESOP Plan § 9.1 and Plan § 13.1), Plaintiff believes and alleges that Defendants Bell, Hudson, Lindemann and Womack were also members of the ESOP Committee during the Class Period.

Company ("Georgia Power"); (iv) CFO of Gulf Power Company ("Gulf Power");
(v) CFO of Mississippi Power Company ("Mississippi Power"); (vi) CFO of SCS;
(vii) CFO of any other subsidiary of Southern that may adopt a pension plan for its
employees; and (viii) Senior Vice-President – Administration of SCS.   As
discussed in more detail below, the PFIRC Defendants were fiduciaries during the
Class Period because, among other fiduciary powers and actions, they possessed
and exercised responsibility for prudently selecting investment fund options for the
Plan. Thus, in this capacity, the PFIRC members exercised discretionary authority
with respect to management and administration of the Plan and/or management and
disposition of the Plan's assets.

33.     Defendant Craig R. Elder ("Elder") is a member of the PFIRC. As a
result of the fiduciary responsibilities and functions described above, Defendant
Elder is a fiduciary within the meaning of ERISA in that he exercises discretionary
authority or discretionary control with respect to the management of the Plan,
possessed discretionary authority or discretionary responsibility in the
administration of the Plan, and/or exercised authority or control with respect to the
management of the Plan's assets.

34.     Defendant Thomas A. Flanning ("Flanning") is the Executive Vice-

---

6  *See* Extract of meeting minutes of SCS Board meeting held on October 19, 1981 (attached

President of Southern, President of its External Affairs Group, serves on its "Management Council," and is currently Southern's CFO. In addition, Defendant Flanning is a member of the PFIRC. As a result of the fiduciary responsibilities and functions described above, Defendant Flanning is a fiduciary within the meaning of ERISA in that he exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.

35. Defendant Robert M. Gilbert ("Gilbert") is a member of the PFIRC. As a result of the fiduciary responsibilities and functions described above, Defendant Gilbert is a fiduciary within the meaning of ERISA in that he exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.

36. Defendant Carson B. Harreld ("Harreld") is a member of the PFIRC. As a result of the fiduciary responsibilities and functions described above, Defendant Harreld is a fiduciary within the meaning of ERISA in that he exercises

---

hereto as Exhibit A).

discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.  In addition to his service on PFIRC, for at least part of the Class Period, Defendant Harreld served as CFO for Georgia Power Co.

37.    Defendant William B. Hutchins, III ("Hutchins") is a member of the PFIRC.  As a result of the fiduciary responsibilities and functions described above, Defendant Hutchins is a fiduciary within the meaning of ERISA in that he exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.  Further, Defendant Hutchins also served as CFO for Alabama Power Co. for at least part of the Class Period.

38.    Defendant Kathleen S. King ("King") is a member of the PFIRC.  As a result of the fiduciary responsibilities and functions described above, Defendant King is a fiduciary within the meaning of ERISA in that she exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the

administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.

39.     Defendant Ronnie R. Labrato ("Labrato") is a member of the PFIRC. As a result of the fiduciary responsibilities and functions described above, Defendant Labrato is a fiduciary within the meaning of ERISA in that he exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets. Further, for at least part of the Class Period, Defendant Labrato was the Vice President, Chief Financial Officer and Comptroller. Moreover, he was also the CFO of Gulf Power Co. for at least part of the Class Period.

40.     Defendant Michael W. Southern ("M. Southern") is a member of the PFIRC. As a result of the fiduciary responsibilities and functions described above, Defendant M. Southern is a fiduciary within the meaning of ERISA in that he exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets. In addition, for at

18

least part of the Class Period, Defendant M. Southern served as the CFO for Mississippi Power Co., a subsidiary of Southern.

41.    Defendant Kirby R. Willis ("Willis") is a member of the PFIRC. As a result of the fiduciary responsibilities and functions described above, Defendant Willis is a fiduciary within the meaning of ERISA in that he exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets. Additionally, for at least part of the Class Period, Defendant Willis served as the CFO for Savannah Electric and Power Co., a subsidiary of Southern.

42.    Defendant Gale E. Klappa ("Klappa") served on the PFIRC for at least a portion of the Class Period. Consequently, and as a result of the fiduciary responsibilities and functions described above, Defendant Klappa was a fiduciary within the meaning of ERISA in that he exercised discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.

19

43.     Defendant Allen L. Leverett ("Leverett") served on the PFIRC for at least a portion of the Class Period.  Consequently, and as a result of the fiduciary responsibilities and functions described above, Defendant Leverett was a fiduciary within the meaning of ERISA in that he exercised discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.

44.     As previously stated, in addition to his service on the ESP Committee, Defendant Hudson also serves on the PFIRC.  Consequently, and as a result of the fiduciary responsibilities and functions described above, Defendant Hudson is a fiduciary within the meaning of ERISA in that he exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.

45.     Defendant Lindemann, in addition to her service on the ESP Committee, for at least part of the Class Period served on the PFIRC.  Indeed, in a

letter specifically addressed to Plan participants,[7] Defendant Lindemann lists herself as member of the PFIRC.  Consequently, and as a result of the fiduciary responsibilities and functions described above, Defendant Lindemann was a fiduciary within the meaning of ERISA in that she exercised discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.

46.    Collectively, Defendants Elder, Fanning, Gilbert, Harreld, Hudson, Hutchins, King, Labrato, Southern, Willis, Klappa, Lindemann and Leverett are hereafter referred to as the "PFIRC Defendants."

**Trustee & Investment Manager**

47.    Defendant Merrill Lynch Trust Company, FSB ("ML") served as the Trustee for the Plan during the Class Period.  According to a notification of Plan changes sent to Plan participants, ML "assist[s] in the administration of the [Plan]" and Plan participants were told to direct their questions regarding Plan

---

[7]  *See* November 12, 2002 Letter to Southern Company Employee Savings Plan Participants ("November 2002 letter"), attached hereto as Exhibit B.

enhancements to ML.[8]  Moreover, according to the Trust Agreement between SCS and ML, ML "acknowledges its status as a 'fiduciary' of the Plan within the meaning of ERISA."  Consequently, ML is a fiduciary within the meaning of ERISA in that it exercises discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets.

48.    ML also acted as the Plan's investment manager during the Class Period. *See* November letter, Exhibit B.  Consequently, in this regard, ML was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A)(ii).

## THE PLAN

### A.    Plan Operation

49.    According to the Company's Form 11-K for year ending 2002 ("2002 11-K") filed with the SEC, the Plan is a "defined contribution plan" which is administered by the ESP.

50.    The Plan, according to the Company's 2002 11-K, covers substantially all employees, certain former employees, and retirees of the

---

[8] *See* November 2002 letter, Exhibit B.

Company's subsidiaries.[9]

51.     According to the Plan's master documents, "[t]he purpose of the Plan is to encourage *employee thrift*, to create added employee interest in the affairs of The Southern Company, to provide a means for becoming a shareholder in The Southern Company, to supplement *retirement and death benefits... ." See* The Southern Company Employee Savings Plan as Amended and Restated Effective January 1, 2002 ("Plan") at § 1 (emphasis added)[10]; *see also* Employee Savings Plan (ESP) Summary Plan Description, dated July 15, 2002 ("SPD")[11] (stating that the "Company offers the Employee Savings Plan to *encourage you to save, to provide income for your retirement*, and as a way to buy Company Stock.") (emphasis added).

52.     All regular full and part-time employees are eligible to participate in the Plan. *See* SPD.

_____

[9]  These subsidiaries include Alabama Power Company, Georgia Power Company, Gulf Power Company, Mississippi Power Company, Savannah Electric and Power Company, Southern Communications Services, Inc., Southern Company Energy Solutions LLC, Southern Company Services, Inc., and Southern Nuclear Operating Company, Inc.  As more fully explained herein, in April 2001, Southern Energy Resources, Inc. ("Southern Energy Resources") was removed as a subsidiary and, therefore, its participants were no longer eligible to participate in the Plan. Southern Energy Resources was the predecessor-in-interest to Mirant Services, the sponsor of Mirant's retirement savings plans.

[10]  The Plan is attached hereto as Exhibit C.

[11]  The SPD is attached hereto as Exhibit D.

53.     Generally, under the Plan, there are three sources of contributions to participants' Plan accounts: (1) Elective Employee Contributions, by which participants elect to have their salary reduced by one to sixteen percent and such reduction contributed to their Plan accounts; (2) Voluntary Participant Contributions, by which participants can elect to contribute additional amounts to their Plan accounts; and (3) Employer Matching Contributions, by which the Board of Directors of SCS, in its "absolute discretion," determines the matching amount to be contributed by the Company, and causes such amount to be contributed to participants' Plan accounts.

54.     The Plan Documents provides that participants have the ability to direct the investment of their Elective Employee and Voluntary Participant Contributions into one or more of the Investment Funds provided under the Plan and selected by the PFIRC, including the Southern Company Stock Fund. *See* Plan § 8.2.

55.     The Plan Documents further provide that participants have no choice regarding the investment of Employer Matching Contributions.    Instead, such contributions are invested in the Company Stock Fund. *See* Plan § 8.3

**B.     Plan Ownership of Mirant Common Stock**

56.     Mirant was spun-off from the Company on April 2, 2001 with each

24

shareholder of Company stock receiving a fractional share of Mirant stock. Consequently, the Plan received a significant amount of Mirant stock in proportion to the amount of Southern Stock held by the Plan. This newly acquired Mirant stock was held by the Plan in a "Mirant Stock Fund." *See* Plan at § 8.8.

57.    The Southern Company Employee Stock Ownership Plan[12] ("ESOP") is a separate plan that employees of Southern and its subsidiaries are eligible to participate in.[13]   All Mirant stock that was acquired by the ESOP through the Mirant spin-off was immediately transferred over to the Plan. Shares of the Mirant stock acquired by the Plan were held in a "Participant's 'Transferred ESOP Account.'" *See* Plan § 9.1. This account was a subaccount of the Mirant Stock fund. *See id.* at § 9.1(d), 8.8.

58.    Consequently, participants in the Southern ESOP became participants in the Plan to the extent that they held Mirant stock in the "Transferred ESOP

---

[12] *See* Southern Company Employee Stock Ownership Plan, effective January 1, 2002, § 6.10.

[13] The number of Plan participants for the Plan listed in the 2002 Form 5500 is greater than the number of ESOP participants when compared to that plan's Form 5500 for the same time period. Consequently, Plaintiff believes and alleges that not all members of the Plan were also members of the ESOP. However, since the ESOP members necessarily had Company stock and therefore received Mirant stock after the divestiture and subsequently became members of the Plan, pursuant to the transfer described above, Plaintiff brings this action on behalf of both Plan and ESOP members who held Mirant stock during the Class Period against Defendant-fiduciaries who continued to permit the Plan to hold Mirant stock after it became an imprudent investment.

Account." *See* Plan § 11.1.

59.    Participants were permitted to transfer funds out of the Mirant Stock Fund and into any other investment fund offered by the Plan. *Id.* at § 8.8. However, as discussed below, Defendants failed to provide participants with complete and accurate information such that they could appreciate the true risks of maintaining investment in Mirant stock.

60.    As noted above, as of December 31, 2001, the Mirant Stock Fund contained over *$358 million* in Mirant stock, which represented over 13 percent of the total assets of the Plan. The value of Mirant stock plunged over 99 percent during the Class Period. Yet, despite the plunge, clear evidence of the serious mismanagement of Mirant and the deteriorating financial condition of Mirant, the Plan fiduciaries took no action to divest the Plan of Mirant stock. Currently, the stock is virtually worthless. However, prudent, diligent, and timely action by the responsible Plan fiduciaries could have prevented millions of dollars of Plan losses. The failure to take such action was a breach of fiduciary duty under ERISA, as ERISA requires Plan fiduciaries to ensure on a continuous basis that Plan investments are prudent investment vehicles for participants' retirement savings.

## C.    Recent Revisions to the Plan

61.    According to a series of notices sent to Plan participants, the Plan was revised to allow a "new Self-Directed Option" ("SDO") (this change apparently took effect in December 2002).   The SDO gave participants "more investment choices" by providing access to individual stocks and more than 700 mutual funds. Notably one of the stocks that the SDO gave participants access to was Mirant stock.  However, Plan participants could not acquire Southern stock via the SDO.

62.    In a letter to Plan participants dated September 3, 2003 from Southern's Human Resources department, Plan participants were informed that (i) Mirant had filed for bankruptcy, and (ii) Mirant stock was delisted from the New York Stock Exchange.[14]  Plan participants were also notified that they retained the right to hold or sell their shares of Mirant stock and that ML had waived the commissions it charged on sales of Mirant stock within the Plan.  Absent from this notification was the fact that the Mirant plans[15] had liquidated their holdings of Mirant stock on July 22, 2003.  Plaintiff believes and alleges that, to date, the Plan

---

[14]  *See* September 3, 2003 letter to Plan Participants ("September 2003 letter"), attached hereto as Exhibit E.

[15]  These plans were the Mirant Services Employee Savings Plan (the "Mirant Savings Plan") and Mirant Services Bargaining Unit Employee Savings Plan (the "Mirant Bargaining Unit Plan") respectively.  These were the plans that were created when employees of Southern Energy Resources became ineligible to participate in the Southern Company's Plan.

still holds Mirant stock.

## CLASS ACTION ALLEGATIONS

63.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between April 2, 2001 and the Present (the "Class Period") and whose accounts held Mirant stock.

64.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.[16]

65.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

---

[16]  According to the Plan's 2001 Form 5500, there were 28,805 Plan participants as of December 31, 2001.

b.      whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

c.      whether Defendants violated ERISA; and

d.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

66.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

67.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

68.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to

protect their interests.

69.     Class action status is also warranted under the other subsections of Rule 23(b) because:  (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' FIDUCIARY STATUS

70.     *Named Fiduciaries*  ERISA requires every plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  According to the Plan, the ESP Committee is the "named fiduciary" of the Plan. *See* Plan § 13.5.

71.     *De Facto Fiduciaries*  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions.   ERISA  § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i) (stating that a person is a fiduciary "to the extent…he exercises any

discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets....").

72.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its participants under ERISA in the manner and to the extent set forth in the Plan Document, through their conduct, and under ERISA.    As fiduciaries, Defendants were required by ERISA §§ 404(a)(1), 29 U.S.C. §§ 1104(a)(1) to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

73.    Plaintiff does not allege that each Defendant was a fiduciary with respect to *all* aspects of Plan management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

31

74.     In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

75.     Other than with respect to the Trustee and investment manager, ML, instead of delegating fiduciary responsibility for the Plan to external service providers, Southern and SCS chose to comply with the requirements of § 402(a)(1) by internalizing the fiduciary function as set forth below.

**A.     Southern & SCS**

76.     Southern administered the Plan through its employees who all, via their position with the Company, exercised discretionary authority or discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or exercised authority or control with respect to the management of the Plan's assets. The Company appointed the persons who served in the following high-level corporate positions with Southern to positions on the either the ESP Committee or PFIRC: CFO (member of PFIRC); Vice President, System Compensation and Benefits, of the Southern Company (member of ESP Committee); Senior Vice-

32

President, Human Resources of the Southern Company (chairman of ESP Committee); and Comptroller of the Southern Company (member of ESP Committee). Further, the Chairmen and CEOs of Southern during the Class Period (Defendants Franklin and Ratcliffe) were also members of SCS's Board during the Class Period.

77.     Hence, Southern was responsible for appointing, removing, and, thus, monitoring the ESP Committee. Further, Southern, at all applicable times, exercised control over the activities of its officers and employees that performed fiduciary functions with respect to the Plan, including the ESP Committee, and could hire, terminate, and replace such employees at will. Thus, Southern is responsible for the activities of its officers and employees through principles of agency and *respondeat superior* liability.

78.     Further, through its employees, Southern exercised responsibility for communicating with Plan participants regarding the Plan and Plan assets. *See, e.g.,* SPD (regarding fund information, "Southern Company will communicate any changes before the change takes effect").

79.     As previously stated, SCS is the Plan's sponsor. SCS, through its Board of Directors, acting on behalf of SCS, was responsible for appointing, removing, and, thus, monitoring, the Trustee. *See* Plan §§ 14.7, 2.17. Further, to

the extent that other Defendants acted in the course and scope of their employment with SCS in the conduct giving rise to liability hereunder, SCS is liable for the actions of such other Defendants under the doctrine of *respondeat superior*.

80.     According to the Trust Agreement, in the event that a Named Investment Fiduciary is "not named or provided for in the Plan or if so named or provided for, is not then serving, ***the Employer shall be the…Named Investment Fiduciary***…." Employer is defined as SCS. *See* Trust Agreement at 1.

81.     Consequently, Southern and SCS were fiduciaries of the Plan in that they exercised discretionary authority or management of the administration of the Plan and/or exercised authority or control over the Plan's assets.

## B.     Director Defendants

82.     As stated above, SCS relies on its Board of Directors to carry out its Plan-related fiduciary functions.     As a result, the Director Defendants are functional fiduciaries of the Plan under ERISA.   However, the Board's role is not purely derivative of SCS.   To the contrary, the Board itself was assigned and exercised fiduciary responsibility for the Plan and Plan assets.   Specifically, SCS' Board exercises responsibility for the appointment, removal, and, thus, monitoring of the Trustee.

83.     Further, according to the Board meeting minutes produced by

Defendants, the PFIRC was required to at a minimum report annually to the Audit Committee of the Board of Directors of SCS any actions/recommendations needed regarding the funding policy for the Plan.  Hence, SCS' Board had a supervisory role over the PFIRC.[17]

84.    Consequently, the Director Defendants were fiduciaries of the Plan in that they exercised discretionary authority or management of the administration of the Plan and/or exercised authority or control over the Plan's assets.

## C.    ESP Committee Defendants

85.    As previously stated, according to the Plan documents, "the Committee shall be deemed the administrator of the Plan as the term 'administrator' is defined in ERISA, and the Committee shall be, with respect to the Plan, a *named fiduciary* as that term is defined in ERISA."  Plan at § 13.5 (emphasis added).  The ESP Committee was tasked with the "duty to administer the Plan" and had the "discretionary authority, power, and duty to take all actions and to make all decisions necessary or proper to carry out the Plan and to control and manage the operation and administration of the Plan." *Id.* at § 13.4.

86.    Hence, the ESP Committee Defendants possessed the authority to take action to protect the Plan against losses due to the Plan's imprudent investment in

---

[17]  The degree of this supervisory role and the members of the Audit Committee of SCS's Board

Mirant stock.   Indeed, the Plan specifically authorizes the ESP Committee to "appoint an independent fiduciary to carry out such actions [that] . . . involve the potential for undue influence on Participants with regard to . . . Company stock." *Id.* at § 8.7.

87.    Furthermore, the ESP Committee was responsible for communicating with participants, and providing participants with information and materials required by the Plan and ERISA. *See* Plan at § 13.9.

88.    Consequently, the ESP Committee Defendants were fiduciaries of the Plan in that they exercised discretionary authority or management of the administration of the Plan.

**D.    PFIRC Defendants**

89.    The Plan Document states that "[t]he Investment Funds shall be selected from time to time by the Pension Fund Investment Review Committee of the Southern Company System."    Plan at § 8.1.    In connection with its responsibility for selecting Plan investments, the PFIRC Defendants possessed and exercised authority to evaluate the merits and performance of the Plan's investment options, and under appropriate circumstances, eliminate options that were unduly risky, inappropriate, and imprudent, including the Mirant Stock Fund.   Indeed, the

---

is not presently known to Plaintiff and can only be ascertained through discovery.

SPD specifically states "investment options previously listed will change upon recommendation of Southern Company's Pension Fund Investment Review Committee (PFIRC)." Further, the November 2002 letter (Exhibit B), notifies Plan participants that the investment options available under the new SDO, including Mirant stock, were chosen by the PFIRC.

90.    According to the Trust Agreement, the "Named Investment Fiduciary" listed as a named fiduciary of the Plan in the Trust Agreement (*see* Trust Agreement § 2) is the PFIRC. *See also* Plan §§ 8.1, 13.13 (identifying the PFIRC as the investment fiduciary under the Plan). Further, the PFIRC is "responsible for the investment and management of the Plan assets to the extent provided for in this Trust Agreement." *See* Trust Agreement at § 2.01

91.    To this extent, the PFIRC exercised responsibility for evaluating the merits of the Plan's investments, determining the suitability of the investments for participants' retirement savings, eliminating inappropriate and unduly risky investments, directing the Trustee regarding the investment of Plan assets, and, generally, ensuring that the Plan's assets were invested prudently. Thus, PFIRC exercised authority and control with respect to the management and disposition of the Plan's assets.

92.    Moreover, the PFIRC is responsible for the appointment of – and, thus

corresponding duty to monitor – an investment advisor/investment manager who shall be at least partially responsible for the management of Plan assets. *See* Plan at § 13.14.

93.     Consequently, the PFIRC Defendants were fiduciaries of the Plan in that they exercised discretionary authority or management of the administration of the Plan and/or exercised authority or control over the Plan's assets.

**E.     Trustee Defendant**

94.     ML served as the Trustee for the Plan, and in the Trust Agreement acknowledges its status as a Fiduciary of the Plan. *See* Trust Agreement § 6.03.

95.     Trustees that invest assets pursuant to the direction of other Named Fiduciaries are required to act prudently based on what they know or should know about the investments at issue, and disregard directions that are contrary to the Plan or ERISA. *See* ERISA § 403(a)(1), 29 U.S.C. § 1103(a)(1) (providing that a trustee that acts pursuant to the direction of a named fiduciary "shall be subject to ***proper*** directions of such fiduciary which are made in accordance with the terms of the plan and which are ***not contrary*** [to ERISA]") (emphasis added); *see also* ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) (providing fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with

the provisions of [ERISA]").

96.    The Trust Agreement reflects this requirement in that it states: "*Except as required by ERISA*, the Trustee shall invest the Trust Fund as directed by the Named Investment Fiduciary, an Investment Manager or a Plan participant or beneficiary, as the case may be...." Trust Agreement § 5.01. Thus, in this case, even if subject to the direction of other Named Fiduciaries, ML's responsibility to follow the directions of others was *subject* to ERISA's requirements. Accordingly, ML had discretion under ERISA to disregard investment directions that it knew or should have known were contrary to ERISA, such as to make or maintain investment in Mirant stock when it no longer was a prudent investment option for the Plan, or under circumstances that indicated that the Plan's fiduciaries failed to properly investigate the prudence of maintaining the Plan's investment in Mirant stock.

97.    In addition, whether as the primary investment fiduciary, or as a trustee that acted pursuant to the direction of other Named Fiduciaries, the Trust Agreement provides ML with other important discretionary authority, including the express authority to "limit the categories of assets in which the Trust Fund may be invested." Trust Agreement § 5.01. Thus, ML had the authority to eliminate the Mirant Stock Fund as an investment option within the Plan. In addition, the

Trust Agreement states that ML is authorized and empowered "generally to do all other acts which the Trustee deems necessary or appropriate for the protection of the Trust Fund." *Id.* § 7.02(d). This necessarily included divesting the Plan of its imprudent holdings of Mirant stock.

98.     As previously stated, ML "assist[s] in the administration of the [Plan]." *See* para. ___ *supra*.

99.     Consequently, ML was a fiduciary of the Plan in that it exercised discretionary authority with respect to the Plan and Plan assets, and authority and control with respect to the management and disposition of the Plan's assets.

100.     Further, ML was a fiduciary of the Plan in that it served as the Plan's investment manager, including for the Plan's holdings of Mirant stock. *See* November 2002 letter, Exhibit B. As previously stated, this alone confers fiduciary status on ML in that it rendered investment advice for a fee. *See* ERISA § 3(21)(A)(ii).

## MIRANT STOCK WAS AN IMPRUDENT PLAN INVESTMENT

**A.     The Mirant Spin-off**

101.     As detailed below, the Mirant Corporation was the (dead) end-result of a corporate divestment strategy undertaken by Southern, Mirant's former parent.

102.     In the early 1980's, as a vehicle for circumventing government